CONNECTICUT COALITION FOR JUSTICE IN
EDUCATION FUNDING, INC., ET AL. *v.*
GOVERNOR M. JODI RELL ET AL.
(SC 18032)

Norcott, Katz, Palmer, Vertefeuille, Zarella, Schaller and McLachlan, Js.*

* This case originally was argued before a panel of this court consisting of Justices Norcott, Katz, Palmer, Zarella and Schaller. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices Vertefeuille and McLachlan were added to the panel, and they have read the record, briefs and transcript of oral argument.

The listing of justices reflects their seniority status as of the date of oral argument.

Argued April 22, 2008—officially released March 30, 2010

Neil Weare and David Noah, certified legal interns, with whom were Robert A. Solomon and Robin Golden, for the appellants (plaintiffs).

Gregory T. D'Auria, associate attorney general, with whom were Clare E. Kindall and Robert J. Deichert, assistant attorneys general, and, on the brief, Richard Blumenthal, attorney general, for the appellees (defendants).

Erika L. Amarante and Michael A. Rebell filed a brief for the Campaign for Educational Equity et al. as amici curiae.

Steven D. Ecker filed a brief for the Workforce Alliance et al. as amici curiae.

Robert M. DeCrescenzo filed a brief for the Connecticut Conference of Municipalities et al. as amici curiae.

Linda L. Morkan, Ndidi N. Moses and Nicole A. Bernabo filed a brief for One Connecticut as amicus curiae.

John C. Brittain, Jennifer Mullen St. Hilaire and Emily A. Gianquinto filed a brief for the Connecticut State Conference NAACP et al. as amici curiae.

David N. Rosen filed a brief for Christopher Collier and Simon J. Bernstein as amici curiae.

*Opinion*

NORCOTT, J. It is by now well established that, under the constitution of Connecticut, the state must " 'provide a substantially equal educational opportunity to its youth in its free public elementary and secondary schools' "; *Horton* v. *Meskill*, 172 Conn. 615, 649, 376 A.2d 359 (1977) (*Horton I*); and that this court has a role in ensuring that our state's public school students receive that fundamental guarantee. See *Sheff* v. *O'Neill*,

238 Conn. 1, 45–46, 678 A.2d 1267 (1996). In this public interest appeal, we consider whether article eighth, § 1, of the constitution of Connecticut[1] also guarantees students in our state's public schools the right to a particular minimum quality of education, namely, suitable educational opportunities. The plaintiffs, the Connecticut Coalition for Justice in Education Funding, Inc.,[2] and numerous parents and their children, who are enrolled in public schools across the state,[3] appeal, upon a grant of certification by the Chief Justice pursuant to General Statutes § 52-265a,[4] from the judgment

[1] Article eighth, § 1, of the constitution of Connecticut provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

[2] We note that the trial court granted the defendants' motion to dismiss the claims of the named plaintiff, the Connecticut Coalition for Justice in Education Funding, Inc., after concluding that it lacked representational standing under *Connecticut Assn. of Health Care Facilities, Inc.* v. *Worrell*, 199 Conn. 609, 616, 508 A.2d 743 (1986). Specifically, the trial court determined that it could not determine from the pleadings that the parents who are alleged to be members of the named plaintiff are in fact the parents of children in Connecticut's public schools. Thereafter, the trial court granted the plaintiffs' motion, filed pursuant to Practice Book § 10-60, to amend the operative complaint to cure this jurisdictional defect and to permit the named plaintiff to participate in these proceedings.

[3] The individual plaintiffs in this case are: (1) Nekita Carroll-Hall, who resides in Bridgeport with her children Ana-Simone Hall and Jacob Hall; (2) Marta Calderon, who resides in Bridgeport with her grandson Angel Calderon; (3) Richard Molinaro, who resides in Danbury with his granddaughter Jada Mourning; (4) Sherry Major, who resides in Willimantic with her sons Joseph Major and James Major; (5) Nancy Diaz, who resides in Hartford with her son Joshua Diaz; (6) Glenny Pentino, who resides in New Haven with her daughter Quintana Riveras; (7) Lawrence Porter, who resides in East Hartford with his children Katelyn Porter and Sean Porter; (8) Maria Santiago, who resides in New London with her daughter Carimarie Colon; (9) Donna Finnemore, who resides in Plainfield with her sons Benjamin Wisniewski, Brandon Wisniewski and Brian Wisniewski; and (10) Juana Feliciano, who resides in New Britain with her sons Christian Alvarado and Victor Alvarado. We note, however, that Porter, Santiago, Feliciano and their children are no longer involved in this appeal.

[4] Chief Justice Rogers granted the plaintiffs' petition for certification of an immediate expedited appeal pursuant to General Statutes § 52-265a, which provides in relevant part: "(a) Notwithstanding the provisions of sections

of the trial court granting the motion of the defendants, various state officials and members of the state board of education,[5] to strike counts one, two and four of the plaintiffs' amended complaint.[6] Having determined that the plaintiffs' claims are justiciable because they do not present a political question, we conclude that article eighth, § 1, of the Connecticut constitution guarantees Connecticut's public school students educational standards and resources suitable to participate in democratic institutions, and to prepare them to attain

52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice. . . ."

[5] The defendants in this case are named only in their official capacities and are: (1) Governor M. Jodi Rell or her successor; (2) Mark K. McQuillan, successor to Betty J. Sternberg as commissioner of education; (3) Allan B. Taylor, Beverly Bobroske, Donald J. Coolican, Lynne S. Farrell, Janet M. Finneran, Theresa Hopkins-Staten, Timothy J. McDonald, Patricia B. Luke, Alice L. Carolan and John H. Foss or their successors on the state board of education; (4) Treasurer Denise L. Nappier or her successor; and (5) Comptroller Nancy S. Wyman or her successor.

[6] After the trial court granted the defendants' motion to strike counts one, two and four of the amended complaint, it granted the plaintiffs' motion for written permission to appeal from the judgment on those counts pursuant to Practice Book § 61-4 (a), which permits an appeal from a trial court decision "that disposes of at least one cause of action where the judgment does not dispose of either of the following: (1) an entire complaint, counterclaim, or cross complaint, or (2) all the causes of action in a complaint, counterclaim or cross complaint brought by or against a party . . . [upon] a written determination that the issues resolved by the judgment are of such significance to the determination of the outcome of the case that the delay incident to the appeal would be justified, and the chief justice or chief judge of the court having appellate jurisdiction concurs. . . ." Rather than appealing from that judgment to the Appellate Court, the plaintiffs filed a petition pursuant to § 52-265a seeking certification of an immediate expedited appeal to this court, which Chief Justice Rogers granted on October 31, 2007. See footnote 4 of this opinion.

productive employment and otherwise to contribute to the state's economy, or to progress on to higher education. Accordingly, we reverse the judgment of the trial court.

The record reveals the following relevant facts, as alleged in the operative complaint and construed in the manner most favorable to the pleader; see, e.g., *Violano* v. *Fernandez*, 280 Conn. 310, 317–18, 907 A.2d 1188 (2006); and procedural history. The individual plaintiffs' children attend public schools in Bridgeport, Danbury, Windham, Hartford, New Haven, East Hartford, New London, Plainfield and New Britain. The plaintiffs allege that the state has failed to provide their children with "suitable and substantially equal educational opportunities" because of inadequate and unequal inputs, which "are essential components of a suitable educational opportunity," namely: (1) high quality preschool; (2) appropriate class sizes; (3) programs and services for at-risk students; (4) highly qualified administrators and teachers; (5) modern and adequate libraries; (6) modern technology and appropriate instruction; (7) an adequate number of hours of instruction; (8) a rigorous curriculum with a wide breadth of courses; (9) modern and appropriate textbooks; (10) a school environment that is healthy, safe, well maintained and conducive to learning; (11) adequate special needs services pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq.; (12) appropriate career and academic counseling; and (13) suitably run extracurricular activities. These inputs have been recognized by the state board of education in various "[p]osition [s]tatements" as "necessary components of a suitable educational opportunity."

The availability and quality of these essential inputs vary significantly in schools across the state, as demonstrated by statistics from the 2003–2004 school year cited by the plaintiffs. For example, at the Lincoln Ele-

mentary School (Lincoln) in New Britain, 50 percent of the kindergarten students attended preschool, nursery school or Head Start, as compared to 76 percent statewide. None of the computers at Lincoln are high or moderate powered, in comparison to the statewide average of 63 percent. Lincoln's library has ninety non-print materials, as compared to an average of 395 elsewhere in the state. At Lincoln, 68 percent of the teachers have a master's degree, in comparison to 80 percent statewide. Finally, although numerous students at Lincoln perform poorly in mathematics, the school does not offer pull-out remedial instruction or in-class tutorials in that subject.[7]

At the Roosevelt School in Bridgeport, which includes grades kindergarten through eight, 61 percent of the kindergarten students have attended preschool or Head Start, as compared with 76 percent statewide. The average size for a kindergarten class is twenty-six students there, as compared with nineteen statewide. For a seventh grade class, the average size is thirty students, as compared with twenty-two statewide. The library has nine print volumes per student, in comparison to twenty volumes per student statewide, and thirty-seven nonprint materials, as compared to 324 statewide. The library does not subscribe to any periodicals, while the average kindergarten through eighth grade school subscribes to fifteen periodicals. Roosevelt School does not offer any computer education instruction, while other schools statewide provide an average of eighteen hours per year. Roosevelt School also does not provide any world language instruction, while 66 percent of the kindergarten through eighth grade schools statewide

---

[7] The plaintiffs also make similar allegations with respect to the South Street Elementary School in Danbury, and emphasize that its library has seventeen print volumes per student, as compared to twenty-five statewide, and the school provides 966 hours of instruction per year, as compared to 985 statewide.

do provide such instruction. Finally, each counselor at the Roosevelt School works with 438 students, in comparison to the statewide average of 265.

At the high school level, for example, Plainfield High School does not offer pull-out remedial instruction, in-class tutorials, after school programs, or summer school in mathematics or language arts, despite the fact that numerous students performed poorly in those subjects. Students at Plainfield High School took advanced place-ment tests in five courses, in comparison to the state-wide average of nearly ten such courses. Finally, several dedicated specialty areas of Plainfield High School are in poor physical condition, including the all-purpose room, cafeteria, outdoor athletic facilities, educational technology and office/administrative space.[8]

As evidence of the state's failure to provide "suitable educational opportunities," the plaintiffs further rely on educational "outputs" from the previously discussed schools, as measured by the "adequate yearly progress" on student achievement tests required under the federal No Child Left Behind Act; 20 U.S.C. § 6301 et seq.; including the Connecticut Mastery Test and the Con-necticut Academic Performance Test.[9] Indeed, students in these schools failed to complete essential courses, such as chemistry and algebra I, at a rate exceeding

---

[8] Similarly, East Hartford High School does not provide any pull-out reme-dial instruction or in-class tutorial instruction in mathematics and language arts, despite having numerous students who performed poorly in those subjects. East Hartford High School has 6.9 students per academic computer, in comparison to the statewide average of 3.3. Finally, 29 percent of East Hartford High School's computers are moderate or high powered, in compari-son to the state average of 77 percent.

[9] For example, the fourth grade plaintiff students at the Lincoln, South Street and Roosevelt Schools, in New Britain, Danbury and Bridgeport respectively, tested significantly below the 2004 state averages for "goal" and "proficiency" on the Connecticut Mastery Test for mathematics and reading. The plaintiffs make similar claims with respect to the Plainfield and East Hartford tenth grade students' scores on the Connecticut Academic Performance Test.

the statewide average.[10] The plaintiffs also emphasize the higher than statewide average rates of students at these schools who either are retained or advanced despite not being ready for promotion.[11] Finally, the plaintiffs emphasize the higher than average cumulative dropout rate at these districts' high schools when compared to the statewide average of 10 percent, most notably, Plainfield and Bridgeport's dropout rates of 20 and 45 percent respectively.

The plaintiffs allege that these deficiencies are the product of a flawed educational funding system that has failed to provide and "effectively [manage]" the resources necessary to ensure suitable and substantially equal educational opportunities in the public schools, which are state agencies managed by local school districts. Specifically, schools are funded by two sources, namely, local property taxes and state grants to municipalities via the educational cost sharing system pursuant to General Statutes § 10-262f et seq. Although the state board of education has taken the position that the state and municipalities should bear the costs of education equally, the educational cost sharing system grants have accounted for only 39 percent of school funding in Connecticut. The plaintiffs attribute this shortfall to: (1) the legislature's failure to raise the "foundation" grant amount from $5891 since 1999; see

---

[10] The statewide average rates of completion for algebra I, chemistry and three or more credits in science are 90, 69 and 85 percent respectively. The respective percentages of East Hartford High School graduates who have completed those courses are 56, 42 and 57 percent. The respective percentages of Plainfield High School graduates who have completed those courses are 76, 43 and 74 percent.

[11] For example, although 47 percent of the fourth grade students at Lincoln scored below proficiency in math, and 66 percent scored below proficiency in reading, 99.8 percent of the school's students were promoted to the next grade level. In contrast, Roosevelt School exhibited a rate of retention more than double that of the state average. Similarly, 16.7 percent of students at the East Hartford and Plainfield High Schools were retained, a rate more than triple that of the statewide average.

General Statutes (Rev. to 2007) § 10-262f (9) (G);[12] (2) the failure of that "foundation" amount to account for the "actual costs of providing special education students with suitable and substantially equal educational opportunities"; and (3) the failure of "the minimum base aid ratio"; see General Statutes (Rev. to 2007) § 10-262f (2);[13] which addresses a municipality's ability to pay and to calculate accurately a town's ability to raise the necessary funds. The plaintiffs reside in communities that "do not have the ability to raise the funds needed to compensate for the monetary shortfalls that result from the state's arbitrary and inadequate funding system."

The plaintiffs claim further that the state's failure to provide them with suitable and substantially equal educational opportunities has caused them irreparable

---

[12] General Statutes (Rev. to 2007) § 10-262f (9) provides in relevant part: " 'Foundation' means . . . (G) for the fiscal years ending June 30, 2000, to June 30, 2007, inclusive, five thousand eight hundred ninety-one dollars."

We note, however, that No. 07-3, § 61 (9), of the 2007 Public Acts amended § 10-262f (9) by adding a new subparagraph (H) to increase the foundation amount, and that General Statutes § 10-262f (9) (H) now provides in relevant part: " 'Foundation' means . . . for the fiscal years ending June 30, 2008, to June 30, 2012, inclusive, nine thousand six hundred eighty-seven dollars." We take no position as to whether this statutory change suffices to address the problems complained of by the plaintiffs herein.

[13] General Statutes (Rev. to 2007) § 10-262f (2) provides: " 'Base aid ratio' means one minus the ratio of a town's wealth to the state guaranteed wealth level, provided no town's aid ratio shall be less than six one-hundredths."

We note, however, that No. 07-3, § 61 (2), of the 2007 Public Acts amended § 10-262f (2), and General Statutes § 10-262f (2) now provides: " 'Base aid ratio' means one minus the ratio of a town's wealth to the state guaranteed wealth level, provided no town's aid ratio shall be less than nine one-hundredths, except for towns which rank from one to twenty when all towns are ranked in descending order from one to one hundred sixty-nine based on the ratio of the number of children below poverty to the number of children age five to seventeen, inclusive, the town's aid ratio shall not be less than thirteen one-hundredths when based on data used to determine the grants pursuant to section 10-262h for the fiscal year ending June 30, 2008." We take no position as to whether this statutory change suffices to address the problems complained of by the plaintiffs herein.

harm by rendering them "unable to take full advantage of the country's democratic processes and institutions, risking political and social marginalization." The plaintiffs also claim that these deficiencies will preclude them from being "competitive in seeking meaningful employment" and will leave them "less able to reap both the tangible and intangible benefits, including the salary, health benefits, and self-realization that come with securing a dependable and adequately paying job." The plaintiffs contend that the deficiencies will leave them "unable to continue their education" and "deprived of both the monetary and intellectual rewards that are associated with [higher] education." In sum, the plaintiffs claim that they are being educated "in a system which sets them up for economic, social, and intellectual failure."

Accordingly, in their four count complaint, the plaintiffs claim that the state has violated: (1) article eighth, § 1, and article first, §§ 1 and 20, of the state constitution by "failing to maintain a public school system that provides [them] with suitable and substantially equal educational opportunities"; (2) article eighth, § 1, of the state constitution by "failing to maintain a public school system that provides [them] with suitable educational opportunities"; (3) article eighth, § 1, and article first, §§ 1 and 20, of the state constitution by "failing to maintain a public school system that provides [them] with substantially equal educational opportunities"; and (4) article eighth, § 1, and article first, §§ 1 and 20, of the state constitution, as well as 42 U.S.C. § 1983, by acting under color of state law in "fail[ing] to maintain a public school system that provides [them] with suitable and substantially equal educational opportunities," which has disproportionately impacted African-American, Latino and other minority students. The plaintiffs seek a judgment declaring that: (1) they "have a right to receive suitable and substantially equal educational opportuni-

ties as a matter of state constitutional law"; (2) "the state's failure to provide suitable and substantially equal educational opportunities violates article eighth, § 1, and article first, §§ 1 and 20, of the [state] constitution"; and (3) the "existing school funding system is unconstitutional, void and without effect." The plaintiffs also seek, inter alia, injunctions against the continued operation of the present funding system except in transition to a court-ordered and newly created constitutional funding system, as well as the appointment of a special master, and an award of reasonable attorney's fees.

Thereafter, the defendants moved to strike the first, second and fourth counts of the complaint, arguing that article eighth, § 1, and article first, §§ 1 and 20, of the state constitution do not confer a right to "suitable" educational opportunities, and in particular, do not "guarantee equality or parity of educational achievement or results."[14] In addressing the defendants' motion to strike, the trial court first concluded that it had subject matter jurisdiction because the plaintiffs' claims were justiciable under *Sheff* v. *O'Neill*, supra, 238 Conn. 1, and *Horton I*, supra, 172 Conn. 615. The trial court, applying the well established state constitutional analysis of *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), concluded that the language of the state constitution did not support the plaintiffs' claim to a right to a suitable public education, and that the decisions of this court, including *Broadley* v. *Board of Education*, 229 Conn. 1, 639 A.2d 502 (1994), have demonstrated its "reluctance to insert itself into educational policy decisions in the absence of clear constitutional or legislative authority to do so." The trial court also concluded that federal precedents did not support the plaintiffs'

---

[14] The defendants conceded before the trial court that count three of the plaintiffs' complaint, which alleges only that the plaintiffs have been denied "substantially equal" educational opportunities, states a viable cause of action under *Horton I*, supra, 172 Conn. 615.

claim, and that those state courts that have found "some qualitative content in their state constitution's educational clauses . . . have done so on the basis of language substantially different than Connecticut's."[15] Accordingly, the trial court concluded that there is no "constitutional right to 'suitable' educational opportunities."[16] The trial court rendered judgment striking counts one, two and four of the complaint, and this appeal followed. See footnotes 4 and 6 of this opinion.

"We begin by setting out the well established standard of review in an appeal from the granting of a motion to strike. Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on the [defendants' motion] is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in

[15] The trial court also rejected the plaintiffs' reliance on remarks at the 1965 constitutional convention proceedings by Simon J. Bernstein, the proponent of article eighth, § 1, of the state constitution as "far too slender a reed" to support their claims, and concluded that, although public policy supported the "notion of a suitable education as a fundamental right," it was deterred by prudential concerns about judicial intrusion into public education policy set by state and local legislative bodies.

[16] Citing Justice Loiselle's dissenting opinion in *Horton I*, supra, 172 Conn. 658–59, the trial court emphasized, however, that courts cannot "abdicate their duty to give strict scrutiny to executive and legislative efforts to comply with the constitutional mandate to provide free education," and stated that, it could "well imagine situations where state or local authorities might seek to eliminate, cut back or restrict programs in such a way that the ability of children in the state or a particular town or region to receive an education would be endangered." The trial court also noted that there might well be a *statutory* right to a "suitable" education under General Statutes § 10-4a, but did not develop this point further.

determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Violano* v. *Fernandez*, supra, 280 Conn. 317–18.

I

Because it implicates our subject matter jurisdiction, we begin with the defendants' contention that the trial court improperly concluded that this case is justiciable, and does not present a political question.[17] The defendants argue that the trial court improperly relied on *Sheff* v. *O'Neill*, supra, 238 Conn. 1, and *Horton I*, supra, 172 Conn. 615, in concluding that the plaintiffs' claims are justiciable because those cases involved educational equality claims, while this case presents questions of educational policy that are distinctly committed to coordinate branches of government. The defendants further contend that, under the well established political question analysis of *Baker* v. *Carr*, 369 U.S. 186, 211, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); see, e.g., *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 573, 858 A.2d 709 (2004); the plaintiffs' claims present questions that are textually committed to the legislative branch, not readily evaluated under "judicially discoverable and manageable standards," and

[17] We note that the defendants did not raise the justiciability issue as an alternate ground for affirmance pursuant to Practice Book § 63-4 (a) (1), or file a cross appeal from the trial court's justiciability ruling pursuant to Practice Book § 61-8. Nevertheless, we consider this issue on its merits because it implicates our subject matter jurisdiction and, therefore, may be raised at any time. See, e.g., *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 569, 858 A.2d 709 (2004). Moreover, the plaintiffs have not been prejudiced by the defendants' late raising of the justiciability issue on appeal because that question was argued extensively before the trial court, and we granted the plaintiffs' motion for permission to file an overlong reply brief to respond to the defendants' arguments.

would require this court to act improperly as a "super legislature" to address educational policy in the first instance. In response, the plaintiffs contend that we rejected these same arguments in *Sheff*, and that their claims do not require the courts to mandate particular educational policies. They contend that their claims need only be evaluated under the "totality of the circumstances," which would compare the facts as found to a variety of indicators and inputs, none of which needs to be constitutionalized individually. The plaintiffs also emphasize the standard for considering motions to dismiss or to strike, which requires their allegations to be viewed in the light most favorable to the pleader. The plaintiffs further rely on *Seymour* v. *Region One Board of Education*, 261 Conn. 475, 482–84, 803 A.2d 318 (2002), in which we considered the plaintiffs' claims justiciable because formulation of the appropriate remedy could be left to the legislative branch in the first instance. We agree with the plaintiffs, and conclude that their claims do not present a nonjusticiable political question.

"We first set forth the fundamental principles that underlie justiciability. Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . As we have recognized, justiciability comprises several related doctrines, namely, standing, ripeness, mootness and the political question doctrine, that implicate a court's subject matter jurisdiction and its competency to adjudicate a particular matter. . . . Finally, because an issue

regarding justiciability raises a question of law, our appellate review is plenary." (Citations omitted; internal quotation marks omitted.) *Office of the Governor* v. *Select Committee of Inquiry*, supra, 271 Conn. 568–69.

"The political question doctrine itself is based on the principle of separation of powers . . . as well as the notion that the judiciary should not involve itself in matters that have been committed to the executive and legislative branches of government. To conclude that an issue is within the political question doctrine is not an abdication of judicial responsibility; rather, it is a recognition that the tools with which a court can work, the data which it can fairly appraise, the conclusions which it can reach as a basis for entering judgments, have limits. . . . Whether a controversy so directly implicates the primary authority of the legislative or executive branch, such that a court is not the proper forum for its resolution, is a determination that must be made on a case-by-case inquiry." (Citations omitted; internal quotation marks omitted.) Id., 572–73.

Following *Baker* v. *Carr*, supra, 369 U.S. 211, "[i]n considering whether a particular subject matter presents a nonjusticiable political question, we have articulated [six] relevant factors, including: a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. Unless one of these formulations is inextricable from the case at bar, there

should be no dismissal for nonjusticiability on the ground of a political question's presence. . . . Furthermore, simply because the case has a connection to the political sphere [is not] an independent basis for characterizing an issue as a political question . . . ." (Internal quotation marks omitted.) *Office of the Governor* v. *Select Committee of Inquiry*, supra, 271 Conn. 573. Indeed, "the principle that a case should not be dismissed for nonjusticiability as a political question unless an unusual need for unquestioned adherence to that decision is inextricable from the case, means that courts should view such cases with a heavy thumb on the side of justiciability, and with the recognition that, simply because the case is connected to the political sphere, it does not necessarily follow that it is a political question." *Seymour* v. *Region One Board of Education*, supra, 261 Conn. 488.

We agree with the plaintiffs that our decision in *Sheff* v. *O'Neill*, supra, 238 Conn. 1, controls the justiciability issue in this appeal. In that case, the plaintiff schoolchildren had claimed, inter alia, that the state "defendants bear responsibility for the de facto racial and ethnic segregation between Hartford and the surrounding suburban public school districts and thus have deprived the plaintiffs of an equal opportunity to a free public education as required by article first, §§ 1 and 20, and article eighth, § 1." Id., 5. The plaintiffs also alleged "that the defendants have failed to provide the plaintiffs with an equal opportunity to a free public education as required by article first, §§ 1 and 20, and article eighth, § 1, because the defendants have maintained in Hartford a public school district that, by comparison with surrounding suburban public school districts: (1) is severely educationally disadvantaged; (2) fails to provide equal educational opportunities for Hartford schoolchildren; and (3) fails to provide a mini-

mally adequate education for Hartford schoolchildren."
Id., 6.

In *Sheff*, the state contended that the case was a
nonjusticiable political question "expressly and exclu-
sively entrusted to the legislature" by article eighth, § 1;
id., 13; which directs the legislature "to implement this
principle [of free public education] by appropriate legis-
lation." Conn. Const., art. VIII, § 1. Describing the dis-
tinction between cases that are justiciable and those
that are not as an "uneasy line," we emphasized that
"courts do not have jurisdiction to decide cases that
involve matters that textually have been reserved to
the legislature, such as the implementation of a consti-
tutional spending cap . . . or the appointment of addi-
tional judges. . . . In the absence of such a textual
reservation, however, it is the role and the duty of
the judiciary to determine whether the legislature has
fulfilled its affirmative obligations within constitutional
principles. . . . Deciding whether a matter has in any
measure been committed by the [c]onstitution to
another branch of government, or whether the action
of that branch exceeds whatever authority has been
committed, is itself a delicate exercise in constitutional
interpretation, and is a responsibility of this [c]ourt as
ultimate interpreter of the [c]onstitution." (Citations
omitted; internal quotation marks omitted.) *Sheff* v.
*O'Neill*, supra, 238 Conn. 13–14.

In *Sheff*, we emphasized that, in *Horton I*, supra, 172
Conn. 615, "we reviewed, in plenary fashion, the actions
taken by the legislature to fulfill its constitutional obli-
gation to public elementary and secondary school-
children." *Sheff* v. *O'Neill*, supra, 238 Conn. 14. We
emphasized that the "plaintiff schoolchildren in the
present case invoke the same constitutional provisions
to challenge the constitutionality of state action that
the plaintiff schoolchildren invoked in *Horton [I]* . . . .
The text of article eighth, § 1, has not changed. Further-

more, although prudential cautions may shed light on the proper definition of constitutional rights and remedies . . . such cautions do not deprive a court of jurisdiction.

"*In light of these precedents, we are persuaded that the phrase 'appropriate legislation' in article eighth, § 1, does not deprive the courts of the authority to determine what is 'appropriate.'* Just as the legislature has a constitutional duty to fulfill its affirmative obligation to the children who attend the state's public elementary and secondary schools, so the judiciary has a constitutional duty to review whether the legislature has fulfilled its obligation. Considerations of justiciability must be balanced against the principle that every presumption is to be indulged in favor of subject matter jurisdiction. . . . In this case, our precedents compel the conclusion that the balance must be struck in favor of the justiciability of the plaintiffs' complaint."[18] (Citations omitted; emphasis added.) Id., 14–16; see also *Office of the Governor* v. *Select Committee of Inquiry*, supra, 271 Conn. 574 ("[a]lthough the text of our state constitution confers impeachment authority on the legislature . . . that authority is not unbounded and legislative encroachment upon other constitutional principles may, in an appropriate case, be subject to judicial review" [citations omitted]).

---

[18] We note that the justiciability conclusion in *Sheff* was unanimous, as the three dissenters, Justices Borden, Callahan and Palmer, who also subsequently rejected the plaintiffs' claim that their right to a minimally adequate education had been violated, nevertheless found that claim justiciable. See *Sheff* v. *O'Neill*, supra, 238 Conn. 57 (*Borden, J.*, dissenting).

We further disagree with the argument of the defendants and Justice Zarella in his dissenting opinion that the present case is distinguishable for justiciability purposes from *Sheff* and *Horton I* because it is an adequacy of education case, rather than an equality case. Our holding in *Sheff* with respect to article eighth, § 1, does not refer specifically to the constitution's equal protection provisions, and relies expressly on the "appropriate legislation" clause from article eighth, § 1, to justify judicial examination of educational statutes. See *Sheff* v. *O'Neill*, supra, 238 Conn. 15.

In support of his argument that article eighth, § 1, textually commits issues of educational quality to the legislature, Justice Zarella in his dissenting opinion relies on *Nielsen* v. *State*, 236 Conn. 1, 670 A.2d 1288 (1996), which addressed the legislature's responsibility to implement the constitutional spending cap, *Pellegrino* v. *O'Neill*, 193 Conn. 670, 480 A.2d 476, cert. denied, 496 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984) (plurality opinion), wherein the plaintiffs sought this court to direct the appointment of additional trial judges, and *Simmons* v. *Budds*, 165 Conn. 507, 338 A.2d 479 (1973), cert. denied, 416 U.S. 940, 94 S. Ct. 1943, 40 L. Ed. 2d 291 (1974), wherein a professor challenged grading regulations adopted by the University of Connecticut. In our view, Justice Zarella's reliance on these cases is inapposite because the constitutional provisions at issue therein unambiguously confer full authority over the respective subject matter to the legislature, and do not contain qualifying terms such as "appropriate legislation" that imply a judicial role in disputes arising thereunder, particularly when coupled with the word "shall," which itself implies a "constitutional duty" that is "mandatory and judicially enforceable." See *Nielsen* v. *State*, supra, 9–10 (unlike "appropriate legislation" language of article eighth, § 1, language in article third, § 18 [b], requiring legislature to "by law define" terms for constitutional spending cap "by its plain and unambiguous terms, commits *exclusively* to the General Assembly the power to define the spending cap terms and nowhere intimates any role in this process for the judiciary" [emphasis added]); *Pellegrino* v. *O'Neill*, supra, 681 (number of trial judges is textually committed to legislature by provision stating, without qualification that " '[t]he judges of the . . . superior court shall, upon nomination by the governor, be appointed by the general assembly in such manner as shall by law be prescribed' "); *Pellegrino* v. *O'Neill*,

supra, 688 (*Healey, J.,* concurring) (same); *Simmons* v. *Budds,* supra, 514 (although article eighth, § 2, of state constitution contains qualitative " 'excellence' " standard, it also does not have "appropriate legislation" clause of article eighth, § 1);[19] see also R. Levy, "Gunfight at the K-12 Corral: Legislative vs. Judicial Power in the Kansas School Finance Litigation," 54 Kan. L. Rev. 1021, 1051–52 (2006) ("[o]rdinarily, when the term 'shall' is used in a legal document, it is construed as mandatory and judicially enforceable"). Accordingly, Justice Zarella's restrictive view of the constitutional language notwithstanding, the drafters of article eighth, § 1, could have used more restrictive language, had they wished to avert completely the potential involvement of the judiciary in its enforcement and implementation, regardless of the propriety of those legislative acts. Cf. *Nixon* v. *United States,* 506 U.S. 224, 229–31, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993) (claim that Senate improperly delegated impeachment fact-finding to committee was political question because of constitutional language giving Senate " '*sole* [p]ower to try all [i]mpeachments' " [emphasis added]).

Moreover, our subsequent decision in *Seymour* v. *Region One Board of Education,* supra, 261 Conn. 475, demonstrates that at least one of the plaintiffs' desired remedies supports the justiciability of their claims. In *Seymour,* the plaintiffs claimed that General Statutes

---

[19] In particular, we note our specific disagreement with Justice Zarella's reliance on the proposition from *Simmons* v. *Budds,* supra, 165 Conn. 514, that, under article eighth, § 2, of the state constitution, "the constitutional [s]tandard of 'excellence' was not meant to be a wedge for penetration of the educational establishment by judicial intervention in policy decisions." As noted in *Sheff, Simmons* rejected the merits of the plaintiff's attack on the actions of the defendant officials of the University of Connecticut, and was not purely a justiciability holding. See *Sheff* v. *O'Neill,* supra, 238 Conn. 15 n.17. Moreover, as noted previously; see footnote 18 of this opinion; unlike § 1, § 2 of article eighth does not refer to "appropriate legislation," which further distinguishes the higher education clause from the public education clause for purposes of judicial review.

§ 10-51 (b), which provides for the financing of regional school districts, unconstitutionally resulted in higher education costs for property poor towns. Id., 479. In concluding that this claim was justiciable, "we first address[ed] the specific forms of relief that the plaintiffs seek. If we were to construe the complaint as requesting only that a court, having determined that the plaintiffs' constitutional claims are meritorious, order the [school] district to establish itself as a taxing district, and set the taxing powers and standards suggested by the plaintiffs, we would have grave doubts about the justiciability of the claim, as the defendant suggests. In that case, it is very likely that the claim would fall within one or more of the categories of nonjusticiability.

"We do not, however, view the plaintiffs' prayer for relief so narrowly. Although the plaintiffs do seek, in part, such an order from the court, and although the text of the complaint presents such a remedy as the only way to vindicate the plaintiffs' rights, a separate prayer for relief is simply '[t]hat judgment be entered declaring that . . . § 10-51 (b) is unconstitutional on its face and as applied by [the board].' When a complaint is challenged by a motion to dismiss, we view its allegations in the light favorable to the pleader. . . . We see no reason why the same principle should not apply to the prayer for relief. This latter prayer for relief is susceptible of an interpretation that would leave the formulation of the appropriate remedy to the legislative branch, rather than requiring the judicial branch to entangle itself in what probably would be the nonjudicial function of establishing a taxing district. Furthermore, there is precedent for this court, having determined that a particular legislative scheme is unconstitutional, to leave the remedy to the legislative branch, at least initially. . . . We, therefore, consider the question of justiciability on the premise that the plaintiffs seek a declaration of the unconstitutionality

of § 10-51 (b), with the remedy that they propose to be considered by the legislative branch." (Citations omitted.) Id., 483–84; accord M. Besso, *"Sheff v. O'Neill:* The Connecticut Supreme Court at the Bar of Politics," 22 Quinnipiac L. Rev. 165, 210 (2003) (The author noted that the "existing" political question doctrine is "depend[ent] on a linkage between right and remedy," that it "no longer comports with the reality of our constitution in practice," and that "[w]e should expect that the judiciary will declare constitutional principles, when warranted, but should expect no more. We should expect that the court's declaration will be stated with clarity, and with no compromise, because of concerns about complex remedies. And we should expect that realization will come through the operation of politics beyond the court, but always in the shadow of the court's declaration."); see also M. Besso, supra, 211–12 (noting distinction between declaration of right and ordering of remedy, and arguing in favor of "a new role for the court that is at once more active and more restrained").

In the present case, as in *Seymour*, the complaint clearly requests a declaration of a constitutional violation, with the precise remedy being left to the defendants in the first instance. Specifically, the plaintiffs ask that the court "order [the] defendants to create and maintain a public education system that will provide suitable and substantially equal educational opportunities [for the] plaintiffs."[20] This type of relief would not

---

[20] In his dissent, Justice Zarella refers to a report commissioned by the plaintiffs in this case, and relies on it in support of the proposition that, "the inescapable fact . . . is that the plaintiffs are asking this court to order the legislature to rearrange its spending priorities by increasing the annual appropriation for public elementary and secondary education by nearly 92 percent over the present level of funding in order to satisfy the constitutional mandate of providing Connecticut schoolchildren with a suitable education." See Augenblick, Palaich & Associates, Inc., "Estimating the Cost of an Adequate Education in Connecticut" (June, 2005) p. v, available at http://www.schoolfunding.info/states/ct/costingout_ct.php3 (last visited March 9, 2010) (copy contained in the file of this case in Supreme Court clerk's office). We decline to consider this report prematurely in the context of

turn a trial judge into a de facto education superinten-
dent, and supports the plaintiffs' argument that their
claims are justiciable. See also *Horton I*, supra, 172
Conn. 650–51 (This court noted that the trial court prop-
erly "limited its judgments to declaratory ones while
retaining jurisdiction for consideration of the granting
of any consequential relief" because "the fashioning of
a constitutional system for financing elementary and
secondary education in the state is not only the proper
function of the legislative department but its expressly
mandated duty under the provisions of the constitution
of Connecticut, article eighth, § 1. The judicial depart-
ment properly stays its hand to give the legislative
department an opportunity to act.").

With respect to the other *Baker* factors, we first note
that "[t]here are easily discoverable and manageable
judicial standards for determining the merits of the
plaintiffs' claim[s]." *Seymour* v. *Region One Board of
Education*, supra, 261 Conn. 485. Although the plain-
tiffs' claims present a question of first impression in

this appeal. First, this appeal is taken from a motion to strike and our
analysis is, therefore, limited only to those "well-pleaded facts and those
facts necessarily implied from the allegations . . . ." (Internal quotation
marks omitted.) *Violano* v. *Fernandez*, supra, 280 Conn. 317. Moreover, the
content of this report is not subject to judicial notice without an opportunity
for a hearing, because it would constitute adjudicative, rather than legisla-
tive, facts. See *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977)
(describing "distinction between 'legislative facts,' those which help deter-
mine the content of law and policy, and 'adjudicative facts,' facts concerning
the parties and events of a particular case"); compare *Mahoney* v. *Lensink*,
213 Conn. 548, 562 n.20, 569 A.2d 518 (1990) (taking judicial notice of
newspaper article about events that led to enactment of patient bill of rights),
with *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 222–23 n.58,
957 A.2d 407 (2008) (criticizing, in context of quasi-suspect class analysis,
dissent's reliance on opinions expressed in news conference and press
release because, "to infer, on the basis of those opinions, that a gay marriage
bill soon will become law in this state . . . contravenes the prohibition
against appellate factfinding"). At this early stage in this litigation, particu-
larly as no liability has yet been found, we decline to speculate about precise
remedies and their attendant financial consequences.

Connecticut, similar issues with respect to the substantive content of education clauses have been considered by courts in many of our sister states, some of which have articulated standards for determining whether a state's public schools satisfy minimum constitutional requirements. See part II E of this opinion. Although our courts should remain cautious of separation of powers concerns in crafting remedies, should the plaintiffs ultimately succeed in establishing liability at trial, the plaintiffs' claims at this stage present nothing more than a basic question of constitutional interpretation, a task for which this court is well suited.[21] See *Seymour* v. *Region One Board of Education,* supra, 485; see also *Office of the Governor* v. *Select Committee of Inquiry,* supra, 271 Conn. 574 ("[t]here are no special impediments to our ascertainment and application of the standards by which to resolve this challenge; indeed, the matter raises questions of constitutional interpretation that, for more than two centuries, regularly have been reserved for the judiciary"); *Neeley* v. *West Orange-Cove Consolidated Independent School District,* 176 S.W.3d 746, 779 (Tex. 2005) (The court noted that dis-

---

[21] Justice Zarella relies on the specter of the decades old New Jersey education litigation in the long lines of cases stemming from *Robinson* v. *Cahill,* 62 N.J. 473, 303 A.2d 273 (1973), and *Abbott* v. *Burke,* 100 N.J. 269, 495 A.2d 376 (1985), to warn that our conclusion in the present case puts our courts on the precipice of becoming "bogged down for years in endless litigation" occasioned by the lack of "easily identifiable judicial standards by which to measure whether children are receiving a suitable education." Although the judicial remedies implemented in the *Abbott* line of cases are particularly aggressive, and could well raise some separation of powers issues; see also footnote 22 of this opinion; we emphasize that the possibility that a judicially articulated standard may well evolve over time does not render it unworkable, as "[a]ny judicial genesis of a constitutional standard will subsequently undergo a process of development, evolution, and perhaps even revision. To be engaged in the development of constitutional jurisprudence is, by definition, the role of a state supreme court." M. Blanchard, "The New Judicial Federalism: Deference Masquerading as Discourse and the Tyranny of the Locality in State Judicial Review of Education Finance," 60 U. Pitt. L. Rev. 231, 275 (1998).

agreements about the meaning of the constitutional language "are not unique to [the state's education clause]; they persist as to the meanings and applications of due course of law, equal protection, and many other constitutional provisions. Indeed, those provisions have inspired far more litigation than [the state's education clause] . . . .").

Further, deciding the merits of the plaintiffs' claims does not inextricably involve us "in making an initial policy determination of a clearly nonjudicial, discretionary nature. Whenever a court engages in the process of determining whether a statute violates the constitution, matters of policy admittedly enter into the analysis. That does not mean, however, that, in applying the appropriate constitutional standards in the present case, we would be required to make some initial policy determination of a kind clearly for nonjudicial discretion . . . ." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, supra, 261 Conn. 486; see also *Sheff* v. *O'Neill*, supra, 238 Conn. 13 ("it is the role and the duty of the judiciary to determine whether the legislature has fulfilled its affirmative obligations within constitutional principles"). Put differently, deciding the plaintiffs' claims does not put this court in the position of articulating in the first instance, for example, maximum class sizes or minimal technical specifications for classroom computers.[22] See also

---

[22] We view Justice Zarella's reliance on the decades old New Jersey education litigation in the lines of cases stemming from *Robinson* v. *Cahill*, 62 N.J. 473, 303 A.2d 273 (1973), and *Abbott* v. *Burke*, 100 N.J. 269, 495 A.2d 376 (1985), in support of his contention that our decision in this appeal will lead us into a morass of judicial policy making, as premature and as of yet unwarranted. We agree that the *Abbott* line of cases presents a particularly aggressive judicial remedy in the area of education adequacy. For example, in its fifth decision in that line of cases, the New Jersey Supreme Court adopted a ruling directing the state to require its property poor school districts with special needs, to, inter alia: (1) adopt the Success for All and Roots and Wings models of " 'whole-school reform' "; (2) implement full day kindergarten immediately; and (3) provide half day preschool programs. *Abbott* v. *Burke*, 153 N.J. 480, 493, 710 A.2d 450 (1998). Indeed, commentators

*Neeley* v. *West Orange-Cove Consolidated Independent School District*, supra, 176 S.W.3d 779 ("[t]he judiciary's choice is not between complete abstinence from [education clause] issues, and being, in the [s]tate defendants' words, 'the arbiter of education and policy, overseeing such issues as curriculum and testing development, textbook approval, and teacher certification' "). The judicial role is limited to deciding whether certain public educational systems, as presently constituted and funded, satisfy an articulated constitutional standard.[23]

have noted that New Jersey's judicial remedies entail more active court involvement in education policy than do the more deferential approaches of other states, which leave the implementation of reforms to the political branches to be conducted under broader standards articulated by the judicial branch. See J. Chia & S. Seo, "Battle of the Branches: The Separation of Powers Doctrine in State Education Funding Suits," 41 Columbia J.L. & Soc. Probs. 125, 131–36 (2007); P. Trachtenberg, "Beyond Educational Adequacy: Looking Backward and Forward Through the Lens of New Jersey," 4 Stan. J. C.R. & C.L. 411, 412 (2008). We emphasize, however, that liability has not yet been proven in the present case, and it is premature to consider the implications of specific remedies. Indeed, we recognize that separation of powers concerns necessarily will inform the creation of any remedy in this case, should one ultimately be required. Guided by the presumption in favor of subject matter jurisdiction and against unnecessary findings of nonjusticiability; see, e.g., *Seymour* v. *Region One Board of Education*, supra, 261 Conn. 488; we will not let premature, and perhaps unfounded, concerns about the crafting of a remedy deprive the plaintiffs of their day in court. See also footnote 59 of this opinion.

[23] Justice Zarella notes that "student achievement is not merely a function of what takes place at school, but is also influenced by economic, social, cultural and other factors, some unknown and perhaps unknowable, beyond the control of the educational system." Justice Zarella, whose observation has been echoed by, inter alia, President Barack Obama; see footnote 20 of the dissenting opinion; undoubtedly is correct, which counsels against an excessive reliance on outputs such as test scores in assessing whether the state has fulfilled its constitutional obligations. See *Sheff* v. *O'Neill*, supra, 238 Conn. 143–44 (*Borden, J.*, dissenting); see also part II B of this opinion. That said, "[i]n neighborhoods across our country, there are boys and girls with dreams, and a decent education is their only hope of achieving them." President George W. Bush, State of the Union Address (January 28, 2008). Accordingly, we join the majority of the states that have considered this issue; see footnote 24 of this opinion; and do not use the political question doctrine as a way to avoid answering the narrow issue of constitutional interpretation presented by this appeal.

Indeed, "[w]e see nothing in the plaintiffs' claim of unconstitutionality, moreover, that would, if we were to undertake to decide it or if it were found to be meritorious, involve the courts in expressing a lack of due respect for coordinate branches of government." *Seymour* v. *Region One Board of Education*, supra, 261 Conn. 486. We have recognized that, "deciding that a statute is unconstitutional, either on its face or as applied, is a delicate task in any event, and one that the courts perform only if convinced beyond a reasonable doubt of the statute's invalidity. . . . That alone does not mean, however, that, if such a result must be reached on the facts and the law, such a declaration expresses lack of due respect for the legislative branch. Performing such a task simply exemplifies the fundamental judicial burden of determining whether a statute meets constitutional standards." (Citation omitted.) Id.

Whether there is a risk of "multifarious pronouncements by other governmental departments on the question presented by the complaint" is not an inextricable concern. Id., 482. "Simply because the legislature has passed a statute adopting a particular fiscal formula cannot mean that a court may not entertain a constitutional challenge to that formula." Id., 487–88. Thus, "this matter does not present an unusual need for unquestioning adherence to a preexisting political decision. As previously discussed, it is well within the province of the judiciary to determine whether a coordinate branch of government has conducted itself" in accordance with "the authority conferred upon it by the constitution."[24]

---

[24] As we noted in *Sheff*, the vast majority of jurisdictions "overwhelmingly" have concluded that claims that their legislatures have not fulfilled their constitutional responsibilities under their education clauses are justiciable. *Sheff* v. *O'Neill*, supra, 238 Conn. 15 n.18. Indeed, some of the cases cited in *Sheff* are *adequacy* cases that interpret constitutional provisions committing the establishment of public schools to the legislature. See, e.g., *Rose* v. *Council for Better Education, Inc.*, 790 S.W.2d 186, 205, 213–14 (Ky. 1989) (considering adequacy of state's public education system under education clause requiring legislature to, "by appropriate legislation, provide for an

efficient system of common schools"); *McDuffy* v. *Secretary of the Executive Office of Education*, 415 Mass. 545, 606, 610–11, 615 N.E.2d 516 (1993) (recognizing separation of powers concerns in leaving remedy to legislature after concluding that state constitution imposes affirmative duty on commonwealth "to provide an education for *all* its children, rich and poor . . . to prepare them to participate as free citizens of a free [s]tate to meet the needs and interests of a republican government" [emphasis in original]); see also, e.g., *Idaho Schools for Equal Educational Opportunity* v. *Evans*, 123 Idaho 573, 583, 850 P.2d 724 (1993) ("[W]e decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us. That would be an abject abdication of our role in the American system of government.").

Indeed, other courts have arrived at the same conclusion in cases decided subsequent to *Sheff*. See *Lobato* v. *State*, 218 P.3d 358, 374 (Colo. 2009) (concluding that adequacy claims are justiciable and that engaging in rational basis review of state's public school financing system, guided by laws and pronouncements of legislature "as well as other courts' interpretations of similar state education clauses," would "satisf[y] the judiciary's obligation to evaluate the constitutionality of the public school system without unduly infringing on the legislature's policymaking authority"); *Bonner* v. *Daniels*, 885 N.E.2d 673, 689–90 (Ind. App. 2008) (rejecting claim that adequacy claim is unreviewable on ground that "school funding lies exclusively within the dominion of the legislature" because, although "specific method of funding education is within the legislature's realm, nevertheless, in the discharge of our constitutional obligations, we may be required to determine whether the legislative action is constitutionally valid"), rev'd on other grounds, 907 N.E.2d 516, 522 (Ind. 2009) (concluding on merits that "the [e]ducation [c]lause of the Indiana [c]onstitution does not impose upon government an affirmative duty to achieve any particular standard of resulting educational quality"); *Columbia Falls Elementary School District No. 6* v. *State*, 326 Mont. 304, 310, 109 P.3d 257 (2005) ("In the case sub judice, the [l]egislature has addressed the threshold political question: it has executed Article X, [§] 1 [3], by creating a basic system of free public schools. As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the [l]egislature enforces, protects and fulfills the right."); *Leandro* v. *State*, 346 N.C. 336, 345, 488 S.E.2d 249 (1997) (The court rejected the political question argument and concluded that "[w]hen a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits. . . . Therefore, it is the duty of this [c]ourt to address [the plaintiffs'] constitutional challenge to the state's public education system. [Citation omitted.]); *DeRolph* v. *State*, 78 Ohio St. 3d 193, 198, 677 N.E.2d 733 (1997) ("We will not dodge our responsibility by asserting that this case involves a nonjusticiable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto

supra, 271 Conn. 576. Accordingly, we conclude that we have subject matter jurisdiction over this case.[25]

## II

We now turn to the merits of the plaintiffs' claims, which are properly framed using the state constitutional

the lap of the General Assembly."); *Neeley* v. *West Orange-Cove Consolidated Independent School District*, supra, 176 S.W.3d 780–81 ("[l]ike the majority of these states, we conclude that the separation of powers does not preclude the judiciary from determining whether the [l]egislature has met its constitutional obligation to the people to provide for public education"); cf. *Brigham* v. *State*, 179 Vt. 525, 527–28, 889 A.2d 715 (2005) (trial court improperly granted motion to dismiss on ground of judicial restraint).

Thus, we continue to follow *Sheff* and disagree with the defendants' and the dissent's reliance on *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles*, 680 So. 2d 400 (Fla. 1996), *Nebraska Coalition for Educational Equity & Adequacy* v. *Heineman*, 273 Neb. 531, 731 N.W.2d 164 (2007), and *Oklahoma Education Assn.* v. *State*, 158 P.3d 1058 (Okla. 2007). We simply disagree with the somewhat perfunctory analysis undertaken by the Florida Supreme Court, which construed an education clause with language even more specifically amenable to judicial review than article eighth, § 1, of our state constitution. See *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles*, supra, 405 (state constitutional provision provides that "[a]dequate provision shall be made by law for a uniform system of free public schools" [internal quotation marks omitted]). Moreover, the Oklahoma and Nebraska decisions are based on state constitutional language and history that render them distinct from the "appropriate legislation" provision contained in article eighth, § 1, of the constitution of Connecticut, which we found in *Sheff* v. *O'Neill*, supra, 238 Conn. 15, to permit judicial review. See *Nebraska Coalition for Educational Equality & Adequacy* v. *Heineman*, supra, 550–54 (relying on voters' recent rejection of constitutional amendment to include qualitative standards in education clause and emphasizing complicated policy questions surrounding educational funding that would require reassessing legislative spending priorities); *Oklahoma Education Assn.* v. *State*, supra, 1062 n.8, 1065–66 (relevant constitutional provision provides that legislature "shall establish and maintain a system of free public schools wherein all the children of the [s]tate may be educated"); see also justiciability cases cited in footnote 54 of this opinion.

[25] "[I]n deciding whether the complaint presents a justiciable claim, we make no determination regarding its merits. We do not consider, for example, whether it would survive a motion to strike on the ground that it does not state a valid cause of action for deprivation of the constitutional rights asserted, or whether it would survive a motion for summary judgment on the basis that the undisputed facts show that no such constitutional deprivations have occurred. We consider only whether the matter in contro-

analysis articulated by *State* v. *Geisler*, supra, 222 Conn. 672, and posit that the fundamental right to education under article eighth, § 1, of the state constitution encompasses a minimum qualitative standard that guarantees students the right to "suitable educational opportunities." The plaintiffs define "suitable educational opportunities" as having three components: (1) "An educational experience that prepares them to function as responsible citizens and enables them to fully participate in democratic institutions"; (2) "a meaningful high school education that enables them to advance through institutions of higher learning, or that enables them to compete on equal footing to find productive employment and contribute to the state's economy"; and (3) an opportunity to meet the educational standards as set by the political branches of the state. We conclude, consistent with the conclusions of other state courts that have considered similar constitutional guarantees, that article eighth, § 1, of the state constitution embodies a substantive component requiring that the public schools provide their students with an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting, and to prepare them to progress to institutions of higher education, or to attain productive employment and otherwise to contribute to the state's economy.

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the

versy [is] capable of being adjudicated by judicial power . . . ." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education*, supra, 261 Conn. 481.

United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [supra, 222 Conn. 684–86], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 509–10, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party—the state or the defendant—can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . Finally, not every *Geisler* factor is relevant in all cases."[26] (Citation omit-

---

[26] In his dissenting opinion, Justice Zarella notes his agreement with "commentators who question [*Geisler's*] legitimacy on the ground that 'it is no more than a checklist from which to select [various interpretive] tools' and that it provides no guidance as to the significance of selecting 'any particular method in any particular case.' " Justice Zarella also considers the *Geisler* test to be "more harmful than beneficial because, without such guidance,

ted.) *State* v. *Morales*, 232 Conn. 707, 716 n.10, 657 A.2d 585 (1995). Accordingly, we now turn to the parties' specific arguments with respect to each factor.

## A

### The Operative Constitutional Text

As noted previously, the text of article eighth, § 1, of the constitution of Connecticut provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Thus, the plaintiffs argue that the textual factor supports their claim because the use of the word "school" in article eighth, § 1, necessarily means institutions wherein "systematic" or "intellectual, moral and social" instruction is provided, and that not maintaining a minimum constitutional standard would eviscerate the legislature's responsibilities thereunder. The defendants contend in response that § 2 of article eighth of the state constitution, which provides that the University of Connecticut shall be devoted to "excellence" in education, as well as the use of qualitative language in other states' education clauses, indicates that the drafters acted intentionally to omit a particular qualitative standard from article eighth, § 1. The defendants rely, then, on *Moore* v. *Ganim*, 233 Conn. 557, 595, 660 A.2d 742 (1995), for the proposition that "[w]e are especially hesitant to read into the constitution unenumerated affirmative

---

the mere accumulation of analyses or precedents from an array of different methods, some of which may be of questionable relevance, can be used as a means to reach a desired end." In our view, this criticism of the *Geisler* analysis is unwarranted. The *Geisler* analysis promises nothing more than "a structured and comprehensive approach" to state constitutional interpretation; *Honulik* v. *Greenwich*, 293 Conn. 641, 648 n.9, 980 A.2d 845 (2009); it is nothing more than an organizational tool that cannot be expected always to yield a single answer to a question of constitutional interpretation. Accordingly, we agree with Justice Vertefeuille's conclusion that the *Geisler* framework is "equally useful in analyzing the scope of a right guaranteed by the state constitution that has no federal analog."

governmental obligations. In general, the declaration of rights in our state constitution was implemented not to impose affirmative obligations on the government, but rather to secure individual liberties against direct infringement through state action." The defendants contend, therefore, that the plaintiffs' adequacy claims are distinct from those considered in *Sheff* v. *O'Neill*, supra, 238 Conn. 1, which also involved constitutional provisions directly implicating equality and segregation. In our view, the text of article eighth, § 1, is ambiguous, which necessitates a complete *Geisler* analysis to determine its meaning with respect to a qualitative component.

"In dealing with constitutional provisions we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state. . . . Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution." (Citations omitted.) *Stolberg* v. *Caldwell*, 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981). Moreover, we do not supply constitutional language that the drafters intentionally may have chosen to omit. See *State* v. *Colon*, 272 Conn. 106, 320, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

As noted previously, the text of article eighth, § 1, of the constitution of Connecticut, provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Article eighth, § 1, does not contain any qualitative language, in contrast to § 2 of article eighth of the constitution of Connecticut, which requires the state to "maintain a system of higher education, including The University of Connecticut,

which *shall be dedicated to excellence* in higher education. The general assembly shall determine the size, number, terms and method of appointment of the governing boards of The University of Connecticut and of such constituent units or coordinating bodies in the system as from time to time may be established." (Emphasis added.) Indeed, this court previously has held that the qualitative standard of "excellence" under article eighth, § 2, "was not meant to be a wedge for penetration of the educational establishment by judicial intervention in policy decisions." *Simmons* v. *Budds,* supra, 165 Conn. 514; id. (rejecting professor's challenge to actions of officials of university setting grading policies to apply in wake of student antiwar protests).

The language of certain other states' education clauses also supports the defendants' textual argument superficially. The majority of the states have constitutional language that requires their legislatures to establish and maintain schools that are "adequate," "general," "thorough" or "efficient," which supports the defendants' argument that the drafters of article eighth, § 1, of the constitution of Connecticut could have imposed similar qualitative standards. See, e.g., Ark. Const., art. 14, § 1 ("[i]ntelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education"); Colo. Const., art. IX, § 2 ("[t]he general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously"); Fla. Const., art. IX, § 1 (a) ("The education of children is a fundamental value of the people of the State of Florida. It

is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require."); Ga. Const., art. VIII, § 1 ("The provision of an adequate public education for the citizens shall be a primary obligation of the State of Georgia. Public education for the citizens prior to the college or postsecondary level shall be free and shall be provided for by taxation."); N.J. Const., art. VIII, § 4 (1) ("[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years"); Ohio Const., art. VI, § 2 ("[t]he general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state; but no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this state"); Va. Const., art. VIII, § 1 ("[t]he General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained"); Wyo. Const., art. 7, § 97-7-001 ("[t]he legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other

institutions as may be necessary").[27] Thus, these other

[27] For additional examples of state constitutional provisions that utilize qualitative language, see Ala. Const., art. XIV, § 256 ("[t]he Legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of seven and twenty-one years"); Ariz. Const., art XI, § 1 (A) ("[t]he legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system"); Del. Const., art. X, § 1 ("[t]he General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools, and may require by law that every child, not physically or mentally disabled, shall attend the public school, unless educated by other means"); Idaho Const., art. IX, § 1 ("[t]he stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools"); Ill. Const., art. X, § 1 ("The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free."); Ind. Const., art. VIII, § 1 ("[k]nowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all"); Kan. Const., art. VI, § 6 (b) ("[t]he legislature shall make suitable provision for finance of the educational interests of the state"); Ky. Const., § 183 ("[t]he General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State"); Md. Const., art. VIII, § 1 ("[t]he General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public [s]chools; and shall provide by taxation, or otherwise, for their maintenance"); Minn. Const., art. XIII, § 1 ("The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state."); Mont. Const., art. X, § 1 ("[1] It is the goal of the people to establish a system of education which will develop the full educational potential of each person. Equality of educational opportunity is guaranteed to each person of the state. [2] The state recognizes the distinct and unique cultural heritage of the American Indians and is committed in its educational goals to the preservation of their cultural integrity. [3] The legislature shall provide a basic system of free quality public elementary and secondary schools. The legislature may provide such other educational institutions, public libraries, and educational programs as it deems desirable. It shall fund and distribute in an equitable manner

states' educational provisions provide some indication that the drafters of article eighth, § 1, could have, but did not, act to enact a constitutional provision with a clearly articulated qualitative standard for its public schools.

to the school districts the state's share of the cost of the basic elementary and secondary school system."); Nev. Const., art. XI, § 2 ("[t]he legislature shall provide for a uniform system of common schools, by which a school shall be established and maintained in each school district at least six months in every year, and any school district which shall allow instruction of a sectarian character therein may be deprived of its proportion of the interest of the public school fund during such neglect or infraction, and the legislature may pass such laws as will tend to secure a general attendance of the children in each school district upon said public schools"); N.M. Const., art. XII, § 1 ("[a] uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained"); N.C. Const., art. IX, § 2 (1) ("[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students"); N.D. Const., art. VIII, § 2 ("[t]he legislative assembly shall provide for a uniform system of free public schools throughout the state, beginning with the primary and extending through all grades up to and including schools of higher education, except that the legislative assembly may authorize tuition, fees and service charges to assist in the financing of public schools of higher education"); Or. Const., art. VIII, § 3 ("[t]he Legislative Assembly shall provide by law for the establishment of a uniform, and general system of Common schools"); Pa. Const., art. III, § 14 ("[t]he General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth"); R.I. Const., art. XII, § 1 ("[t]he diffusion of knowledge, as well as of virtue among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools and public libraries, and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education and public library services"); S.D. Const., art. VIII, § 1 ("[t]he stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education"); Tex. Const., art. VII, § 1 ("[a] general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public

We disagree, however, with the defendants' contention that *Moore* v. *Ganim*, supra, 233 Conn. 580–81, is dispositive of the plaintiffs' claims under the textual factor. In *Moore*, we rejected the plaintiffs' claim that the state constitution contains an "unenumerated . . . obligation of the state to provide subsistence benefits to all its citizens in need," concluding "that the state has no affirmative constitutional obligation to provide minimal subsistence to its poor citizens." Id., 580–81. We emphasized that "[t]he text of our constitution makes evident the fact that its drafters have been explicit when choosing to impose affirmative obligations on the state," noting that, "the history of article eighth, § 1, is particularly instructive in the present case. This explicit textual provision, and its counterparts, article eighth, § 2 (system of higher education), and article eighth, § 4 (school fund), are the only constitutional provisions, recognized to date, that impose affirmative obligations on the part of the state to expend public funds to afford benefits to its citizenry. Other provisions, such as those in article first, protect individuals from state intrusion."[28] Id., 595–96. *Moore* is inapposite because, in the present case, we are called on to consider the extent of the state's obligations under the *already existing* education clause, rather than to carve a new unenumerated right out of whole cloth.

---

free schools"); W. Va. Const., art. XII, § 1 ("[t]he Legislature shall provide, by general law, for a thorough and efficient system of free schools").

[28] In *Moore*, we noted that, although both public education and providing for the poor have deep historical roots, and "the framers of the education clause had looked to the historical statutory tradition of free public education in this state to support its explicit inclusion in the state constitution, they did not consider this tradition in and of itself to create a state constitutional obligation. . . . To the contrary, they found it appropriate to amend the constitution in order to give public education constitutional status." (Citation omitted.) *Moore* v. *Ganim*, supra, 233 Conn. 596; see also id., 597 (noting "[explicit]" protections under article first, § 20, of the Connecticut constitution and amendment twenty-one for "certain discrete groups in order to deal with specific social problems").

Moreover, although the defendants' textual arguments are plausible, the constitutional language nevertheless is ambiguous, and is not dispositive of this appeal. See *State* v. *Gethers*, 197 Conn. 369, 385–88, 497 A.2d 408 (1985) (recognizing that "superficially appealing" constitutional language may be rendered ambiguous in context of relevant case law in concluding that no right to hybrid representation in criminal case exists under article first, § 8, of the constitution of Connecticut). The commonly cited dictionary definitions of the relevant terms in article eighth, § 1, namely, "elementary," "secondary" and "school," have a qualitative connotation, as "elementary school" is defined as "a school usu[ally] the first four to the first eight grades and often a kindergarten," and particularly, "secondary school" is defined as a "school intermediate between elementary school and college and usu[ally] offering general, technical, vocational, or college-preparatory courses."[29] Merriam-Webster's Collegiate Dictionary (10th Ed. 1998). Indeed, even Justice Loiselle's dissenting opinion in *Horton I*, supra, 172 Conn. 658–59, in which he concluded that education was *not* a fundamental right under the state constitution, appears to contemplate that the education clause must have some substantive content in order to be meaningful, as he said that "when the constitution says free education it must be interpreted in a reasonable way. A town may not herd children in an open field to hear lectures by illiterates." See also id., 661 (*Loiselle, J.*, dissenting) ("[w]e cannot lose sight of the fact that the issue is not that our children are not getting a sound education, measured by reasonable standards, which will enable them to exercise fully their rights as citizens of their country"). Accordingly, since the text of article eighth, § 1, is ambiguous, we necessarily must continue with our review of the other *Geisler* factors.

---

[29] The dictionary further defines "school" in relevant part as "an organization that provides instruction . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1998).

B

The Holdings and Dicta of This Court

This factor similarly is not dispositive of the plaintiffs' appeal because this case presents a question of first impression, namely, the qualitative content of the education clause with respect to inadequacy without considerations of inequality.[30] A review of this court's[31] education clause jurisprudence demonstrates, however, that the plaintiffs' claims are in fact consistent with our precedents. The seminal[32] case is *Horton I*, supra, 172 Conn. 618, wherein the plaintiffs challenged the state's educational finance system, claiming that its reliance on the property tax "ensure[d] that, regardless of the educational needs or wants of children, more educational dollars will be allotted to children who live

---

[30] The first wave of education litigation nationwide focused largely on inequality claims, with inadequacy claims arising more recently within the last twenty years. See J. Dinan, "The Meaning of State Constitutional Education Clauses: Evidence from the Constitutional Convention Debates," 70 Alb. L. Rev. 927, 927–28 (2007); W. Koski & R. Reich, "When 'Adequate' Isn't: The Retreat from Equity in Educational Law and Policy and Why it Matters," 56 Emory L.J. 545, 558–60 (2006); C. Lockard, note, "In the Wake of *Williams* v. *State*: The Past, Present and Future of Education Finance Litigation in California," 57 Hastings L.J. 385, 393–95 (2005).

[31] Although this *Geisler* factor also contemplates reviewing decisions of the Appellate Court, neither the parties' briefs nor our independent research has identified any relevant opinions from that court.

[32] Although our analysis under this *Geisler* factor focuses on our more recent case law applying and interpreting article eighth, § 1, of the state constitution, we acknowledge that this court's older case law has documented the historical importance of public education in Connecticut as well, a factor we consider in greater detail in part II C of this opinion. See *State ex rel. Huntington* v. *Huntington School Committee*, 82 Conn. 563, 566, 74 A. 882 (1909) (noting that "Connecticut has for centuries recognized it as her right and duty to provide for the proper education of the young" in concluding that unified town school committees are agents of state); see also *Bissell* v. *Davison*, 65 Conn. 183, 191, 32 A. 348 (1894) (describing education as duty "assumed by the [s]tate . . . chiefly because it is one of great public necessity for the protection and welfare of the [s]tate itself," in upholding statute permitting school districts to adopt mandatory vaccination rules).

in property-rich towns than to children who live in property-poor towns." Id., 633.

This court first determined, with respect to the applicable level of scrutiny, that, "in Connecticut the right to education is so basic and fundamental that any infringement of that right must be strictly scrutinized."[33] Id., 646. In so concluding, the court emphasized the presence of a specific education clause in the state constitution, in contrast to the federal constitution, under which education is not a fundamental right. See id., 640–45 (distinguishing and discussing *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 [1973]). The court, therefore, concluded that "the present legislation enacted by the General Assembly to discharge the state's constitutional duty to educate its children, depending, as it does, primarily on a local property tax base without regard to the disparity in the financial ability of the towns to finance an educational program and with no significant equalizing state support, is not 'appropriate legislation' (article eighth, § 1) to implement the requirement that the state provide a substantially equal educational opportunity to its youth in its free public elementary and secondary schools." *Horton I*, supra, 172 Conn.

---

[33] The court noted the long history of public education in Connecticut since colonial days, and the existence of the basic public educational system since that time, with "the state recognizing that providing for education is a state duty and function now codified in the constitution, article eighth, § 1, with the obligation of overseeing education on the local level delegated to local school boards which serve as agents of the state. . . . The General Assembly has by word, if not by deed, recognized in the enactment of § 10-4a of the General Statutes . . . that it is the concern of the state that 'each child shall have . . . equal opportunity to receive a suitable program of educational experiences.' Indeed the concept of equality is expressly embodied in the constitutional provision for distribution of the school fund in the provision (article eighth, § 4) that the fund 'shall be inviolably appropriated to the support and encouragement of the public schools throughout the state, and for the equal benefit of all the people thereof.' " (Citations omitted.) *Horton I*, supra, 172 Conn. 647–48.

649. The court left the remedy to the legislature in the first instance, however, noting that "the fashioning of a constitutional system for financing elementary and secondary education in the state is not only the proper function of the legislative department but its expressly mandated duty under the provisions of the constitution of Connecticut, article eighth, § 1."[34] Id., 651; see also id. ("[t]he judicial department properly stays its hand to give the legislative department an opportunity to act").

[34] Thereafter, in *Horton* v. *Meskill*, 195 Conn. 24, 27, 486 A.2d 1099 (1985) (*Horton III*), the court considered an appeal and cross appeal from the trial court's ruling holding the legislative response to *Horton I* "constitutional in design but unconstitutional in part." The trial court had upheld the basic plan, which had "two principal components: (1) the guaranteed tax base grant formula (GTB) and (2) the minimum expenditure requirement (MER). The GTB formula is a plan of state grants designed to provide towns with a state-guaranteed tax base for the financing of public school education. It is designed to distribute equitably state aid to towns that establish their eligibility through the MER, a formula that sets the minimum acceptable level of per pupil town expenditures." Id., 28–29.

Further developing the rule of *Horton I*, this court adopted a three step analysis for the strict scrutiny of educational financing plans, which provided: "First, the plaintiffs must make a prima facie showing that disparities in educational expenditures are more than de minimis in that the disparities continue to jeopardize the plaintiffs' fundamental right to education. If they make that showing, the burden then shifts to the state to justify these disparities as incident to the advancement of a legitimate state policy. If the state's justification is acceptable, the state must further demonstrate that the continuing disparities are nevertheless not so great as to be unconstitutional. In other words, to satisfy the mandate of *Horton I*, a school financing plan must, as a whole, further the policy of providing significant equalizing state support to local education." Id., 38.

Applying this test, the court concluded that, although there were "continued significant disparities in the funds that local communities spend on basic public education," the legislation nevertheless "was a constitutionally acceptable response to the problem of disparate local educational expenditures" because, "if adequately funded, the GTB program would provide sufficient overall expenditures for public school education, that its five-year phase-in assured an efficient use of educational resources, and that its design would provide equity in the distribution of educational funds and a proper balance between state and local contributions thereto. In addition, the court found that the program retained a salutary role for local choice by guaranteeing minimum funds without imposing a ceiling on what a town might elect to spend for public education." Id., 39–40.

The concurring and dissenting opinions in *Horton I* demonstrate that, as a basic fundamental point, the entire court agreed that article eighth, § 1, necessarily embodies some qualitative component. Concurring in the reasoning as well as the judgment of the court, Justice Bogdanski wrote separately to highlight the history of the education clause and the 1965 constitutional convention proceedings, which "formalized free public education on the elementary and secondary levels as a fundamental right." Id., 653–54. Justice Bogdanski also emphasized that "the right of our children to an education is a matter of right not only because our state constitution declares it as such, but because education is the very essence and foundation of a civilized culture: it is the cohesive element that binds the fabric of society together. In a real sense, it is as necessary to a civilized society as food and shelter are to an individual. It is our fundamental legacy to the youth of our state to enable them to acquire knowledge and possess the ability to reason: for it is the ability to reason that separates man from all other forms of life." Id., 654–55 (*Bogdanski, J.*, concurring). Indeed, Justice Bogdanski noted specifically that the equality issues presented by *Horton I* "are directed toward the right of the children of this state to a *basic education*, and the determination of whether certain statutes of this state unconstitutionally impinge upon that right." (Emphasis added.) Id., 655.

Justice Loiselle dissented from the majority's holding that education is a fundamental right under the state constitution. Id., 655–56. He characterized the majority's opinion as "requiring . . . an equalized pot of money per town"; id., 658 (*Loiselle, J.*, dissenting); and stated that "the constitution requires free education, and 'appropriate legislation' is legislation which makes education free. I will concede that when the constitution says free education it *must be interpreted in a reasonable way. A town may not herd children in an*

*open field to hear lectures by illiterates.* But there is no contention that such situations exist, *or that education in Connecticut is not meaningful or does not measure up to standards accepted by knowledgeable leaders in the field of education.*" (Emphasis added.) Id., 658–59. Finally, Justice Loiselle emphasized that "[w]e cannot lose sight of the fact that *the issue is not that our children are not getting a sound education, measured by reasonable standards, which will enable them to exercise fully their rights as citizens of their country.* The issue is whether, because our state laws allow some towns to furnish a broader spectrum of choice than other towns desire to furnish or feel financially able to furnish, that the system has to tumble down." (Emphasis added.) Id., 661. In our view, the various opinions in *Horton I* support the plaintiffs' position that the fundamental right to an education is not an empty linguistic shell, but has at least some minimal substantive content. Indeed, Justice Loiselle's emphasis on the lack of a claim that the plaintiffs in *Horton I* were not getting a basic education is a harbinger of the plaintiffs' claims in this appeal.

Our most recent decision with respect to article eighth, § 1, is *Sheff* v. *O'Neill*, supra, 238 Conn. 1. In *Sheff*, we considered claims that severe racial and ethnic isolation in Hartford, as well as the high concentration of poverty there, violated the rights of the plaintiff schoolchildren under article eighth, § 1, and article first, §§ 1 and 20,[35] of the state constitution. Id., 3–5. The

---

[35] "The *constitution of Connecticut, article first,* § 1, provides: 'All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.'

"The constitution of Connecticut, article first, § 20, as amended by articles five and twenty-one of the amendments, provides: 'No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.' " *Sheff* v. *O'Neill*, supra, 238 Conn. 3–4 n.2.

plaintiffs argued that the state bore responsibility for the de facto racial and ethnic segregation between Hartford and its surrounding suburban school districts; id., 5; and also that "the defendants have failed to provide the plaintiffs with an equal opportunity to a free public education as required by article first, §§ 1 and 20, and article eighth, § 1, because the defendants have maintained in Hartford a public school district that, by comparison with surrounding suburban public school districts: (1) is severely educationally disadvantaged; (2) fails to provide equal educational opportunities for Hartford schoolchildren; and (3) fails to provide a minimally adequate education for Hartford schoolchildren." Id., 6.

On the merits of the plaintiffs' claims, this court framed the issue as "whether the state has fully satisfied its affirmative constitutional obligation to provide a substantially equal educational opportunity if the state demonstrates that it has substantially equalized school funding and resources."[36] Id., 25. We concluded that, notwithstanding the lack of any invidious intentional conduct on the part of the state in creating the conditions of segregation, "in the context of public education, in which the state has an affirmative obligation to monitor and to equalize educational opportunity, the state's awareness of existing and increasing severe racial and ethnic isolation imposes upon the state the responsibility to remedy segregation . . . because of race [or] . . . ancestry . . . . We therefore hold that, textually, article eighth, § 1, as informed by article first, § 20,

---

[36] The court noted that "[s]tate financial aid is distributed so that the neediest school districts receive the most aid. Accordingly, in the 1990–91 and 1991–92 school years, overall per pupil state expenditures in Hartford exceeded the average amount spent per pupil in the twenty-one surrounding suburban towns. The state reimburses Hartford for its school renovation projects at a rate that is considerably higher than the reimbursement rate for the twenty-one surrounding suburban towns." *Sheff* v. *O'Neill*, supra, 238 Conn. 10.

requires the legislature to take affirmative responsibility to remedy segregation in our public schools, regardless of whether that segregation has occurred de jure or de facto."[37] (Internal quotation marks omitted.) Id., 29–30.

We applied the strict scrutiny analysis from *Horton* v. *Meskill*, 195 Conn. 24, 38–39, 486 A.2d 1099 (1985) (*Horton III*); see footnote 34 of this opinion; and noted that the "methodology requires us to balance the legislature's affirmative constitutional obligation to provide all of the state's schoolchildren with a substantially equal educational opportunity against the legislature's recognized significant discretion in matters of public elementary and secondary education." *Sheff* v. *O'Neill*, supra, 238 Conn. 37. Citing statistics with respect to the ethnic and racial composition of the schools' population, we stated that "the disparities in the racial and ethnic composition of public schools in Hartford and the surrounding communities are more than de minimis . . . [and] jeopardize the plaintiffs' fundamental right to education."[38] Id., 38–39.

---

[37] The court emphasized that "[n]othing in the description of the relevant legal landscape in any of our cases suggests that the constitutional right that we articulated in *Horton I* was limited to school financing," and that the "addition of [the] term ['segregation'] to the text of our equal protection clause distinguishes this case from others in which we have found a substantial equivalence between our equal protection clause and that contained in the United States constitution." *Sheff* v. *O'Neill*, supra, 238 Conn. 26–27.

[38] We stated that, although poverty is not by itself a suspect classification, the trial court's "extensive findings about the significant role that adverse socioeconomic conditions play in the difficulties encountered by Hartford schoolchildren" did not "undermine the plaintiffs' claim." *Sheff* v. *O'Neill*, supra, 238 Conn. 39. Rather, we concluded that "Hartford's schoolchildren labor under a dual burden: their poverty and their racial and ethnic isolation. These findings regarding the causal relationship between the poverty suffered by Hartford schoolchildren and their poor academic performance cannot be read in isolation. They do not diminish the significance of the stipulations and undisputed findings that the Hartford public school system suffers from severe and increasing racial and ethnic isolation, that such isolation is harmful to students of all races, and that the districting statute codified at [General Statutes] § 10-240 is the single most important factor contributing to the concentration of racial and ethnic minorities in the Hartford public school system." Id.

Thus, we concluded that "the state has failed to fulfill its affirmative constitutional obligation to provide all of the state's schoolchildren with a substantially equal educational opportunity. Much like the substantially unequal access to fiscal resources that we found constitutionally unacceptable in *Horton I*, the disparity in access to an unsegregated educational environment in this case arises out of state action and inaction that, prima facie, violates the plaintiffs' constitutional rights, although that segregation has occurred de facto rather than de jure." Id., 40. Notwithstanding "the initiatives undertaken by the defendants to alleviate the severe racial and ethnic disparities among school districts, and despite the fact that the defendants did not intend to create or maintain these disparities, the disparities that continue to burden the education of the plaintiffs infringe upon their fundamental state constitutional right to a substantially equal educational opportunity."[39] Id., 42. Accordingly, we concluded that "the school districting scheme, as codified at [General Statutes] §§ 10-184 and 10-240 and as enforced with regard to these plaintiffs, is unconstitutional." Id., 43. We then elected "to employ the methodology used in *Horton I*," and directed only the granting of declaratory relief while retaining jurisdiction to grant consequential relief if needed in the future, following action by the political branches. Id., 45–46; see id., 46 ("[p]rudence and sensitivity to the constitutional authority of coordinate branches of government counsel the same caution in this case").

---

[39] We first concluded that the state met its initial burden of proving the legitimacy of the districting statute, which was enacted "not to impose or to foster racial or ethnic isolation, but to improve educational quality for all Connecticut schoolchildren by increasing state involvement in all aspects of public elementary and secondary education," as well as to "[further] the legitimate nonracial interests of permitting considerable local control and accountability in educational matters." *Sheff* v. *O'Neill*, supra, 238 Conn. 40–41.

In our view, *Sheff* supports the plaintiffs in the present case. Although not decided as an educational adequacy case, our determination therein that the claim that the government's failure to fulfill its constitutional responsibilities pursuant to article first, § 20, was justiciable; see footnotes 18 through 24 of this opinion and the accompanying text; as well as our willingness to consider and order judicial remedies for the effect of the segregated conditions in Hartford's schools on the education of the children there, indicates that this court is willing to protect the state constitutional right to an education afforded under article eighth, § 1.

Indeed, as in *Horton I*, the separate opinions in *Sheff* provide even stronger support for the plaintiffs' claims herein, as the plaintiffs in *Sheff* also raised an educational adequacy claim that was not addressed directly by the majority opinion. See *Sheff* v. *O'Neill*, supra, 238 Conn. 48 (*Berdon, J.,* concurring); id., 141 (*Borden, J.,* dissenting). Justice Berdon, concurring in the reasoning and the judgment, concluded that "a racially and ethnically segregated educational environment also deprives schoolchildren of *an adequate education as required by the state constitution.*" (Emphasis added.) Id., 48. Noting the fundamentality of the right to an education under article eighth, § 1; see id., 49–50; Justice Berdon stated that ethnic and racial segregation between school districts "can have a devastating impact on a minority student's education"; id., 51; and concluded that, "[i]n order to provide an adequate or 'proper' education, our children must be educated in a nonsegregated environment." Id., 51–52. Although Justice Berdon described Hartford's comparatively low achievement test scores as "insightful into the devastating effects of racial isolation on the students' education"; id., 52; he emphasized that the effects of de facto segregation are felt beyond Hartford: "Children of every race and ethnic background suffer when an educational system is adminis-

tered on a segregated basis. Education entails not only the teaching of reading, writing and arithmetic, but today, in our multicultural world, it also includes the development of social understanding and racial tolerance. If the mission of education is to prepare our children to survive and succeed in today's world, then they must be taught how to live together as one people." Id., 53 (*Berdon, J.,* concurring).

In contrast, Justice Borden rejected the plaintiffs' educational adequacy claim in his dissenting opinion, although he concluded that "it is not necessary in this case to decide whether article eighth, § 1, embodies a requirement that the state provide a minimally adequate education or, if it does, the extent to which such a requirement is subject to judicial review . . . [or] to define the specific contours of such an education." Id., 142. Justice Borden assumed that there was a constitutional right to an adequate education, but rejected the plaintiffs' reliance on state mastery test scores as a standard for determining whether that right had been violated, noting that, "[n]ot only the trial court's findings in this case, but also common sense tells me that any appropriate standard by which to measure the state's assumed obligation to provide a minimally adequate education must be based generally, *not on what level of achievement students reach, but on what the state reasonably attempts to make available to them,* taking into account any special needs of a particular local school system." (Emphasis added.) Id., 143. Describing students' problems such as low birth weight, maternal drug use and other "early environmental deprivations"; id., 144; Justice Borden concluded that, "[a]lthough schools are important socializing institutions in our democratic society, they cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder the academic achievement of

those students." Id. Significantly, Justice Borden noted, however, that his conclusion was "not to say that, as part of its assumed constitutional obligation to provide a minimally adequate education, the state has no obligation to attempt, by reasonable means, to ameliorate these problems. It may well have such an obligation. It is to say, however, that this record fully establishes that the state has, through the programs, policies and funding mechanisms already described, met that obligation." Id. Although Justice Borden's dissenting opinion rejected the plaintiffs' claims on the record in *Sheff*, his analysis explicitly left open the question of whether article eighth, § 1, embodies a particular minimum quality of education.

Other decisions from this court provide additional insight into the limits of the state's responsibilities under the education clause, and consistent with Justice Borden's dissenting opinion in *Sheff*, indicate that the state's responsibilities under article eighth, § 1, are not unbounded, and do not require the state to take measures that will maximize the potential of specific students or mitigate the effect of every possible negative external factor for which the state bears no direct responsibility.[40] For example, in *Savage* v. *Aronson*, 214 Conn. 256, 286, 571 A.2d 696 (1990), the plaintiffs claimed that "terminating emergency housing and offering as an alternative only group shelter housing distant from the New Haven area, where the children of these

---

[40] We note that in *Campbell* v. *Board of Education*, 193 Conn. 93, 104, 475 A.2d 289 (1984), this court was required to "decide the applicability of the fundamental rights guaranteed by article eighth, § 1, to a school board's policy of imposing uniform school-wide academic sanctions for nonattendance." We disagreed with the plaintiff's reliance on *Horton I* for the proposition that strict scrutiny must be applied to "any and all governmental regulations affecting public school education." Id., 105. We concluded that the school board's policy, "which is neither disciplinary . . . nor an infringement of equal educational opportunity, does not jeopardize any fundamental rights under our state constitution." (Citations omitted.) Id.

plaintiffs have been attending school, would violate their state constitutional right to education because of the harmful effect upon them of frequent school transfers." Applying *Horton I*, this court concluded that "the burden imposed on the state by our decision in *Horton* [*I*] to ensure approximate equality in the public educational opportunities offered to children throughout this state . . . despite variations in funding by the towns, [does not include] any guaranty that children are entitled to receive their education at any particular school or that the state must provide housing accommodations for them and their families close to the schools they are presently attending. The undoubted hardship imposed upon the children of these plaintiffs from the lack of affordable housing near the schools where they now are being educated cannot be disputed. *It results, however, from the difficult financial circumstances they face, not from anything the state has done to deprive them of the right to equal educational opportunity.* When the plaintiffs were displaced from their former homes, the commissioner [of income maintenance] was not obligated to provide emergency housing for them located near their former homes so that their children could continue to attend the same schools." (Citation omitted; emphasis added.) Id., 286–87.

Similarly, in *Broadley* v. *Board of Education*, supra, 229 Conn. 4, we considered the plaintiff's claim "that he has a state constitutional right to receive a program of education specially designed to meet his individual needs as a gifted child." Relying on General Statutes § 10-76a et seq., the plaintiff in *Broadley* contended that "the legislature, by classifying gifted children as among those children who are unable to 'progress effectively' without special education, has created for those children the right to special education under article eighth, § 1, of the Connecticut constitution . . . ." Id., 5. He "concede[d], however, that, the Connecticut constitu-

tion does not, standing alone, afford gifted children the right to a program of special education," and also "that gifted children have no state statutory right to special education, because the legislature has not mandated such a course of study for gifted pupils." Id., 6. We "conclude[d] that the legislature did not intend to create a right to special education for gifted children. Although the language of § 10-76a (c) includes gifted children as among those exceptional children who do not 'progress effectively' without special education, [General Statutes] § 10-76d (b) and (c) manifest the unambiguous intent of the legislature that special education is mandatory only for children with disabilities and not for gifted students. Indeed, there is not the slightest suggestion in the legislative history of the special education statutes that the legislature, in establishing a program of special education, sought either to define the parameters of the state constitutional right to a free public education, or to constitutionalize any particular kind of educational program for exceptional children." Id., 7. In our view, *Broadley* is another illustration of the limitations of the education clause, in its rejection of the plaintiff's claim that he was constitutionally entitled to a particular program of education aimed at his individual progress specifically; indeed, the plaintiff therein did not claim that his education was insufficient to provide him with the minimum knowledge and skill base necessary to seek higher education or meaningful employment.

C

Constitutional History

As noted by the parties and the brief of the amici curiae, Christopher Collier, the state historian emeritus, and Simon J. Bernstein, the principal draftsman and proponent of article eighth, § 1, at the 1965 constitutional convention, Connecticut's deeply rooted commit-

ment to free public education is well documented. See *State ex rel. Huntington* v. *Huntington School Committee*, 82 Conn. 563, 566, 74 A. 882 (1909) ("Connecticut has for centuries recognized it as her right and duty to provide for the proper education of the young"); see also *Bissell* v. *Davison*, 65 Conn. 183, 191, 32 A. 348 (1894) (describing education as duty "assumed by the [s]tate . . . chiefly because it is one of great public necessity for the protection and welfare of the [s]tate itself"). Indeed, the Code of Laws for the Colony of Connecticut, promulgated in 1650 and commonly known as the Ludlow Code, recognized that "the good Education of Children is of singular behoofe and benefitt to any Common wealth," and required families to educate their children "to read the [E]nglish tounge, and knowledge of the Capitall Lawes," in the "grounds and principles of religion," and "in some honest lawfull . . . labour or [e]mployment, either in husbandry, or some other trade proffitable for themselves and the Common wealth, if they will not nor cannott traine them [u]p in Learning to fitt them for higher [e]mployments." Code of Laws, Children (1650), reprinted in 1 Col. Rec. 509, 520–21 (J. Hammond Trumbull ed., 1850). To that end, the Ludlow Code made public education and school attendance mandatory, requiring "euery Towneshipp within this Jurissdiction, after the Lord hath increased them to the number of fifty houshoulders . . . [to] forthwith appoint one within theire Towne to teach all such children as shall resorte to him, to write and read," and further, "where any Towne shall increase to the number of one hundred families or housholders, they shall sett [u]p a Grammer Schoole, the masters thereof being able to instruct youths so farr as they may bee fitted for the [U]niversity." Code of Laws, Schooles (1650), reprinted in 1 Col. Rec., supra, 555.

Thus, Bernstein stated that he had introduced the resolution that ultimately was enacted as article eighth,

§ 1, because "our system of free public education [has]
a tradition acceptance on a par with our bill of rights
and it should have the same [c]onstitutional sanctity.
It was because our [c]onstitution had no reference to
our school system that I submitted my resolution . . . .
I became aware of this . . . when I served on a board
of education and was surprised to find that Connecticut
with its traditional good education had no reference
to it in the [c]onstitution when I use the word 'good
education' I am quoting . . . from the Connecticut
code of 1650 which others I believe call the Ludlow
Code. Quote 'a good education of children is of singular
of behoove and benefit to any [c]ommonwealth' so we
do have the tradition which goes back to our earliest
days of free good public education and we have h[ad]
good public schools so that this again is not anything
revolutionary, it is something which we have, it is which
is practically all [c]onstitutions in the [s]tates of our
nation and Connecticut with its great tradition certainly
ought to honor this principle."[41] Proceedings of the Con-
necticut Constitutional Convention (1965), Pt. 3, p.
1039, remarks of Delegate Bernstein; see id., p. 1062,
remarks of Delegate Chase G. Woodhouse ("I think it
is extremely fitting that we should finally put into our
[c]onstitution a reference to our great public schools
because Henry Barnard of Connecticut is perhaps one
of the greatest historical figures in this development of
public school education in this whole nation of ours");

---

[41] Bernstein had noted previously that "[i]t may come as a matter of some
surprise to all of us who have grown up in this [s]tate of Connecticut, which
considers itself a well educated populace [with] schools dating back to our
early history. Our [c]onstitution as it is presently written does not say
anything about a provision for public education on any level." Proceedings
of the Connecticut Constitutional Convention (1965), Pt. 1, p. 311. Bernstein
noted further that "the history of education in Connecticut is as early as
the day our [c]olonies were founded in 1636 when Hartford was founded,
they wasted no time in getting a school master for Hartford. . . . We have
a great history and tradition requiring that the public body supply our
children with free public education." Id., p. 312.

see also *Moore* v. *Ganim*, supra, 233 Conn. 595–96 (discussing history of article eighth, § 1, in noting that our constitution's drafters "have been explicit when choosing to impose affirmative obligations on the state"). Woodhouse noted that, in conjunction with § 2, which constitutionalized higher education, article eighth "covers everything that we might regard as essential now for a system of education that will be one of the best in the whole United States."[42] Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, p. 1063. Indeed, in introducing the provision, Bernstein noted specifically the importance of education with respect to the preservation of representative democratic institutions.[43] See Proceedings of the Connecticut

---

[42] Indeed, the delegates at the 1965 constitutional convention enacted article eighth, § 1, with the knowledge that Connecticut was the only state in the United States that did not have an education guarantee in its state constitution. See J. Zaiman, "First Constitutional Guarantee Of Free Education Is Approved," Hartford Courant, October 20, 1965, pp. 1, 5.

[43] Bernstein's remarks echo the sentiments of several notable early proponents of public education, including Thomas Jefferson and Horace Mann. See T. Jefferson, Notes on Virginia (1782), Query XIV ("[o]f all the views of this law [for public education], none is more important, none more legitimate, than that of rendering the people the safe as they are the ultimate guardians of their own liberty"), "Thomas Jefferson on Politics & Government," available at http://etext.virginia.edu/jefferson/quotations/jeff1370.htm (last visited March 9, 2010); Letter from Thomas Jefferson to John Adams (1813) ("[t]his [bill] on education would [raise] the mass of the people to the high ground of moral respectability necessary to their own safety and to orderly government"), "Thomas Jefferson on Politics & Government," available at http://etext.virginia.edu/jefferson/quotations/jeff1370.htm (last visited March 9, 2010); see also *McDuffy* v. *Secretary of the Executive Office of Education*, 415 Mass. 545, 619–20, 615 N.E.2d 516 (1993) (stating that " 'under our republican government, it seems clear that the minimum of this education can never be less than such as is sufficient to qualify each citizen for the civil and social duties he will be called to discharge—such an education as teaches the individual the great laws of bodily health; as qualifies for the fulfilment of parental duties; as is indispensable for the civil functions of a witness or a juror; as is necessary for the voter in municipal and in national affairs; and finally, as is requisite for the faithful and conscientious discharge of all those duties which devolve upon the inheritor of a portion of the sovereignty of this great republic' "), quoting H. Mann, The Massachusetts System of Common Schools: Tenth Annual Report of the Massachusetts Board of Education (1849) p. 17.

Constitutional Convention (1965), Pt. 1, p. 312, remarks of Delegate Bernstein ("[i]t goes without saying that [if] we are g[o]ing to have represen[ta]tive [g]overnment elected by a public that the education of the public is the first and best way of promoting the best representatives [to] be elected to our various legislative bodies in the [c]ity and the [s]tate").

Although the proponents of article eighth, § 1, did not articulate a substantive standard, they emphasized the historical importance of education to Connecticut in the context of its role in fostering meaningful civic participation in a representative democracy. Thus, in the absence of any contravening evidence in the historical record supporting the proposition that the education provision only is hortatory and lacks real substance,[44] this historical factor informs our construction of article eighth, § 1.

## D

### Federal Precedents

Having reviewed those *Geisler* factors specific to Connecticut, we now turn to a review of those considerations that go beyond our borders. We note, however, that "not every *Geisler* factor is relevant in all cases." *State* v. *Morales*, supra, 232 Conn. 716 n.10; see also

---

[44] The defendants have cited a law review article that comprehensively has reviewed the histories of the various states' education clauses, and classifies article eighth, § 1, into a category of clauses that are "hortatory," and drafted for the "purpose of recognizing or confirming actions already taken by legislatures." J. Dinan, "The Meaning of State Constitutional Education Clauses: Evidence from the Constitutional Convention Debates," 70 Alb. L. Rev. 927, 941 (2007); see id., 943–44. Given Bernstein's emphasis on putting education "on par with the bill of rights"; Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, p. 1039; and Woodhouse's comments about making Connecticut's public education system one of the best nationwide; id., p. 1063; we disagree with Professor Dinan's narrower view of the constitutional history.

*Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 157, 956 A.2d 1174 (2008) (same). Thus, the lack of a comparable provision in the United States constitution that assures a fundamental right to a free public education renders federal precedent, most significantly *San Antonio Independent School District* v. *Rodriguez*, supra, 411 U.S. 1, largely inapposite, and this *Geisler* factor generally is irrelevant to our analysis herein.

We note briefly, however, that the defendants rely on passages from *San Antonio Independent School District*,[45] emphasizing, for example, that the case presented "the most persistent and difficult questions of

[45] By way of background, we note briefly that *San Antonio Independent School District* was a "class action on behalf of schoolchildren throughout [Texas] who are members of minority groups or who are poor and reside in school districts having a low property tax base," in which the plaintiffs alleged that the state's educational funding system violated the equal protection clause of the fourteenth amendment to the United States constitution. *San Antonio Independent School District* v. *Rodriguez*, supra, 411 U.S. 5–6. The Supreme Court rejected the plaintiffs' claims that public education was a fundamental right under the federal constitution, noting statements from its past decisions, such as *Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), about the importance of education to our nation, but nevertheless stating that "the importance of a service performed by the [s]tate does not determine whether it must be regarded as fundamental for purposes of examination under the [e]qual [p]rotection [c]lause." *San Antonio Independent School District* v. *Rodriguez*, supra, 30. The court stated that fundamental rights are those that are "explicitly or implicitly guaranteed" in the constitution; id., 33; and that "[i]t is not the province of this [c]ourt to create substantive constitutional rights in the name of guaranteeing equal protection of the laws." Id.; see also id., 35 (rejecting plaintiffs' claim "that education is distinguishable from other services and benefits provided by the [s]tate because it bears a peculiarly close relationship to other rights and liberties accorded protection under the [c]onstitution" specifically, "the effective exercise of [f]irst [a]mendment freedoms and to intelligent utilization of the right to vote"). Accordingly, the court acted out of "sensitiv[ity]" to the state's efforts and applied deferential rational basis review to conclude that Texas' educational finance system, which relied on both state and local resources, was a rational approach to addressing disparities in local resources caused by the development of commercial and industrial centers with population shifts; id., 47–49; and served as "a means of guaranteeing a minimum statewide educational program without sacrificing the vital element of local participation." Id., 48.

educational policy, another area in which this [c]ourt's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels"; id., 42; and that, "[e]ducation, perhaps even more than welfare assistance, presents a myriad of intractable economic, social, and even philosophical problems."[46] (Internal quotation marks omitted.) Id. Their reliance is misplaced because of the distinct nature of education under the state and federal constitutions, particularly, because the Supreme Court specifically concluded in *San Antonio Independent School District* that the right to a public education is not fundamental under the federal constitution, and therefore the plaintiffs therein were not entitled to strict scrutiny review of their claims with respect to the constitutionality of the state's educational finance system. Id., 37–39. Put differently, the prudential concerns that the Supreme Court discussed in *San Antonio Independent School District* may well have their place in the state constitutional context with respect to specific remedies, but failing to consider carefully the plaintiffs' claims would amount to an evisceration of the central holding of *Horton I*, namely, that, under article eighth, § 1, of the Connecticut constitution, "the right to education is so basic and fundamental that any infringement of that right must be strictly scrutinized."[47] *Horton I*, supra, 172 Conn. 646. Accord-

[46] The court also stated that "[t]he ultimate wisdom [about educational problems] is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the [s]tates inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions." *San Antonio Independent School District* v. *Rodriguez*, supra, 411 U.S. 43.

[47] Finally, the significance of the cautionary language in *San Antonio Independent School District* is further mitigated by the Supreme Court's emphasis that, unlike the present case, that case did not present any educational adequacy claims. Indeed, the majority opinion noted that, "[e]ven if it were conceded that *some identifiable quantum of education is a constitutionally protected prerequisite* to the meaningful exercise of either

ingly, we conclude that federal precedent does not inform our analysis of the plaintiffs' claims in this appeal.

## E

## Sister State Decisions

A review of the sister state decisions in this area is of paramount importance to this appeal, which presents a question of first impression in an area of constitutional law that uniquely has been the province of the states. Cf. *San Antonio Independent School District* v. *Rodriguez,* supra, 411 U.S. 133 n.100 (Marshall, J., dissenting) ("nothing in the [c]ourt's decision today should inhibit further review of state educational funding schemes under state constitutional provisions"). The linguistic diversity of the various states' education clauses; see part II A of this opinion; requires a careful review of the sister state decisions to determine which cases are of greatest precedential significance. Put differently, our analysis must go beyond simply determining the "majority" and "minority" approaches to this issue, and must focus specifically on decisions from states whose constitutional clauses, like article eighth, § 1, do not

right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short"; (emphasis added) *San Antonio Independent School District* v. *Rodriguez,* supra, 411 U.S. 36–37; and that "no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the *basic minimal skills* necessary for the enjoyment of the rights of speech and of full participation in the political process." (Emphasis added.) Id., 37. Justice Marshall, joined by Justice Douglas, dissented specifically on the ground that, "because some 'adequate' level of benefits is provided to all, discrimination in the provision of services is therefore constitutionally excusable. The [e]qual [p]rotection [c]lause is not addressed to the minimal sufficiency but rather to the unjustifiable inequalities of state action. It mandates nothing less than that 'all persons similarly circumstanced shall be treated alike.'" Id., 89; see also id., 111–12 (Marshall, J., dissenting) (concluding that education is fundamental right).

use qualitative language to describe their respective rights to education.[48]

We begin, then, with New York case law, which, as explained by the amici curiae Campaign for Educational

[48] States whose education clauses are similar to Connecticut's with respect to an absence of qualitative language, but lack published appellate case law addressing any adequacy requirement thereunder, are Alaska, California, Hawaii, Michigan, Mississippi, Missouri, Utah and Vermont. See Alaska Const., art. VII, § 1 ("The legislature shall by general law establish and maintain a system of public schools open to all children of the State, and may provide for other public educational institutions. Schools and institutions so established shall be free from sectarian control."); Cal. Const., art. IX, § 5 ("the Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established"); Haw. Const., art. X, § 1 ("[t]he State shall provide for the establishment, support and control of a statewide system of public schools free from sectarian control, a state university, public libraries and such other educational institutions as may be deemed desirable, including physical facilities therefor"); Mich. Const., art. VIII, § 2 ("The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."); Miss. Const., art. VIII, § 201 ("[t]he Legislature shall, by general law, provide for the establishment, maintenance and support of free public schools upon such conditions and limitations as the Legislature may prescribe"); Mo. Const., art. IX, § 1 (a) ("[a] general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this state within ages not in excess of twenty-one years as prescribed by law"); Utah Const., art. X, § 1 ("The Legislature shall provide for the establishment and maintenance of the state's education systems including: [a] a public education system, which shall be open to all children of the state; and [b] a higher education system. Both systems shall be free from sectarian control."); Vt. Const., c. II, § 68 ("[l]aws for the encouragement of virtue and prevention of vice and immorality ought to be constantly kept in force, and duly executed; and a competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth"). In California, however, a recent equal protection challenge, with adequacy overtones, to the state's oversight of the public education system, was settled following a one time payout of $1 billion. See C. Lockard, note, "In the Wake of *Williams* v. *State*: The Past, Present and Future of Education Finance Litigation in California," 57 Hastings L.J. 385, 414–15 (2005).

Equity et al., is particularly instructive, given the similarity between its broadly worded constitutional provision and ours. New York's education clause provides simply that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. Const., art. XI, § 1. In 1995, the New York Court of Appeals addressed a claim that the "[s]tate's educational financing scheme fails to provide public school students in the [c]ity of New York . . . an opportunity to obtain a sound basic education as required by the [s]tate [c]onstitution." *Campaign for Fiscal Equity, Inc.* v. *State*, 86 N.Y.2d 307, 314, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995) (*Campaign I*). In the context of a motion to dismiss, an analogue to our motion to strike, the court concluded that New York's education clause "requires the [s]tate to offer all children the opportunity of a sound basic education . . . . Such an education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury. If the physical facilities and pedagogical services and resources made available under the present system are adequate to provide children with the opportunity to obtain these essential skills, the [s]tate will have satisfied its constitutional obligation." (Citation omitted.) Id., 316. The court further emphasized that "[t]he state must assure that some essentials are provided," specifically, "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those

subject areas." Id., 317. The court did not, however, "attempt to definitively specify what the constitutional concept and mandate of a sound basic education entails" because of the early procedural posture of the case, which lacked a developed factual record.[49] Id.

A subsequent decision rendered after the remand trial in *Campaign I* further developed this standard to provide that students have a right to a "meaningful high school education, one which prepares them to function productively as civic participants," although not necessarily a high school diploma. *Campaign for Fiscal Equity, Inc.* v. *State*, 100 N.Y.2d 893, 908, 801 N.E.2d 326, 769 N.Y.S.2d 106 (2003) (*Campaign II*). After concluding that, "whether measured by the outputs or the inputs, New York City schoolchildren are not receiving the constitutionally-mandated opportunity for a sound basic education"; id., 919; the court again remanded the case to the trial court for further proceedings, wherein "[t]he [s]tate need only ascertain the actual cost of providing a sound basic education in New York City. Reforms to the current system of financing school funding and managing schools should address the shortcomings of the current system by ensuring, as a part of that process, that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education. Finally, the new scheme should ensure a system of accountability to measure whether the reforms actually provide the opportunity for a sound basic education."[50] Id., 930.

---

[49] The court stated that the trier of fact would "have to evaluate whether the children in [the] plaintiffs' districts are in fact being provided the opportunity to acquire the basic literacy, calculating and verbal skills necessary to enable them to function as civic participants capable of voting and serving as jurors"; *Campaign I*, supra, 86 N.Y.2d 318; and emphasized that the plaintiffs' "fact-based claims of inadequacies in physical facilities, curricula, numbers of qualified teachers, availability of textbooks, library books, etc." had properly stated a cause of action. Id., 319.

[50] After the proceedings on remand, although the state Senate had agreed with the recommendation of a commission appointed by New York's governor that a $1.93 billion appropriation was needed to cover the shortfall and

The New Hampshire Supreme Court has ascribed similar substantive meaning to its education clause, which provides in relevant part: "Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education through the various parts of the country, being highly conducive to promote this end; *it shall be the duty of the legislators and magistrates, in all future periods of this government, to cherish the interest of literature and the sciences, and all seminaries and public schools,* to encourage private and public institutions, rewards, and immunities for the promotion of agriculture, arts, sciences, commerce, trades, manufac-

ensure a "sound basic education" in New York City's schools, the legislature ultimately only appropriated $300 million toward that end. *Campaign for Fiscal Equity, Inc.* v. *State,* 8 N.Y.3d 14, 24–25, 861 N.E.2d 50, 828 N.Y.S.2d 235 (2006) (*Campaign III*). A blue ribbon panel of referees appointed by the trial court then conducted hearings, and the trial court adopted their recommendation to require an appropriation of $9.18 billion. Id., 25–26. On appeal, the Court of Appeals subsequently concluded that the trial court "erred by, in effect, commissioning a de novo review of the compliance question. The role of the courts is not, as [the trial court] assumed, to determine the best way to calculate the cost of a sound basic education in New York City schools, but to determine whether the [s]tate's proposed calculation of that cost is rational. [The trial court] should not have endorsed an examination in which the cost of a sound basic education in New York was calculated anew, when the state budget plan had already reasonably calculated that cost." Id., 27. Rather, the court concluded that "the constitutionally required funding for the New York City [s]chool [d]istrict includes, as demonstrated by this record, additional operating funds in the amount of $1.93 billion . . . ." Id. The court emphasized that its "deference to the [l]egislature's education financing plans is justified not only by prudent and practical hesitation in light of the limited access of the [j]udiciary to the controlling economic and social facts, but also by our abiding respect for the separation of powers upon which our system of government is based . . . ." (Citation omitted; internal quotation marks omitted.) Id., 28; see also id., 28–29 ("Devising a state budget is a prerogative of the [l]egislature and [e]xecutive; the [j]udiciary should not usurp this power. The legislative and executive branches of government are in a far better position than the [j]udiciary to determine funding needs throughout the state and priorities for the allocation of the [s]tate's resources.").

tures, and natural history of the country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and economy, honesty and punctuality, sincerity, sobriety, and all social affections, and generous sentiments, among the people . . . ." (Emphasis added.) N.H. Const., Pt. II, art. LXXXIII. In a decision concluding that the state's system of financing public education, mostly via property taxation, was unconstitutional because the school property taxes were not "proportional and reasonable throughout the [s]tate" as was demanded by the state constitution's taxation clause; *Claremont School District* v. *Governor*, 142 N.H. 462, 470, 703 A.2d 1353 (1997) (*Claremont II*); the New Hampshire Supreme Court emphasized that "[o]ur society places tremendous value on education. Education provides the key to individual opportunities for social and economic advancement and forms the foundation for our democratic institutions and our place in the global economy."[51] Id., 472. Thus, the court concluded that a "constitutionally adequate public education is a fundamental right"; id., 473; and emphasized that "[m]ere competence in the basics—reading, writing and arithmetic—is insufficient"; id., 474; and that "[a] broad exposure to the social, economic, scientific, technological, and political realities of today's society is essential for our students to compete, contribute and flourish in the twenty-first century." Id.

---

[51] The court previously had concluded that the legislature was required to fund an "adequate education," but initially did not further "define the parameters of the education mandated by the constitution as that task is, in the first instance, for the legislature and the [g]overnor." *Claremont School District* v. *Governor*, 138 N.H. 183, 192, 635 A.2d 1375 (1993) (*Claremont I*). The court did, however, note that, "[g]iven the complexities of our society today, the [s]tate's constitutional duty extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas." Id.

Although the New Hampshire court left the implementation of a constitutionally adequate educational policy, and the financing thereof, to the political branches in the first instance, it followed the criteria set forth by the Kentucky Supreme Court in *Rose* v. *Council for Better Education, Inc.*, 790 S.W.2d 186 (Ky. 1989),[52] and articulated "general, aspirational guidelines for defining constitutional adequacy," namely, that a public education would provide students with: " '(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.' " *Claremont II*, supra, 142 N.H. 474–75, quoting *Rose* v. *Council for Better Education, Inc.*, supra, 212; see also

---

[52] In *Rose*, the Kentucky Supreme Court had concluded that the state's education financing system violated its constitution; Ky. Const., § 183; which provides that, "[t]he General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the [s]tate." (Internal quotation marks omitted.) *Rose* v. *Council for Better Education, Inc.*, supra, 790 S.W.2d 205. The court concluded that "[a] child's right to an adequate education is a fundamental one under our [c]onstitution," and articulated the *Rose* factors as guidelines and minimum goals by which the General Assembly could recreate the state's financing system. Id., 212 and n.22.

*Londonderry School District* v. *State*, 154 N.H. 153, 161–62, 907 A.2d 988 (2006) (statute modeled after seven *Rose* criteria is insufficient articulation of "constitutionally adequate education" because they are general guidelines that political branches are to use in designating which state education rules, statutes and curriculum frameworks form "constitutionally adequate education").

Similarly, South Carolina's education clause provides broadly that "[t]he General Assembly shall provide for the maintenance and support of a system of free public schools open to all children in the State and shall establish, organize and support such other public institutions of learning, as may be desirable." S.C. Const., art. XI, § 3. In *Abbeville County School District* v. *State*, 335 S.C. 58, 68, 515 S.E.2d 535 (1999), the South Carolina Supreme Court concluded that this provision "requires the General Assembly to provide the opportunity for each child to receive a minimally adequate education." The court "define[d] this minimally adequate education required by our [c]onstitution to include providing students adequate and safe facilities in which they have the opportunity to acquire: 1) the ability to read, write, and speak the English language, and knowledge of mathematics and physical science; 2) a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and 3) academic and vocational skills." Id. Remanding the case for further proceedings, the court recognized separation of powers concerns, and "emphasize[d] that the constitutional duty to ensure the provision of a minimally adequate education to each student in South Carolina rests on the legislative branch of government. We do not intend by this opinion to suggest to any party that we will usurp the authority of that branch to determine the way in which educational opportunities are delivered to the children of our [s]tate. We do not intend the

courts of this [s]tate to become super-legislatures or super-school boards."[53] Id., 69.

In Tennessee, the state education clause provides that "[t]he State of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such post-secondary educational institutions, including public institutions of higher learning, as it determines." Tenn. Const., art. XI, § 12. The Tennessee Supreme Court has interpreted this provision as requiring the legislature to "maintain and support a system of free public schools that provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare students intellectually for a mature life." *Tennessee Small School Systems* v. *McWherter*, 851 S.W.2d 139, 150–51 (Tenn. 1993); id. (rejecting defendants' claim that this rule is not "an enforceable standard for assessing the educational opportunities provided in the several districts throughout the state").

Finally, in one of the earliest adequacy cases, the Washington Supreme Court interpreted its education clause, which provides that "[i]t is the paramount duty

---

[53] An appeal is pending before the South Carolina Supreme Court in *Abbeville County School District* after an extensive trial on remand at which the trial court concluded that "the money allotted to the plaintiff districts, the system of teacher licensure, the state of the facilities, and most other inputs were sufficient. However, the trial court concluded the funding of early childhood intervention programs did not satisfy the constitutional requirement to provide a minimally adequate education. The trial court found that the state has a duty to ameliorate the inequality between under-privileged and more privileged children by establishing an educational system that overcomes the effects of poverty for children in prekindergarten and kindergarten programs." B. DuRant, comment, "Education Law: The Political Question Doctrine: A Doctrine for Long-Term Change in Our Public Schools," 59 S.C. L. Rev. 531, 535 (2008).

of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex"; Wash. Const., art. IX, § 1; and concluded that "the [s]tate's constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the marketplace of ideas. . . . Education plays a critical role in a free society. It must prepare our children to participate intelligently and effectively in our open political system to ensure that system's survival. . . . It must prepare them to exercise their [f]irst [a]mendment freedoms both as sources and receivers of information; and, it must prepare them to be able to inquire, to study, to evaluate and to gain maturity and understanding. The constitutional right to have the [s]tate 'make ample provision for the education of all [resident] children' would be hollow indeed if the possessor of the right could not compete adequately in our open political system, in the labor market, or in the marketplace of ideas." (Citations omitted.) *Seattle School District* v. *State*, 90 Wash. 2d 476, 517–18, 585 P.2d 71 (1978). The court recognized that these standards are not "fully definitive of the [s]tate's paramount duty," but rather, "constitute broad guidelines and that the effective teaching and opportunities for learning these essential skills make up the *minimum* of the education that is constitutionally required." (Emphasis in original.) Id., 518; see also id., 519 (state not required to "furnish total education in the sense of *all* knowledge or the offering of *all* programs, subjects, or services which are attractive but only tangentially related to the central thrust of our guidelines" [emphasis in original; internal quotation marks omitted]).

These cases are illustrative, as our research has revealed that those state courts that have reached the

merits of the issue[54] overwhelmingly have held that there is a floor with respect to the adequacy of the education provided pursuant to their states' education clauses; that education must be in some way "minimally adequate" or "soundly basic."[55] Furthermore, many of

[54] As previously noted in greater detail in footnote 24 of this opinion, courts in several states have concluded instead that disputes over educational adequacy present nonjusticiable political questions. See *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles*, 680 So. 2d 400, 405 (Fla. 1996); *Committee for Educational Rights* v. *Edgar*, 174 Ill. 2d 1, 29–32, 672 N.E.2d 1178 (1996); *Nebraska Coalition for Educational Equity & Adequacy* v. *Heineman*, 273 Neb. 531, 550–54, 731 N.W.2d 164 (2007); *Oklahoma Education Assn.* v. *State*, 158 P.3d 1058, 1065–66 (Okla. 2007); *Marrero* v. *Commonwealth*, 559 Pa. 14, 19–20, 739 A.2d 110 (1999); *Pawtucket* v. *Sundlun*, 662 A.2d 40, 58–59 (R.I. 1995).

[55] We have discussed in detail only those cases from states whose education clauses are worded and structured closely to article eighth, § 1, of the constitution of Connecticut. The vast majority of the other states have reached the same conclusion, namely, that students are entitled to a sound basic, or minimally adequate, education in the public schools, on the basis of differently worded education clauses, which make them strongly indicative of a national trend and informative with respect to the articulation of a specific legal standard; see part III of this opinion; although not necessarily as valuable with respect to the baseline question of interpretation, namely, whether article eighth, § 1, embodies minimum qualitative standards at all. See *Opinion of the Justices No. 338*, 624 So. 2d 107, 154–55 (Ala. 1993); *Hull* v. *Albrecht*, 190 Ariz. 520, 524, 950 P.2d 1141 (1997); *Lake View School District No. 25* v. *Huckabee*, 351 Ark. 31, 67, 91 S.W.3d 472 (2002), cert. denied, 538 U.S. 1035, 123 S. Ct. 2097, 155 L. Ed. 2d 1066 (2003); *McDaniel* v. *Thomas*, 248 Ga. 632, 644, 285 S.E.2d 156 (1981); *Idaho Schools for Equal Educational Opportunity* v. *Evans*, 123 Idaho 573, 583–84, 850 P.2d 724 (1993); *Montoy* v. *State*, 275 Kan. 145, 155, 62 P.3d 228 (2003); *Rose* v. *Council for Better Education, Inc.*, supra, 790 S.W.2d 212; *Hornbeck* v. *Somerset County Board of Education*, 295 Md. 597, 632, 458 A.2d 758 (1983); *McDuffy* v. *Secretary of the Executive Office of Education*, 415 Mass. 545, 618–19, 615 N.E.2d 576 (1993); *Skeen* v. *State*, 505 N.W.2d 299, 310–11, 315 (Minn. 1993); *Columbia Falls Elementary School District No. 6* v. *State*, 326 Mont. 304, 311, 109 P.3d 257 (2005); *Abbott* v. *Burke*, 119 N.J. 287, 374, 575 A.2d 359 (1990); *Leandro* v. *State*, 346 N.C. 336, 347, 488 S.E.2d 249 (1997); *DeRolph* v. *State*, 78 Ohio St. 3d 193, 203–205, 677 N.E.2d 733 (1997); *Pendleton School District 16R* v. *State*, 220 Or. App. 56, 67–68, 185 P.3d 471 (2008); *Neeley* v. *West Orange-Cove Consolidated Independent School District*, supra, 176 S.W.3d 783; *Scott* v. *Commonwealth*, 247 Va. 379, 384–85, 443 S.E.2d 138 (1994); *Pauley* v. *Kelly*, 162 W. Va. 672, 705–706, 255 S.E.2d 859 (1979); *Vincent* v. *Voight*, 236 Wis. 2d 588, 622–23, 614 N.W.2d 388 (2000);

these decisions have articulated comprehensive stan-
dards that have defined the components of a constitu-
tionally adequate education, which provide us with
further guidance as we consider the merits of this
appeal. See part III of this opinion.

F

### Economic and Sociological Public Policy Considerations

Finally, we address the sixth *Geisler* factor, which
requires consideration of the economic and sociological
concerns presented by this appeal.[56] The plaintiffs, sup-

---

*Campbell County School District* v. *State*, 907 P.2d 1238, 1258–59 (Wyo.
1995); but see *Bonner* v. *Daniels*, 907 N.E.2d 516, 522 (Ind. 2009) ("we
conclude that the [e]ducation [c]lause of the Indiana [c]onstitution does
not impose upon government an affirmative duty to achieve any particular
standard of resulting educational quality"); *Charlet* v. *Legislature of State*,
713 So. 2d 1199, 1207 (La. App.) ("[t]he Louisiana [c]onstitution does not
require that the educational funding provided by the state be 'adequate' or
'sufficient,' or that it achieve some measurable result for each pupil or each
school district"), writ denied, 730 So. 2d 934 (La. 1998); *School Administra-
tive District No. 1* v. *Commissioner of Education*, 659 A.2d 854, 857 (Me.
1995) ("There is no provision in the Maine [c]onstitution guaranteeing a
certain level of state funding of education or equitable funding. To the
contrary, the Maine [c]onstitution requires only that the [s]tate enforce the
municipal obligation to support public education.").

[56] We note that the plaintiffs also have raised a procedural claim, namely,
that the trial court improperly evaluated the legal sufficiency of their consti-
tutional claim without first giving them the opportunity to develop a factual
record, particularly with regard to the economic and sociological considera-
tions of the sixth *Geisler* factor. In response, the defendants contend that
the trial court properly applied *Geisler* in the context of a motion to strike,
as state constitutional claims present pure questions of law that do not
require factual findings by the trial court. We agree with the defendants. We
frequently have considered constitutional claims in the context of motions to
strike; see, e.g., *Batte-Holmgren* v. *Commissioner of Public Health*, 281
Conn. 277, 294, 914 A.2d 996 (2007); or for summary judgment, even those
raising novel issues with public policy considerations; see, e.g., *Kerrigan*
v. *Commissioner of Public Health*, supra, 289 Conn. 146–47; or on appeal
pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). See, e.g.,
*State* v. *McKenzie-Adams*, supra, 281 Conn. 498 n.9. Moreover, we have
concluded that this court may consider scientific studies in the context of
the sixth *Geisler* factor, and that the review of such studies does not present
impermissible fact-finding on appeal, even if they were not part of the trial

ported by several of the amici, cite statistics linking higher education and productive employment, given the changing structure of Connecticut's economy, and argue that an education suitable to prepare students for higher education is necessary because students without higher education are more likely to wind up unemployed. The plaintiffs also cite statistics demonstrating that citizens without high school diplomas or higher education are less likely to vote in elections. In response, the defendants do not dispute that education should be, and is a high social priority, as shown by the fact that education already is the second highest appropriation in the state budget. They do, however, cite standardized testing statistics from the United States Department of Education indicating that Connecticut's students already have a " 'better-than-average chance for success at every stage' of their educational trajectory," and emphasize that our students already perform above the national average on standardized tests. Emphasizing that the trial court has left intact the plaintiffs' equal protection claim, they argue that it is unlikely that judicial intervention will remedy the imperfections that do exist in the system, and likely would result in its upheaval, which would "stifle educational innovation" by reducing local control. Finally, the defendants reiterate their argument that the "prudential concerns" with respect to the enforcement of a right to a suitable education, namely, the complications

court record. See *State* v. *Ledbetter*, 275 Conn. 534, 567–68, 881 A.2d 290 (2005) (considering studies with respect to accuracy of eyewitness identification procedures), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). Thus, assuming all facts alleged in the complaint to be true, the trial court properly addressed the plaintiffs' constitutional claim in the context of the motion to strike. See also *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977) (Noting "distinction between 'legislative facts,' those which help determine the content of law and policy, and 'adjudicative facts,' facts concerning the parties and events of a particular case. The former may be judicially noticed without affording the parties an opportunity to be heard, but the latter, at least if central to the case, may not.").

attendant to supplanting the legislature with the judiciary as the primary education policy making body, favor their restrictive interpretation of article eighth, § 1. Although we acknowledge the prudential concerns that will attend the crafting of a remedy for a constitutional violation that may well be found in this case, we nevertheless conclude that this sixth *Geisler* factor favors the plaintiffs.

In addressing the problems wrought by racial and ethnic school segregation, we previously have acknowledged the policy behind public education, quoting the United States Supreme Court and stating that "a sound education is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms. . . . The American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance. . . . We have recognized the public schools as a most vital civic institution for the preservation of a democratic system of government . . . and as the primary vehicle for transmitting the values on which our society rests. . . . And these historic perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists. . . . [E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our [n]ation

when select groups are denied the means to absorb the values and skills upon which our social order rests." (Citation omitted; internal quotation marks omitted.) *Sheff* v. *O'Neill*, supra, 238 Conn. 43–44, quoting *Plyler* v. *Doe*, 457 U.S. 202, 221, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982); *Brown* v. *Board of Education*, 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873 (1954).

Moreover, although individual plaintiffs bear the brunt of constitutional educational deprivation, "that deprivation potentially has an impact on the entire state and its economy—not only on its social and cultural fabric, but on its material well-being, on its jobs, industry, and business. Economists and business leaders say that our state's economic well-being is dependent on more skilled workers, technically proficient workers, literate and well-educated citizens. And they point to the urban poor as an integral part of our future economic strength. . . . So it is not just that their future depends on the [s]tate, the state's future depends on them."[57] (Internal quotation marks omitted.) *Sheff* v. *O'Neill*, supra, 238 Conn. 44.

Thus, although "[p]rudential and functional considerations are relevant to the classical enterprise of constitutional interpretation, especially where, as here, the constitutional provisions at issue are so remarkably open-textured"; *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 185, 610 A.2d 153 (1992); these concerns, which, as Justice Vertefeuille points out in her dissent, involve the potential for judicial over-

---

[57] The statistics cited by the defendants in support of the proposition that Connecticut's public schools already educate their students effectively do not support their position that article eighth, § 1, of the constitution of Connecticut does not entitle students to an adequate education. These statistics, and those offered by the plaintiffs to prove the opposite proposition, likely will have their place in determining at trial whether a constitutional violation requiring remedial action actually exists as a question of fact, but do not support the baseline argument that article eighth, § 1, lacks a substantive adequacy component.

management of the state's education system and interference with the prerogatives of the political branches of government, are in our view better addressed in consideration of potential remedies for any constitutional violations that may be found at a subsequent trial on the merits, which might well require staying further judicial action pending legislative action. See *Sheff* v. *O'Neill*, supra, 238 Conn. 45; *Horton I*, supra, 172 Conn. 653; see also *Campaign for Fiscal Equity, Inc.* v. *State*, 8 N.Y.3d 14, 27–28, 861 N.E.2d 50, 828 N.Y.S.2d 235 (2006) (*Campaign III*) ("[t]he role of the courts is not . . . to determine the best way to calculate the cost of a sound basic education . . . but to determine whether the [s]tate's proposed calculation of that cost is rational" because of "limited access of the [j]udiciary to the controlling economic and social facts, but also by our abiding respect for the separation of powers upon which our system of government is based" [internal quotation marks omitted]). Put differently, concerns over complications with respect to remedies for violations will not lead us to misinterpret substantive provisions of the constitution.

## III

The wealth of information yielded by our *Geisler* analysis has served well to explain the ambiguous text of Connecticut's education clause, article eighth, § 1, of our state constitution. Thus, we conclude that article eighth, § 1, entitles Connecticut public school students to an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting. A constitutionally adequate education also will leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's

economy.[58] To satisfy this standard, the state, through the local school districts, must provide students with an objectively "meaningful opportunity" to receive the benefits of this constitutional right. *Neeley* v. *West Orange-Cove Consolidated Independent School District*, supra, 176 S.W.3d 787 ("[t]he public education

[58] The defendants contend that the plaintiffs have shifted gears inappropriately by arguing on appeal the right to a "minimally adequate" education, although their pleadings and memoranda before the trial court focused on the right to a "suitable" education. See, e.g., *Reardon* v. *Windswept Farm, LLC*, 280 Conn. 153, 164–65, 905 A.2d 1156 (2006) ("as a general rule, [a] party cannot present a case to the trial court on one theory and then ask a reversal in the [S]upreme [C]ourt on another" [internal quotation marks omitted]). The plaintiffs ask for a finding of a right under article eighth, § 1, either to "suitable educational opportunities . . . that [serves] the purposes alleged in [paragraph forty-six] of [the] amended complaint," or, alternatively, "some minimum qualitative standard, the definition of which would be established on a full record . . . ." In their brief, the plaintiffs describe the "suitable educational opportunities" pleaded in the complaint as those that will "prepare students to obtain gainful employment, participate fully in our democracy, advance to higher education, and meet state standards." Similarly, in paragraph forty-six of the amended complaint, the plaintiffs describe a "suitable educational opportunity" as consisting of "the following components":

"a. All students must receive an educational experience that prepares them to function as responsible citizens and enables them to fully participate in democratic institutions;

"b. All students must receive an opportunity to complete a meaningful high school education that enables them to advance through institutions of higher learning, or that enables them to compete on equal footing to find productive employment and contribute to the state's economy;

"c. All students must receive a suitable opportunity to meet standards which the state has set based on its estimation of what students must learn in order to achieve the goals of [General Statutes] § 46a-42b."

In our view, the defendants' argument on this point boils down to rather insignificant semantics, as we view the terms "suitable" and "minimally adequate" as synonymous in this context. Cf. Merriam-Webster's Collegiate Dictionary (10th Ed. 2001) (defining "suitable" as "proper," "able, qualified" and "adapted to a use or purpose"). Indeed, the plaintiffs' explication of a "suitable" education in paragraph forty-six of their amended complaint accords with other jurisdictions' explication of what constitutes a "minimally adequate" education under their state constitutions. See, e.g., *Rose* v. *Council for Better Education, Inc.*, supra, 790 S.W.2d 212; *Claremont II*, supra, 142 N.H. 472–74; *Campaign II*, supra, 100 N.Y.2d 908; *Seattle School District* v. *State*, supra, 90 Wash. 2d 517–18.

system need not operate perfectly; it is adequate if districts are *reasonably* able to provide their students the access and opportunity the district court described" [emphasis in original]); see also *Sheff* v. *O'Neill*, supra, 238 Conn. 143 (*Borden, J.*, dissenting) (constitutional adequacy determined not by "what level of achievement students reach, but on what the state reasonably attempts to make available to them, taking into account any special needs of a particular local school system"). Moreover, we agree with the New York Court of Appeals' explication of the "essential" components requisite to this constitutionally adequate education, namely: (1) "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn"; (2) "minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks"; (3) "minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies"; and (4) "sufficient personnel adequately trained to teach those subject areas." *Campaign I*, supra, 86 N.Y.2d 317; see also, e.g., *Abbeville County School District* v. *State*, supra, 335 S.C. 68 (state constitution requires provision to students of "adequate and safe facilities in which they have the opportunity to acquire: [1] the ability to read, write, and speak the English language, and knowledge of mathematics and physical science; [2] a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and [3] academic and vocational skills"); *Pauley* v. *Kelly*, 162 W. Va. 672, 706, 255 S.E.2d 859 (1979) (provision of constitutionally adequate education "implicit[ly]" requires "supportive services: [1] good physical facilities, instructional materials and personnel; [2] careful state and local supervision to prevent waste and to monitor pupil, teacher and administrative competency").

We recognize that our explication of a constitutionally adequate education under article eighth, § 1, is crafted in broad terms. This breadth reflects, first and foremost, our recognition of the political branches' constitutional responsibilities, and indeed, greater expertise, with respect to the implementation of specific educational policies pursuant to the education clause.[59]

---

[59] In his dissent, Justice Zarella reviews the education statutory scheme, General Statutes § 10-1 et seq., under which local school boards are agents of the state that are responsible for implementing the principle of a free public education in accordance with General Statutes § 10-218 et seq.; see, e.g., *West Hartford Education Assn.* v. *DeCourcy*, 162 Conn. 566, 573, 295 A.2d 526 (1972); under the supervision of the state board of education; see General Statutes § 10-4; and agrees with the defendants that our conclusion herein will have the effect of "wrest[ing] control of education from the local boards [of education]," instead placing it "in the hands of the court." Justice Zarella argues that "[c]ourt intervention to establish a minimum standard of education or level of educational achievement . . . will conflict with legislative directives to local boards, whose discretion to determine what constitutes a 'suitable program' and 'an appropriate learning environment' for children in their respective districts will not only be severely curtailed, but very likely eliminated . . . ." He further notes that "there is nothing in the recorded history of the 1965 convention to suggest that the framers wanted to end the tradition of local control of education by granting the courts authority to determine how the principle of a free public education should be implemented."

We emphasize that our conclusion herein is not intended to supplant local control over education, nor, as the defendants argue, deprive "parents [of] a true say in their children's education." We are cognizant of the risks and separation of powers concerns attendant to intensive judicial involvement in educational policy making; see footnote 22 of this opinion; and emphasize that our role in explaining article eighth, § 1, is to articulate the broad parameters of that constitutional right, and to leave their implementation to the expertise of those who work in the political branches of state and local government, informed by the wishes of their constituents. So long as those authorities prescribe and implement a program of instruction rationally calculated to enforce the constitutional right to a minimally adequate education as set forth herein, then the judiciary should stay its hand. Cf. *Neeley* v. *West Orange-Cove Consolidated Independent School District*, supra, 176 S.W.3d 778 ("At one extreme, no one would dispute that a public education system limited to teaching first-grade reading would be inadequate . . . . At the other, few would insist that merely to be adequate, public education must teach all students multiple languages or nuclear biophysics, or that to be efficient, available resources must be unlimited.").

See *Sheff* v. *O'Neill,* supra, 238 Conn. 46. The broad constitutional standard also reflects our recognition of the fact that the specific educational inputs or instrumentalities suitable to achieve this minimum level of education may well change over time, as a "constitutionally adequate public education is not a static concept removed from the demands of an evolving world." *Claremont II,* supra, 142 N.H. 474; see also, e.g., *DeRolph* v. *State,* 89 Ohio St. 3d 1, 9–10, 728 N.E.2d 993 (2000) ("[w]hat was deemed thorough and efficient when the state's [c]onstitution was adopted certainly would not be considered thorough and efficient today"); *Campbell County School District* v. *State,* 907 P.2d 1238, 1274 (Wyo. 1995) ("[t]he definition of a proper education is not static and necessarily will change"). Finally, it bears mention that, like any other principle of constitutional law, this broad standard likely will be refined and developed further as it is applied to the facts eventually to be found at trial in this case.

We note that the failure of students to achieve the goals of a constitutionally mandated education may be the result of specific deficient educational inputs, or potentially, be caused by factors not attributable to, or capable of remediation by, state action or omission, a complicated question that is at this point beyond the procedural posture of this case.[60] See *Campaign I,*

---

[60] We note that Justice Schaller writes a separate concurring opinion to "express prudential concerns regarding the next stage of this litigation and to offer suggestions in the form of a *preliminary template* based on what [he] anticipate[s] may arise at trial." (Emphasis in original.) Specifically, Justice Schaller explores several methodologies for assessing adequacy, as well as concerns about how to assess the adequacy of education in light of other social factors such as poverty, and also considers potential remedies should a violation be found after remand. Although Justice Schaller's observations are thoughtful and well considered, we emphasize that, beyond the political question issues discussed in part I of this opinion, we take no position on the applicable assessment mechanisms or potential remedies, which present questions beyond those appropriately considered in the narrow procedural posture of a motion to strike.

supra, 86 N.Y.2d 318 ("[i]n order to succeed in the specific context of this case, plaintiffs will have to establish a causal link between the present funding system and any proven failure to provide a sound basic education to New York City school children"); *Neeley* v. *West Orange-Cove Consolidated Independent School District,* supra, 176 S.W.3d 788 ("[w]hile the end-product of public education is related to the resources available for its use, the relationship is neither simple nor direct; public education can and often does improve with greater resources, just as it struggles when resources are withheld, but more money does not guarantee better schools or more educated students"); see also *Savage* v. *Aronson,* supra, 214 Conn. 287 ("The undoubted hardship imposed upon the children of these plaintiffs from the lack of affordable housing near the schools where they now are being educated cannot be disputed. It results, however, from the difficult financial circumstances they face, not from anything the state has done to deprive them of the right to equal educational opportunity."); *Sheff* v. *O'Neill,* supra, 238 Conn. 143 (*Borden, J.,* dissenting) (assuming existence of constitutional right to adequate education, and noting that "any appropriate standard by which to measure the state's assumed obligation to provide a minimally adequate education must be based generally, not on what level of achievement students reach, but on what the state reasonably attempts to make available to them, taking into account any special needs of a particular local school system"); *Sheff* v. *O'Neill,* supra, 144 (*Borden, J.,* dissenting) ("[a]lthough schools are important socializing institutions in our democratic society, they cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder the academic achievement of those students"). Put differently, although we acknowledge the state's signifi-

cant responsibilities under the constitution, we nevertheless recognize that the education clause is not a panacea for all of the social ills that contribute to many of the achievement deficiencies identified by the plaintiffs in their complaint; a constitutionally adequate education is not necessarily a perfect one. See *Neeley* v. *West Orange-Cove Consolidated Independent School District*, supra, 784 (The court stated that the education clause "does allow the [l]egislature, of necessity, much latitude in choosing among any number of alternatives that can reasonably be considered adequate, efficient, and suitable. These standards do not require perfection, but neither are they lax. They may be satisfied in many different ways, but they must be satisfied.").

We conclude, therefore, that the trial court improperly granted the defendants' motion to strike because further proceedings are required to determine as a question of fact whether the state's educational resources and standards have in fact provided the public school students in this case with constitutionally suitable educational opportunities.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion KATZ and SCHALLER, Js., concurred.

PALMER, J., concurring in the judgment. I agree with the plaintiffs[1] that their claims under article eighth, § 1, of the Connecticut constitution[2] are justiciable. I also conclude that the right embodied in that provision is a

[1] The plaintiffs are the Connecticut Coalition for Justice in Education Funding, Inc., and certain parents and grandparents of students enrolled in various public schools throughout the state. See footnote 3 of the plurality opinion and accompanying text.

[2] Article eighth, § 1, of the constitution of Connecticut provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

substantive one that requires the state[3] to provide an educational opportunity to the students of our free public elementary and secondary schools that, at the least, is minimally adequate by modern educational standards.[4] Consequently, like the plurality, I also conclude that the judgment of the trial court must be reversed. I am unable to join the plurality opinion, however, primarily because I take a different view from the plurality with respect to the scope of the right guaranteed by article eighth, § 1. In particular, I believe that the executive and legislative branches are entitled to considerable deference with respect to the determination of what it means, in practice, to provide for a minimally adequate, free public education. Thus, it is the prerogative of the legislature to determine, within reasonable limits, what a minimally adequate education entails. Consequently, in my view, the plaintiffs will not be able to prevail on their claims unless they are able to establish that what the state has done to discharge its obligations under article eighth, § 1, is so lacking as to be unreasonable by any fair or objective standard. As I explain more fully hereinafter, any other approach, including the approach that the plurality advocates, would permit the judicial branch to second-guess the reasoned judgment of the legislative and executive branches with respect to the education policy of this state, thereby depriving those

[3] The defendants in this case are M. Jodi Rell, the governor of Connecticut, Denise Lynn Nappier, the state treasurer, Nancy S. Wyman, the state comptroller, Mark K. McQuillan, successor to Betty J. Sternberg, the former state commissioner of education, and various former and current members of the state board of education. See footnote 5 of the plurality opinion for a list of the particular defendants in this case. In the interest of simplicity, I refer to the defendants collectively as the state throughout this opinion.

[4] I perceive no difference between an educational opportunity that is minimally adequate and an educational opportunity that the plurality characterizes as "soundly basic." (Internal quotation marks omitted.) I use the former terminology, however, because it mirrors the language used in the explication of the standard that I believe is most useful for purposes of explaining the essential requirements of article eighth, § 1. See part II of this opinion.

branches of their "recognized significant discretion in matters of public elementary and secondary education." *Sheff* v. *O'Neill*, 238 Conn. 1, 37, 678 A.2d 1267 (1996).

# I

## JUSTICIABILITY

The state contends that the plaintiffs' claims under article eighth, § 1, of the state constitution give rise to a nonjusticiable political question. Although I agree with the plurality's determination that the plaintiffs' state constitutional claims are justiciable, I disagree with the plurality's assertion that *Sheff* v. *O'Neill*, supra, 238 Conn. 1, "controls the justiciability issue in this appeal." My disagreement with the plurality is twofold. First, *Sheff* involved a claim that the plaintiffs in that case had been denied the right to a substantially equal educational opportunity under article eighth, § 1, *and* under the equal protection provisions of article first, §§ 1[5] and 20,[6] of the state constitution. Second, in retrospect, our justiciability analysis in *Sheff* was less than persuasive.

Before considering these two points, I turn first to this court's relatively brief discussion of justiciability in *Sheff*, in which we first explained that the defendants in that case had asserted that the plaintiffs' claims were nonjusticiable because "the relief [that the plaintiffs sought] would . . . require this court to respond to a

---

[5] Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[6] Article first, § 20, of the constitution of Connecticut provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

Article first, § 20, has been amended by articles five and twenty-one of the amendments, which added sex and disability, respectively, to the list of protected classes.

political question that our constitution has expressly and exclusively entrusted to the legislature." Id., 13. Although we acknowledged that "courts do not have jurisdiction to decide cases that involve matters that textually have been reserved to the legislature"; id.; we also explained that, "[i]n the absence of such a textual reservation . . . it is the role and the duty of the judiciary to determine whether the legislature has fulfilled its affirmative obligations within constitutional principles." Id. We then observed that, "[i]n the context of [a claim seeking] judicial enforcement of the right to a substantially equal educational opportunity arising under article eighth, § 1, and article first, §§ 1 and 20, justiciability is not a matter of first impression for this court." Id., 14. We explained, more specifically, that, "[i]n *Horton* [v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977) (*Horton I*)], and *Horton* v. *Meskill*, 195 Conn. 24, 486 A.2d 1099 (1985) (*Horton III*), we reviewed, in plenary fashion, the actions taken by the legislature to fulfill its constitutional obligation to public elementary and secondary schoolchildren. Judicial authority to render these decisions was expressly reaffirmed in *Nielsen* v. *State*, [236 Conn. 1, 9–10, 670 A.2d 1288 (1996)], and in *Pellegrino* v. *O'Neill*, [193 Conn. 670, 683, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984)]." *Sheff* v. *O'Neill*, supra, 238 Conn. 14.

We then noted: "The defendants [in *Sheff*] do not challenge the continued validity of *Horton I* and *Horton III* . . . but argue that their claim of nonjusticiability differs. That argument is unavailing. The plaintiff schoolchildren . . . invoke the same constitutional provisions to challenge the constitutionality of state action that the plaintiff schoolchildren invoked in *Horton I* and *Horton III*. The text of article eighth, § 1, has not changed." Id., 14–15. The court in *Sheff* concluded that, "[i]n light of these precedents . . . the phrase 'appropriate legislation' in article eighth, § 1, does not

deprive the courts of the authority to determine what is 'appropriate.'" Id., 15.

Thus, our justiciability determination in *Sheff* was predicated entirely on *Horton I* and *Horton III*, and two subsequent cases, *Nielsen* v. *State*, supra, 236 Conn. 1, and *Pellegrino* v. *O'Neill*, supra, 193 Conn. 670. In *Horton I* and *Horton III*, however, this court *never considered* the justiciability of the plaintiffs' claims in those cases because the defendants did not appeal the trial court's decision rejecting their contention that the plaintiffs' claims were nonjusticiable. Although we adverted to that fact in a footnote in *Sheff*;[7] see *Sheff* v. *O'Neill*, supra, 238 Conn. 14 n.16; we nevertheless treated our plenary review of the plaintiffs' claims in *Horton I* and *Horton III* as adequate support for our conclusion in *Sheff* that claims alleging a violation of the constitutionally protected right to an equal educational opportunity are justiciable. See id., 14–15. Therefore, because we never addressed the issue of justiciability

---

[7] We stated in *Sheff*: "The defendants in *Horton I* originally asserted defenses based on justiciability, sovereign immunity and standing. The trial court ruled against the defendants on the issues of justiciability and standing . . . but did not address the issue of sovereign immunity. *Horton* v. *Meskill*, 31 Conn. Sup. 377, 389, 332 A.2d 113 (1974). In their appeal to [the state Supreme] [C]ourt, the defendants in *Horton I* did not challenge the trial court's ruling." *Sheff* v. *O'Neill*, supra, 238 Conn. 14 n.16. In *Horton* v. *Meskill*, supra, 31 Conn. Sup. 389, the court, *Rubinow, J.*, resolved the defendants' claim of nonjusticiability by reference to an earlier decision in the same case by the court, *Parskey, J.*, which had rejected that same claim. The following represents the entire analysis of that claim by the court, *Parskey, J.*: "Justicibility involves such questions as whether the duty asserted can be judicially identified, its breach judicially determined and whether protection of the right asserted can be judicially molded. . . . Such matters deal with the exercise of jurisdiction rather than the lack of it and therefore must be considered on the merits. In a declaratory judgment action the only issue that involves justiciability is whether the interests of the opposing parties are adverse. . . . In this case the defendants make no claim contesting the adverse relationship of the opposing parties; nor could they on the face of the record." (Citations omitted.) *Horton* v. *Meskill*, Superior Court, Hartford County, Docket No. 185283 (January 21, 1974).

in *Horton I* or *Horton III*, our reliance on those cases for purposes of resolving the defendants' justiciability claim in *Sheff* was misplaced.[8] Finally, in both of the cases that we cited in *Sheff* as "expressly reaffirm[ing]" our justiciability determination in *Horton I* and *Horton III*, namely, *Nielsen* and *Pellegrino*; id., 14; we simply explained that we had exercised our authority in *Horton I* and *Horton III* to reach the merits of those cases; we made no mention of the fact that the *issue of our authority to do so* was not before this court in either *Horton I* or *Horton III* because no party to those cases had raised it on appeal. See generally *Nielsen* v. *State*, supra, 9–10; *Pellegrino* v. *O'Neill*, supra, 683. In light of this history, I cannot see how our justiciability determination in *Sheff* is sufficient to warrant our reliance on that conclusion for purposes of the present case.

I also disagree with the plurality's reliance on our justiciability determination in *Sheff* for a second reason, namely, because *Sheff* and the present case involve different rights under the state constitution that implicate materially different jurisprudential considerations. In *Sheff*, the plaintiffs alleged that they had been deprived of their right to an equal educational opportunity under article eighth, § 1, and article first, §§ 1 and 20; see *Sheff* v. *O'Neill*, supra, 236 Conn. 5; whereas the plaintiffs in the present case have claimed that they have been denied their right to a suitable or adequate education under article eighth, § 1. The two types of claims give rise to important differences with respect to the role of the judiciary; the former requires the

---

[8] Moreover, as I have noted; see footnote 7 of this opinion; the trial court in *Horton I* rejected the defendants' justiciability claim in that case solely because "the interests of the opposing parties [were undisputedly] adverse"; *Horton* v. *Meskill*, Superior Court, Hartford County, Docket No. 185283 (January 21, 1974); a reason that is wholly inadequate in light of the significant jurisprudential considerations militating both for and against justiciability of claims raised under article first, §§ 1 and 20, and article eighth, § 1, of the Connecticut constitution.

adjudication of issues that relate primarily to the equality of education, whereas the latter requires the adjudication of issues that are more directly related to education policy. To the extent that education adequacy litigation involves the courts in matters of education policy to a greater degree than education equity litigation, it is reasonable to conclude that, as a general matter, adequacy claims are more likely to result in judicial intrusion into areas of core legislative interest and responsibility. See, e.g., R. Levy, "Gunfight at the K-12 Corral: Legislative vs. Judicial Power in the Kansas School Finance Litigation," 54 U. Kan. L. Rev. 1021, 1033–34 (2006) ("Defining levels of adequacy requires that courts become involved in determining educational policies—the goals and the methods of delivering education—in a way that equity litigation does not. Likewise, fashioning remedies for violations of adequacy requirements is more problematic because legislatures may be reluctant to provide sufficient funding and because judicial enforcement of remedies against the legislature presents practical difficulties and raises serious separation-of-powers concerns.").

I nevertheless agree with the plaintiffs that their claims under article eighth, § 1, are justiciable. First, I am not persuaded that the language of article eighth, § 1, so clearly removes the issue of its implementation from judicial review as to preclude the judiciary from exercising the authority that it otherwise possesses to consider the merits of the plaintiffs' claims. Although the "appropriate legislation" language of article eighth, § 1, affords the legislature considerable latitude in determining how best to meet the constitutional mandate of free public elementary and secondary school education; see part II of this opinion; there is nothing in the wording or history of that provision to indicate that its drafters intended to shield its implementation by the legislature from any and all measure of judicial

interpretation or review. Moreover, although I believe that the other factors to be considered in determining the justiciability of a claim under the state constitution[9] present a closer question than the plurality believes it does, I agree with the plurality and the plaintiffs that those considerations are not sufficiently compelling in this case to relieve this court of *its* constitutional responsibility to safeguard the constitutional rights of our citizenry.[10] Mindful of the fact that we undertake

[9] "It is well settled that certain political questions cannot be resolved by judicial authority without violating the constitutional principle of separation of powers. *Baker* v. *Carr*, 369 U.S. 186, 210, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 184–85, 610 A.2d 153 (1992); *Pellegrino* v. *O'Neill*, [supra, 193 Conn. 679–80]. As we have stated, the 'characterization of such issues as political is a convenient shorthand for declaring that some other branch of government has constitutional authority over the subject matter superior to that of the courts.' *Pellegrino* v. *O'Neill*, supra, 680. The fundamental characteristic of a political question, therefore, is that its adjudication would place the court in conflict with a coequal branch of government in violation of the primary authority of that coordinate branch. *Baker* v. *Carr*, supra, 217. Whether a controversy so directly implicates the primary authority of the legislative or executive branch, such that a court is not the proper forum for its resolution, is a determination that must be made on a case-by-case [basis]. Id., 210–11." *Nielsen* v. *Kezer*, 232 Conn. 65, 74–75, 652 A.2d 1013 (1995). The specific factors that may render a case nonjusticiable are enumerated in the plurality opinion; see part I of the plurality opinion; and I need not restate them here.

[10] I do wish to note, however, my disagreement with the plurality's assertion that "it is premature to consider the implications of specific remedies" for purposes of determining whether the present case is justiciable. Footnote 22 of the plurality opinion. In my view, it is not premature to consider those implications because, for the reasons set forth more fully in part II of this opinion, they are real and, therefore, bear on the issue of whether this court is capable of identifying and imposing an appropriate remedy if and when the plaintiffs prove a constitutional violation. I also disagree with the plurality's assertion that "at least one of the plaintiffs' desired remedies supports the justiciability of their claims," namely, the plaintiffs' request for an order requiring the state "to create and maintain a public education system that will provide suitable and substantially equal educational opportunities [for the] plaintiffs." (Internal quotation marks omitted.) The plurality's assertion is predicated on the notion that a case is likely to be justiciable if at least one of the possible remedies for a violation is to afford the legislature the opportunity to fix the problem. This principle, which this court first identified

our resolution of the state's claim "with a heavy thumb on the side of justiciability, and with the recognition that, simply because the case is connected to the political sphere, it does not necessarily follow that it is a political question"; *Seymour* v. *Region One Board of Education*, 261 Conn. 475, 488, 803 A.2d 318 (2002); I am not convinced that that doctrine bars us from entertaining the plaintiffs' education adequacy claim under article eighth, § 1, of the state constitution. As I explain more fully hereinafter, however, I am persuaded that many of the factors that the state identifies in the present case as requiring complete judicial abstention under the political question doctrine militate strongly in favor of limiting the role of the judiciary by deferring to the reasoned determination of the political branches

and found applicable in *Seymour* v. *Region One Board of Education*, 261 Conn. 475, 803 A.2d 318 (2002), has little, if any, applicability to the present case. In *Seymour*, we considered a challenge to the constitutionality of the statutorily mandated financing system for regional school districts. Id., 476. In addressing the contention of the defendants in that case that the plaintiffs' claims involved a nonjusticiable political question, this court observed that it "would have grave doubts about the justiciability of the claim" if the only remedy available was an order directing the defendant school district "to establish itself as a taxing district, and set the taxing powers and standards suggested by the plaintiffs . . . ." Id., 483. As we explained, we were concerned that such a remedy would "requir[e] the judicial branch to entangle itself in what probably would be the nonjudicial function of establishing a taxing district." Id., 484. We rejected the defendants' claim of nonjusticiabilty, however, due to the fact that, consistent with the plaintiffs' prayer for relief, the legislature could be ordered to create a new taxing district. See id. In *Seymour*, our concern about justiciability was based on the long-standing recognition that matters relating to taxation are quintessentially matters for legislative consideration; the remedy, however, would have been relatively simple and straightforward, and readily accomplished by the legislature. See id. By contrast, if the plaintiffs in the present case are successful in proving their claim under article eighth, § 1, the legislature would be required to overhaul completely the current manner in which the public education system is funded. Moreover, there is little doubt that such an overhaul would require at least some measure of court supervision, likely for an extended period of time. These considerations raise separation of powers issues that cannot be brushed aside as premature or hypothetical. See part II of this opinion.

with respect to the precise parameters of the right established under article eighth, § 1. Thus, affording considerable deference to the political branches with respect to the approach that they deem appropriate to satisfy the mandate of article eighth, § 1, necessarily eases separation of powers concerns—concerns that otherwise might lead to a different resolution of the state's claim of nonjusticiability.

## II

### THE CONSTITUTIONAL STANDARD

By its terms, article eighth, § 1, of the state constitution is not merely precatory or hortatory. On the contrary, it imposes an affirmative, mandatory obligation on the legislature to enact legislation appropriate to the task of maintaining a system of free public elementary and secondary schools. The issue, therefore, is whether article eighth, § 1, obligates the state to ensure that those free public schools provide to the students attending them an educational opportunity of a certain level or quality. I believe that it does.

For several reasons, I am unable to conclude that article eighth, § 1, is satisfied as long as the state maintains a system of public elementary and secondary schools no matter how fundamentally inadequate some or all of those schools may be. It is apparent that Simon Bernstein, one of the delegates at the state constitutional convention of 1965, and other delegates who supported the idea of constitutionalizing the right to free public schools were proud of Connecticut's long-standing commitment to the education of its schoolchildren, and they urged their colleagues to support the proposed right as an expression of the state's continued recognition of that responsibility. See Proceedings of the Connecticut Constitutional Convention (1965), Pt. 1, p. 312, remarks of Bernstein ("[w]e have a great history and tradition requiring that the public body supply our chil-

dren with free public education"); Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, p. 1039, remarks of Bernstein (noting this state's educational "tradition which goes back to our earliest days of a free good public education"); see also id., p. 1062, remarks of Chase Going Woodhouse ("it is extremely fitting that we should finally put into our [c]onstitution a reference to our great public schools because Henry Barnard of Connecticut is perhaps one of the greatest historical figures in this development of public school education in this whole nation of ours"). To presume, therefore, that the legislature may, if it chooses, establish and maintain manifestly inferior or substandard public schools would be inconsistent with the purpose underlying article eighth, § 1, namely, to underscore the importance of free public schools by elevating that principle to constitutional status. See, e.g., id., p. 1039, remarks of Bernstein ("I submitted a resolution . . . which pertained to the subject of education . . . and the statement of purpose of that resolution . . . was that our system of free public education have a tradition [of] acceptance on a par with our bill of rights and it should have the same [c]onstitutional sanctity. It was because our [c]onstitution had no reference to our school system that I submitted my resolution and of course others were aware of the same [omission] in our [c]onstitution and other similar resolutions were submitted. . . . [W]e have [had] good public schools so that this again is not anything revolutionary, it is something which we have, it is which is [in] practically all [c]onstitutions in the [s]tates of our nation and Connecticut with its great tradition certainly ought to honor this principle."). Moreover, a contrary determination would be incompatible with the requirement of article eighth, § 1, that the legislature shall implement a system of free public elementary and secondary schools by "appropriate" legislation, a mandate that suggests that

the delegates contemplated the establishment of free public schools of at least some measure or level of quality. Indeed, it would do violence to the meaning of the term "school,"[11] as a place where students go to learn, to conclude that the legislature is free to establish and maintain a system of public education that is not even minimally adequate to meet the needs of those students.

Finally, I agree with Justice Schaller that our determination in *Horton I* concerning the right to an equal educational opportunity informs our determination of whether that right also includes a qualitative component. As Justice Schaller explains in his concurring opinion: "To be sure, the court concluded in *Horton I* only that the plaintiffs [in that case] were entitled to receive an education that was substantially equal in quality to the education that was provided to other children, not that they were guaranteed an education meeting a minimum qualitative standard. . . . It is not possible to infer generally from a requirement of equality a requirement of adequacy. On the other hand, the idea that it is the *quality of education* to which Connecticut children have an equal right, rather than merely equality in education financing, supports the general proposition that the interest that children have in the fundamental right to education guaranteed by [article eighth, § 1] is inextricably linked to the quality of the education provided. Put another way, our conclusion in *Horton I* that the plaintiffs [in that case] had a right to substantially equal educational funding is based on the right to an education of substantially equal *quality*. The notion that children have a right to an education of substantially equal quality presupposes that 'quality' is an essential component of [article eighth, § 1]. We

---

[11] "School" is defined as "an organized source of education or training: as . . . an institution for the teaching of children . . . a place where instruction is given . . . ." Webster's Third New International Dictionary.

cannot fairly separate the right to education from the right to a *quality* education." (Citation omitted; emphasis in original.) Thus, implicit in the right to an equal educational opportunity in our free public elementary and secondary schools is the right to an education that, at the least, satisfies minimum qualitative standards.

Having determined that article eighth, § 1, contains a qualitative component, the following question remains: What is the nature and scope of the right guaranteed under that provision? For the reasons that follow, I conclude, first, that the right established under article eighth, § 1, requires only that the legislature establish and maintain a minimally adequate system of free public schools. I also conclude that the legislature is entitled to considerable deference with respect to both its conception of the scope of the right and its implementation of the right.

A number of considerations support the conclusion that the right under article eighth, § 1, places no greater an obligation on the legislature than to provide a minimally adequate educational opportunity to this state's public elementary and secondary school students. First, article eighth, § 1, contains no language that mandates any particular standard or otherwise purports to delineate expressly the parameters of the right to a minimally adequate education. At first blush, the framer's omission of such language might appear to be neutral with respect to the issue of the scope of the right created under article eighth, § 1. As the plurality has observed, however, the analogous provisions of a majority of state constitutions require the legislatures in those states to establish and maintain schools of a certain caliber, level or quality. See, e.g., Ark. Const., art. 14, § 1 (state must maintain "a general, suitable and efficient system of free public schools"); Colo. Const., art. IX, § 2 (legislature directed to provide for "a thorough and uniform system of free public schools"); Fla. Const., art. IX, § 1 (a) (state

shall provide for "a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education"); Idaho Const., art. IX, § 1 (legislature shall provide for "a general, uniform and thorough system of public, free common schools"); Ill. Const., art. X, § 1 ("[t]he state shall provide for an efficient system of high quality public educational institutions and services"); Minn. Const., art. XIII, § 1 (legislature shall provide for "a thorough and efficient system of public schools"); Mont. Const., art. X, § 1, para. 3 ("[t]he legislature shall provide a basic system of free quality public elementary and secondary schools"); N.J. Const., art. VIII, § IV, para. 1 ("[t]he [l]egislature shall provide for the maintenance and support of a thorough and efficient system of free public schools"); Ohio Const., art. VI, § 2 (Ohio General Assembly shall make provisions for "a thorough and efficient system of common schools throughout the state"); Va. Const., art. VIII, § 1 ("[t]he General Assembly . . . shall seek to ensure that an educational program of high quality is established and continually maintained"); W. Va. Const., art. XII, § 1 (legislature "shall provide, by general law, for a thorough and efficient system of free schools"); Wyo. Const., art. 7, § 1 ("[t]he [l]egislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction"). In Connecticut, however, we have elected to establish the constitutional right to a free public education without reference to any substantive or qualitative requirement. Although I am not persuaded that the absence of such language in article eighth, § 1, reflects an intent by the framers that our public elementary and secondary schools need not meet any minimum or threshold qualitative standard, the fact that article eighth, § 1, contains no such language is nevertheless reason for this court to refrain from defining the right too broadly or expansively.

Furthermore, article eighth, § 2, of the Connecticut constitution, which, like article eighth, § 1, was adopted at the 1965 constitutional convention, requires that the state "maintain a system of higher education, including The University of Connecticut, which shall be *dedicated to excellence* in higher education." (Emphasis added.) The fact that this provision makes reference to a particular qualitative standard supports an inference that the framers intentionally drafted article eighth, § 1, in nonsubstantive terms and further counsels against an expansive interpretation of article eighth, § 1.

The history of article eighth, § 1, also indicates that the framers themselves did not believe that they were establishing a broad, new right. For example, the main sponsor of the proposed provision, Bernstein, urged its adoption because the other states already had seen fit to include similar provisions in their state constitutions. See Proceedings of the Connecticut Constitutional Convention, supra, Pt. 3, p. 1039, remarks of Bernstein. Indeed, Bernstein expressly stated that the principle embodied in his proposal was "not anything revolutionary." Id.; see also id., p. 1040, remarks of Albert E. Waugh (explaining that because Connecticut was only state not to have constitutional provision establishing right to free public education, adoption of proposed amendment was "natural and proper thing to do"). Thus, the intent and purpose of the framers, as reflected in the proceedings of the 1965 constitutional convention, coupled with the language of article eighth, § 1, strongly suggest that a particularly demanding qualitative requirement was not a matter of paramount importance. These considerations, taken together, nevertheless support the conclusion that article eighth, § 1, contemplates free public elementary and secondary schools that, at the least, are minimally adequate.

I also believe that the proper scope of article eighth, § 1, cannot be determined without due regard for the

principle, previously recognized by this court, that "prudential cautions may shed light on the proper definition of constitutional rights and remedies . . . ." (Citation omitted.) *Sheff* v. *O'Neill*, supra, 238 Conn. 15; see also *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 185, 610 A.2d 153 (1992) ("[p]rudential and functional considerations are relevant to the classical enterprise of constitutional interpretation, especially [when] . . . the constitutional provisions at issue are . . . open-textured"); cf. *United States Dept. of Commerce* v. *Montana*, 503 U.S. 442, 459, 112 S. Ct. 1415, 118 L. Ed. 2d 87 (1992) (observing that issue before court regarding limits of Congress' apportionment authority gave rise to special concerns not present in prior cases but concluding that those concerns "relate[d] to the merits of the controversy rather than to [the court's] power to resolve it"). Several such prudential considerations militate strongly in favor of deferring to the reasoned judgment of the political branches with respect to the determination, in practice, of the parameters of the right.

The first such consideration is what this court has recognized as the legislature's significant discretion in matters of public elementary and secondary school education. *Sheff* v. *O'Neill*, supra, 238 Conn. 37, 41. The judicial branch must accord the legislative branch great deference in this area because, among other reasons, courts are ill equipped to deal with issues of educational policy; in other words, courts "lack [the] specialized knowledge and experience" to address the many "persistent and difficult questions of educational policy" that invariably arise in connection with the establishment and maintenance of a statewide system of education. *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 42, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). Thus, these issues are best addressed by our elected and appointed officials in the exercise of their

informed judgment. See id. As the United States Supreme Court has observed, "[e]ducation . . . presents a myriad of intractable economic, social, and even philosophical problems. . . . The very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them, and that, within the limits of rationality, the legislature's efforts to tackle the problems should be entitled to respect. . . . On even the most basic questions in this area the scholars and educational experts are divided. Indeed, one of the major sources of controversy concerns the extent to which there is a demonstrable correlation between educational expenditures and the quality of education . . . . Related to the questioned relationship between cost and quality is the equally unsettled controversy as to the proper goals of a system of public education. . . . The ultimate wisdom as to [the] . . . problems of education is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the [state] inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions." (Citations omitted; internal quotation marks omitted.) Id., 42–43.

Special deference is warranted in the present case due to the fact that the framers reserved to the legislature the responsibility of implementing the mandate of a free public education under article eighth, § 1, by "appropriate legislation." The ordinary meaning of these words vests the legislature with significant discretion. Indeed, because the framers provided no express guidance as to the nature or scope of the "appropriate" legislation required under article eighth, § 1, it is appar-

ent that they intended to leave that determination to the reasoned judgment of the legislature.

Another compelling reason for judicial restraint in matters relating to educational policy is the potential that exists for a costly and intrusive remedy if it is determined that the state's system of public education has failed to meet the constitutional standard of quality. The recent experience of our neighbors in Massachusetts and New York is instructive. In both of those states, trial courts found that certain schools were constitutionally deficient and imposed remedies that ultimately were upheld on appeal, costing billions of dollars. See *Hancock* v. *Commissioner of Education*, 443 Mass. 428, 436–51, 822 N.E.2d 1134 (2005) (plurality opinion) (explaining history and cost of litigation in Massachusetts); *Campaign for Fiscal Equity, Inc.* v. *New York*, 8 N.Y.3d 14, 20–27, 861 N.E.2d 50, 828 N.Y.S.2d 235 (2006) (explaining history and cost of litigation in New York). Despite these expenditures, and after years of good faith efforts by the political branches to ameliorate the constitutional violations, trial courts in both Massachusetts and New York concluded that the educational deficiencies persisted and ordered further remedial action. See *Hancock* v. *Commissioner of Education*, supra, 443 (plurality opinion); *Campaign for Fiscal Equity, Inc.* v. *New York*, supra, 25–27. On appeal, however, both the Supreme Judicial Court of Massachusetts and the New York Court of Appeals determined that further judicial involvement in budgeting and policy making decisions relating to education was unwarranted—the lingering educational inadequacies notwithstanding—in light of the substantial deference due the political branches in matters of education policy. See *Hancock* v. *Commissioner of Education*, supra, 460 (plurality opinion) (rejecting trial court's remedial order because it was, inter alia, "rife with policy choices that are properly the [l]egislature's

domain" and because remedy "would not be a final [one], but a starting point for what inevitably must mean judicial directives concerning appropriations," which was unacceptable result in light of then ongoing efforts by political branches to improve education statewide); *Campaign for Fiscal Equity, Inc.* v. *New York*, supra, 28 ("[The court's] deference to the [l]egislature's education financing plans is justified not only by prudent and practical hesitation in light of the limited access of the [j]udiciary to the controlling economic and social facts, but also by our abiding respect for the separation of powers [on] which our system of government is based . . . . We cannot intrude [on] the policy-making and discretionary decisions that are reserved to the legislative and executive branches . . . ." [Citations omitted; internal quotation marks omitted.]).

These examples and similar cases from other jurisdictions reflect what one commentary recently has characterized as a distinct trend in education adequacy litigation away from judicial intervention and toward deference to the legislature. J. Simon-Kerr & R. Sturm, "Justiciability and the Role of Courts in Adequacy Litigation: Preserving the Constitutional Right to Education," 6 Stan. J. C.R. & C.L. 83 (2010) (discussing cases). Although I agree with the plaintiffs that the prospect of an expensive remedy, or one that is likely to inject the court into matters of education policy, or both, should not preclude an adjudication of the merits of their education adequacy claims, the significant separation of powers issues that any such remedy invariably would spawn must be given due consideration in determining the scope of the right established under article eighth, § 1.[12] The fact is that the plaintiffs seek

---

[12] I therefore disagree with the plurality's assertion that, "although [p]rudential and functional considerations are relevant to the classical enterprise of constitutional interpretation . . . these concerns, which . . . involve the potential for judicial overmanagement of the state's education system and interference with the prerogatives of the political branches of government, are in our view better addressed in consideration of potential remedies

a complete overhaul of the current system of public education, including a judgment declaring "that the existing school funding system is unconstitutional, void and without effect,"[13] a permanent injunction barring the state "from operating the current public education system, except as necessary to provide an expedient and efficient transition to a constitutional public education system," and the appointment of a special master "to hold hearings, make findings, and report recommendations to the [c]ourt with regard to the constitutionality of any new system of education proposed by [the state]." It is difficult to imagine a more comprehensive or thoroughgoing challenge to the legitimacy of the manner in which the legislature has elected to discharge its responsibilities under article eighth, § 1, than that

---

for any constitutional violations that may be found at a subsequent trial on the merits, which might well require staying further judicial action pending legislative action." (Citation omitted; internal quotation marks omitted.) The plurality's approach is unpersuasive because it fails to acknowledge that, as the experience of other states, including New York and Massachusetts, has borne out, it is unrealistic to believe that a remedy can be devised that will not give rise to separation of powers concerns. Although the plurality seems to believe that it can avoid those concerns simply by leaving the remedy to the legislature in the first instance, I submit that the plurality's confidence in that regard is misplaced. As recent education adequacy cases have demonstrated, there is no way that courts can avoid involvement in complex funding and education policy issues at the remedy stage merely by permitting the legislature to attempt to satisfy the court's mandate; the issues involved at that stage are likely to be too complicated and the parties' views too divergent for the court to be able to remove itself from the remedy phase. See, e.g., *Sheff* v. *O'Neill*, Superior Court, judicial district of Hartford, Docket No. X07 CV-89-4026240-S (February 22, 2010) (stating that "[t]his case returns to court yet again" and providing brief history of *Sheff* litigation, which commenced in 1998 and still has not concluded). Indeed, the plaintiffs in the present case have sought the appointment of a special master to assist the court in what the plaintiffs believe will be the court's ongoing supervision over any remedy that may be proposed or implemented by the state.

[13] The plaintiffs have alleged that the current system of public school funding in this state is "flawed" as well as "arbitrary and inadequate . . . ."

reflected in the relief sought by the plaintiffs in the present case.

With respect to the plaintiffs' funding claim, it is noteworthy that a report commissioned by the named plaintiff, Connecticut Coalition for Justice in Education Funding, Inc., contains an estimate indicating that, during the 2003–2004 school year, the state would have had to spend an additional $2.02 billion on elementary and secondary public school education to meet the constitutional standard advocated by the plaintiffs. See Augenblick, Palaich & Associates, Inc., Estimating the Cost of an Adequate Education in Connecticut (June, 2005) p. v, available at http://www.schoolfunding.info/states/ct/CT-adequacystudy.pdf (last visited March 9, 2010). This "additional" annual amount is approximately 92 percent more than the amount that the state actually spent that year, i.e., approximately $2.2 billion, on those schools. See Office of Fiscal Analysis, Connecticut General Assembly, Connecticut State Budget 2003–2005, p. 13. For present purposes, it is not important whether the $2.02 billion figure is, in fact, accurate; what is important is that, under the plaintiffs' conception of the nature and scope of the right established under article eighth, § 1, the state would be required to spend, at a minimum, many hundreds of millions of additional dollars on the state's public elementary and secondary schools. I fully appreciate, of course, that, at this preliminary stage of the litigation, it would be unfair to use the report or its $2.02 billion estimate for anything other than a very rough indicator of the magnitude of the problem from the plaintiffs' perspective. The potential cost of the remedy as estimated in the report, however, is sufficiently great that it cannot be ignored for purposes of determining the scope and parameters of article eighth, § 1.

The potential for long, protracted and expensive litigation is yet another factor favoring an approach that affords a substantial degree of deference to the legislature concerning the discharge of its responsibility under article eighth, § 1. In his dissenting opinion, Justice Zarella discusses a number of cases in which sister state courts "have become bogged down for years in [seemingly] endless litigation" over the nature and scope of the state constitutional right to a free public education and the appropriate remedies for violations of that right, including, most notably, the New Jersey courts, and I need not repeat that discussion here. The observations of the high courts of Nebraska and Rhode Island are worth noting, however, because they so graphically highlight the problems that can arise when the judiciary becomes embroiled in disputes over the precise contours of the state constitutional right to education.[14] See *Nebraska Coalition for Educational Equity & Adequacy* v. *Heineman*, 273 Neb. 531, 557, 731 N.W.2d 164 (2007) ("The landscape is littered with courts that have been bogged down in the legal quicksand of continuous litigation and challenges to their states' school funding systems. Unlike those courts, we refuse to wade into that Stygian swamp."); *Pawtucket* v. *Sundlun*, 662 A.2d 40, 59 (R.I. 1995) ("[T]he New Jersey Supreme Court has struggled in its self-appointed role as overseer of education for [decades], consuming significant funds, fees, time, effort, and court attention. The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a [l]egislature."). It is no doubt that these potential problems can be minimized or perhaps even eliminated by employing

---

[14] In the present case, the plaintiffs' anticipation of extended involvement by the court is reflected in their request for the appointment of a special master to conduct hearings and make recommendations to the court concerning the propriety of "any new system of education proposed by [the state]."

a mode of constitutional interpretation that affords considerable deference to the legislature with respect to the manner in which the right to a minimally adequate free public education is conceived and implemented.

In accordance with the foregoing principles and considerations, I agree generally that the following "essentials," as explicated by the New York Court of Appeals, are necessary to satisfy the requirement of a minimally adequate education for purposes of article eighth, § 1. "Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn.[15] Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks.[16] Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas."[17] *Campaign for Fiscal Equity, Inc.* v. *New York,*

[15] It goes without saying that a safe and secure environment also is an essential element of a constitutionally adequate education.

[16] These instrumentalities of learning also may include modern technologies, such as computers, that are essential to a minimally adequate education. I express no view, however, as to whether such technologies, and if so, which ones, may be necessary to a minimally adequate education.

[17] To the extent that the plurality also relies on this explication of the qualitative right afforded under article eighth, § 1, I, of course, agree with the plurality. I do not necessarily agree, however, with other statements of the plurality concerning that qualitative standard. For example, the plurality states that its "explication of a constitutionally adequate education under article eighth, § 1, is crafted in broad terms. This breadth reflects, first and foremost, our recognition of the political branches' constitutional responsibilities, and indeed, greater expertise, with respect to the implementation of specific educational policies pursuant to [article eighth, § 1]." The plurality further states that, as with "any other principle of constitutional law, this broad standard likely will be refined and developed further as it is applied to the facts eventually to be found at trial in this case." Although I agree with the plurality's comment concerning the relative expertise of the legislative and judicial branches in matters of public education, I disagree with the plurality that it is appropriate to craft the constitutional standard "in broad terms." In my view, the broader the standard, the more vague it is

86 N.Y.2d 307, 317, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995).

Although these basic, minimum requirements appear to be relatively straightforward, what level of resources or specific measures are necessary to satisfy them in practice is by no means self-evident. Undoubtedly, reasonable people with expertise in the field of education can and will disagree on whether one or more of these requirements has, in fact, been met with regard to a particular school or schools and, if the requirement has not been met, what more is necessary to satisfy it. In my view, the deference owed to the political branches in matters of education policy dictates that, unless the plaintiffs can demonstrate that the actions that the state has taken to satisfy the particular requirement in dispute cannot reasonably be defended as minimally adequate, the court must defer to the judgment of the political branches in the matter. Thus, if the state and the plaintiffs disagree as to whether the legislature has met its obligation under article eighth, § 1, with respect to any of the core or essential components of a minimally adequate education, to prevail on their claim of a constitutional violation, the plaintiffs must establish that the action that the legislature has taken to comply with article eighth, § 1, reasonably cannot be considered sufficient by any fair measure. Put differently, the plaintiffs are not entitled to relief unless they can dem-

likely to be. In addition, the broader the standard, the more difficult it will be for the parties and the court to understand and apply it. I also disagree with the plurality's suggestion that a broad standard is beneficial because it may be "refined and developed further" at trial. Although some constitutional standards must be defined in broad terms because of their applicability to a vast number of fact patterns, this is not such a case; for purposes of a case like the present one, in which it is critically important to give as much guidance to the court and the parties as possible, the more clearly defined the standard, the better. Cf. *Moore* v. *Ganim,* 233 Conn. 557, 629, 660 A.2d 742 (1995) (*Peters, C. J.,* concurring) ("well established jurisprudential doctrine counsels us to construe ambiguous constitutional principles narrowly").

onstrate that the legislature's formulation of the scope of the right to a minimally adequate public education and its efforts in implementing that formulation are unreasonably insufficient. Any less demanding standard would give insufficient voice to the reasoned judgment of the legislature.[18]

## III

## CONCLUSION

"Compulsory school attendance laws and the great expenditures for education both demonstrate [the court's] recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities . . . . It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." *Brown* v. *Board of Education*, 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873 (1954). It reasonably cannot be disputed, however, that, even though "schools are important socializing

---

[18] In contrast to the traditional standard advanced by the plurality, the foregoing approach, which properly considers the significant discretion to which the legislative branch is entitled in matters of public elementary and secondary education; see *Sheff* v. *O'Neill*, supra, 238 Conn. 37; also gives due regard to the prudential considerations that militate strongly in favor of judicial restraint in such matters.

Indeed, it is one thing for a court to determine whether the legislature has acted rationally in fulfilling its obligation under article eighth, § 1, and something entirely different for a court to decide which of two positions concerning the specific parameters of a minimally adequate education in practice—the position advocated by the plaintiffs or the one advocated by the state—is the better position. As I have explained, the latter methodology unduly involves the judiciary in matters of educational policy that are primarily reserved to the political branches, and for which the judiciary is both ill suited and ill equipped.

institutions in our democratic society, they cannot be constitutionally required to overcome every serious social and personal disadvantage that students bring with them to school, and that seriously hinder[s] the academic achievement of those students."[19] *Sheff* v. *O'Neill,* supra, 238 Conn. 144 (*Borden, J.,* dissenting); see also part III of the plurality opinion ("[T]he failure of students to achieve the goals of a constitutionally mandated education may be . . . caused by factors not attributable to, or capable of remediation by, state action . . . . [W]e [therefore] recognize that [article eighth, § 1] is not a panacea for all of the social ills that contribute to many of the achievement deficiencies identified by the plaintiffs in their complaint . . . ." [Citations omitted.]).

In light of our citizenry's "abiding respect for the vital role of education in a free society"; *San Antonio Independent School District* v. *Rodriguez,* supra, 411 U.S. 30; however, and because our free public elemen-

---

[19] Consequently, I agree with the observation that "[p]erformance or achievement of the student population, taken generally, cannot . . . be the principle [on] which [a constitutionally required minimally adequate education] is based. There is nothing in either the language or the history of article eighth, § 1, to support such a standard. . . .

"[Rather, the] obligation to provide a minimally adequate education must be based generally, not on what level of achievement students reach, but on what the state reasonably attempts to make available to them, taking into account any special needs of a particular local school system." *Sheff* v. *O'Neill,* supra, 238 Conn. 143 (*Borden, J.,* dissenting). Although I do not suggest that educational "outputs" are never relevant to the determination of whether the state has complied with the requirements of article eighth, § 1, because student achievement may be affected by so many factors outside the state's control, including, perhaps most particularly, "the disadvantaging characteristics of poverty"; (internal quotation marks omitted) id., 139 (*Borden, J.,* dissenting); educational "inputs" must provide the primary basis for that determination. In part for that reason, I am unable to agree with the plurality's assertion that "[a] constitutionally adequate education . . . will leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy."

tary and secondary schools can serve as a beacon for those most in need, we reasonably may expect that the legislative and executive branches will strive to do much more than is constitutionally required for the benefit of those attending those schools. Article eighth, § 1, however, *guarantees* a minimally adequate education for those students, and the plaintiffs' complaint, liberally construed, alleges a violation of that fundamental right.[20] Consequently, the plaintiffs are entitled to proceed with their claims under that provision. I there-

[20] I acknowledge that portions of the plaintiffs' complaint reasonably may be read as asserting a right to a quality of education under article eighth, § 1, that exceeds the parameters of the right as I conceive it. The plaintiffs have asserted extensive factual allegations, however, and their claims are cast in broad terms. The plaintiffs assert, for example, that, in some of their schools, the state is failing to provide a healthy and safe learning environment and adequate and appropriate textbooks, libraries and technology. They further allege significant disparities in "[education] input statistics" between the plaintiffs' schools and the state school average in categories such as library materials per pupil, class size, and language and computer instruction. The plaintiffs also maintain that (1) "many [students] attend schools that do not have the resources necessary to educate their high concentration of poorly performing students," (2) the state has failed "to provide the resources necessary to intervene effectively on behalf of at-risk students," that is, students "who, because of [a] wide range of financial, familial, and social circumstances, [are] at greater risk of failing or experiencing other unwanted outcomes unless intervention occurs," and (3) the state's education funding system is "arbitrary and inadequate," and not related to the actual costs of providing an education that meets constitutional standards. As a consequence, the plaintiffs contend, "Connecticut has an educational underclass" that is "being educated in a system [that] sets them up for economic, social, and intellectual failure." Because this court is bound to construe the plaintiffs' complaint "in the manner most favorable to sustaining its legal sufficiency"; *Bernhard-Thomas Building Systems, LLC* v. *Dunican*, 286 Conn. 548, 553, 944 A.2d 329 (2008); I cannot say, as a matter of law, that these claims and factual allegations are insufficient to allege a violation of the standard articulated in this opinion. See *Sheff* v. *O'Neill*, supra, 238 Conn. 35 ("the plaintiffs can succeed if any of their claims [fall] within the constitutional right as [the court has] defined it"); see also footnote 58 of the plurality opinion (explaining that, when viewed in context, plaintiffs' claim of constitutional right to suitable education is synonymous with claim of right to minimally adequate education). I am satisfied, therefore, that the plaintiffs have stated a legally cognizable cause of action under article eighth, § 1.

fore agree with the plurality that the trial court's judgment must be reversed and that the case must be remanded for further proceedings.

SCHALLER, J., concurring. I agree with the plurality opinion's conclusion that the education clause, article eighth, § 1, of the constitution of Connecticut[1] requires public schools in Connecticut to provide students with an education that is adequate to prepare them to be full participants in the democratic processes of our government, and to be productive members of society, that is, to compete in the job market either before or after acquiring higher education for that purpose.[2] I write separately in order to clarify and, where necessary, expand on the constitutional principles that compel that conclusion. I also write separately to express some important prudential concerns regarding the future progress of this action. Those concerns pertain to the standards that the trial court should apply in the trial of this matter in order to determine whether the plaintiffs, the Connecticut Coalition for Justice in Education Funding, Inc., and numerous parents and their

---

[1] Article eighth, § 1, of the Connecticut constitution provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."

[2] Because we are required only to interpret the education clause of the state constitution, I agree with the plurality that the case is justiciable. Although I agree with Justice Zarella's dissent that the implementation of the fundamental right to education has been committed by the education clause to the General Assembly, defining that right with sufficient precision to guide the trial of this case is the prerogative—and the duty—of the judicial branch. The challenge going forward, however, may be deciding where judicial interpretation stops and legislative implementation begins. In part III of this concurring opinion, I express various prudential concerns regarding the difficult issues that may arise as the case progresses. In the course of that discussion, I suggest a preliminary template reflecting my judgment of what the trier of fact must consider in determining whether the constitutional obligation of providing an adequate education has been satisfied. I envision that the trial court will flesh out that template based on the factual record presented at trial.

children, who are enrolled in public schools in this state, will have succeeded in establishing a violation of the constitutional right as we define it today, and to the authority of the trial court to order appropriate remedies in the event that a violation has occurred.

It has long been established, based on the express language of our constitution, that the education clause guarantees to citizens of this state an affirmative right to a free public education. See, e.g., *Moore* v. *Ganim*, 233 Conn. 557, 595–96, 660 A.2d 742 (1995) (education clause imposes affirmative obligation on state to expend public funds to provide free public elementary and secondary education); *Broadley* v. *Board of Education*, 229 Conn. 1, 6, 639 A.2d 502 (1994) ("Connecticut schoolchildren have a state constitutional right to an education in our free public elementary and secondary schools"); *Horton* v. *Meskill*, 172 Conn. 615, 645, 376 A.2d 359 (1977) (*Horton I*) (recognition of education as fundamental right guaranteed by education clause). I am convinced, as is the plurality, that the education clause guarantees, in addition, that the education we provide must satisfy a minimum qualitative standard, namely, that children in Connecticut have a constitutional right to an adequate education. Although the various terms by which the minimum qualitative standard has been expressed in this and other state litigation—suitable, adequate, or sound basic—are essentially interchangeable, keeping in mind that we are dealing with an implied, not an express, right, I believe that the term "adequate" conveys best the concept of a minimum qualitative standard. I believe it necessary, first, to explain more fully why that minimum standard is constitutionally required and how it is that this court has the basis as well as the authority to define the standard in terms of practical application—that is, democratic participation and productive citizenship—and, second, to explain why an adequate education, in addi-

tion to serving democratic goals, must, as the plurality concludes, "leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy." I address each of these points in turn. Finally, I will address several prudential concerns that are of paramount importance as this case proceeds to trial. It is crucial to keep in mind at this point that we are at an early stage of what is likely to be a long journey through the court system and, depending on the result, through the other branches of government. We decide the present issues based solely on the allegations of the plaintiffs' complaint. No factual record exists. Neither the judicial branch nor the legislative branch has engaged in fact finding. Our main task is to determine the constitutional issue presented on appeal and, importantly, to guide the trial court and the parties as they undertake the complicated process of litigating this case in the Superior Court. As important as our constitutional decision is, it is no more than a threshold ruling. Because our obligation to instruct the trial court as to how to proceed within proper judicial boundaries is crucial, I will offer a preliminary template for the trial court's role in this litigation.

I

In construing the contours of our state constitution, the plurality employs the analysis established in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992). In view of the fact that our state constitution does not contain an explicit statement of the constitutional right at issue, I agree in principle with this approach. I do not believe, however, that once having undertaken a *Geisler* analysis, it is necessary to determine whether the text is ambiguous. The use of *Geisler* is based on a prior determination that the text does not contain explicit language concerning the right in question. Because my application of *Geisler* differs in some mate-

rial respects from that of the plurality, I will offer an alternative analysis. In the course of the analysis, I undertake to articulate and explain the most persuasive reasons for interpreting the education clause to require that the guaranteed free public education must be adequate. *Geisler,* as we know, is grounded on the well established principle that "federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) Id., 684. In cases such as the present one, in which the question presented requires us to determine the contours of our state constitution in the absence of a specific declaration of a minimum qualitative standard, we have employed "the following tools of analysis . . . to the extent applicable: (1) the textual approach . . . (2) holdings and dicta of this court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations." (Citations omitted.) Id., 685. As we know, the *Geisler* tools were never intended to create a rigid formula nor were they intended to produce, by their mere recitation, a self-evident result as if by some intuitive process. See *State* v. *Hill,* 237 Conn. 81, 112, 675 A.2d 866 (1996) (*Norcott, J.,* dissenting). We have acknowledged this principle, stating that the *Geisler* factors "encourage a *principled development* of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . Finally, not every *Geisler* factor is relevant in all cases." (Citation omitted; emphasis added.) *State* v. *Morales,* 232 Conn. 707, 716 n.10, 657

A.2d 585 (1995). The purpose of *Geisler* was to require our courts to assemble and to assess the relevant information concerning the factors that applied to the particular constitutional interpretation—and then to reach a conclusion by the process of reasoning. This approach explains why the most reasonable interpretation of our education clause is that it implicitly requires that the education provided must be adequate. The *Geisler* factors are meant to serve as a guide to a searching analysis in order to identify and explain the contours of our state constitution, and are a vital component of our constitutional jurisprudence. The quality of the *Geisler* analysis employed has direct bearing on the authoritativeness of the opinion that, in this case, may be called upon to sustain and support this litigation through a demanding, even arduous, process.

I undertake to examine the factors as helpful tools to inform and guide the constitutional analysis. One of the most basic ways to ensure that the factors function as sources of information and guidelines is to allow the question to shape the discussion, rather than routinely going through the list of factors. In other words, the *Geisler* analysis must adapt itself to each particular inquiry. Some factors that are extremely relevant and persuasive in one inquiry may yield little or no persuasive information in another inquiry. The structure, therefore, of any *Geisler* inquiry must derive from the subject matter. I begin, therefore, with the most basic guideline provided by *Geisler*, and apply the factors only to the extent that each applies. In the present case, I agree with the plurality that this basic approach will mean that relatively little weight should be accorded to federal precedent. Accordingly, I will first consider more pertinent factors, and will look to federal precedent briefly, for only the most general guidance. Similarly, although I find that sibling state precedent, two cases, in particular, provides some guidance, the use-

fulness of decisions from other states is greatly limited by the fact that very few states with constitutional language similar to our own have weighed in on the issue, and the decisions of those courts contain little helpful analysis. By contrast, the two factors that I find to be particularly helpful and persuasive are the text of the education clause and our own case precedent, in which we have interpreted the education clause in two seminal cases. See *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996); *Horton I*, supra, 172 Conn. 615. I see no need in this concurring opinion to discuss the history of the education clause or the economic and sociological factors. The plurality opinion thoroughly discusses those considerations and explains fully why each factor supports its conclusion. I agree with its analysis and conclusion that those factors favor interpreting the education clause to include a qualitative element.

In any case, our starting point, as always, should be with the applicable constitutional text. The education clause provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Conn. Const., art. VIII, § 1. Nothing in the express language of the education clause requires that our public schools are required to deliver an education that meets any specific qualitative standard. I rely on two fundamental concepts, however, to conclude that the mere absence of express qualitative language does not preclude us from interpreting the constitutional text to require that public schools provide a minimally adequate level of education. The first is the use of common sense and logic in understanding the ordinary meaning of the constitutional language. The second is the recognition that a *Geisler* analysis would be unnecessary in the presence of an *express* guarantee. The test, after all, was designed to provide us with guidelines for inferring the meaning of a text *in the absence of an*

*explicit statement* of the constitutional right or duty at issue.

As to the first concept, the education clause requires that there shall always be free public elementary and secondary schools in the state. It would defy common sense to conclude that the General Assembly could possibly satisfy its obligation by providing for *bad—or unsuitable, inadequate, or unsound*—public schools. That is precisely what we would have to assume if we were to suppose that the General Assembly could satisfy its obligation to provide such schools without any qualitative requirements. That interpretation, I submit, is unthinkable. As Justice Loiselle famously observed in his dissent in *Horton I,* "when the constitution says free education it must be interpreted in a reasonable way. A town may not herd children in an open field to hear lectures by illiterates." *Horton I,* supra, 172 Conn. 659. A "school" is a "place for instruction in any branch or branches of knowledge; an establishment for *imparting education.*" (Emphasis added.) Webster's New International Dictionary (1916). "When [used] without qualification, school is now familiarly used of an institution for teaching children." Id. A "school," therefore, is defined by its function—to educate children. In other words, the goal of educating children is presupposed in the very idea of a "school." The concept of education cannot be understood absent the incorporation of qualitative principles. To "educate" is "[t]o develop and cultivate mentally or morally; to expand, strengthen and discipline, as the mind . . . to form and regulate the principles and character of; to prepare and fit for any calling or business by systematic instruction; to cultivate; train; instruct." Id. Education, by its very nature, is a process designed to achieve the goal of improving students through cultivation and development of their minds, and training students by systematic instruction.

Second, the absence of explicit language cannot be an absolute determinant, because, otherwise, a *Geisler* analysis would never be appropriate. That is, only when a constitutional right or guarantee at issue is *not* explicit or plain on the face of the text does a *Geisler* analysis become necessary. This does not mean, however, that we may lightly read guarantees into our state constitution. We must, instead, be mindful of the guidance offered in *Moore* v. *Ganim*, supra, 233 Conn. 581, in which, when confronted with a similar claim of an implicit constitutional guarantee, we stated: "In construing the contours of our state constitution, we must exercise our authority with great restraint in pursuit of reaching reasoned and principled results. . . . We must be convinced, therefore, on the basis of a complete review of the evidence, that the recognition of a constitutional right or duty is warranted." (Citation omitted; internal quotation marks omitted.)

I agree with the plurality that it is significant, albeit not dispositive, that article eighth, § 2, of the state constitution, in contrast to § 1 of article eighth, the education clause, does contain express qualitative language, providing: "The state shall maintain a system of higher education, including The University of Connecticut, which shall be dedicated to *excellence* in higher education. The general assembly shall determine the size, number, terms and method of appointment of the governing boards of The University of Connecticut and of such constituent units or coordinating bodies in the system as from time to time may be established." (Emphasis added.) Conn. Const., art. VIII, § 2. The education clause, of course, does not contain similar qualitative language. This difference, however, is not inconsistent with the plurality's interpretation of the education clause to guarantee an adequate education to primary and secondary public school students. As I have discussed in this concurring opinion, the idea of a minimum qualitative standard is implicit in the defini-

tion of "school." "Excellence," however, goes well beyond any minimum qualitative standard. Although, of course, no one would quarrel with the proposition that, in an ideal world, all public schools would be excellent, we cannot say that the idea of "excellence" is necessarily implicit in the idea of a "school." Our reading of the education clause to guarantee "adequacy" as opposed to the "excellence" guaranteed in article eighth, § 2, reflects the difference between a minimally adequate education that is consistent with the definition of a "school," and an excellent one that is expressly guaranteed by the state constitution.

I believe that the most persuasive evidence in support of identifying a qualitative element in the education clause derives from the holdings and dicta of this court, to which I now turn. I agree generally with the plurality's analysis of our previous holdings and dicta, and the bearing that those precedents have on the issue before the court. I offer a few highlights. As the plurality opinion notes, even prior to the addition of the education clause to our constitution following the 1965 constitutional convention, our case law has long recognized the state's commitment to public education. See, e.g., *State ex rel. Huntington* v. *Huntington School Committee*, 82 Conn. 563, 566, 74 A. 882 (1909) ("Connecticut has for centuries recognized it as her right and duty to provide for the proper education of the young"); see also *Bissell* v. *Davison*, 65 Conn. 183, 191, 32 A. 348 (1894) (describing education as duty "assumed by the [s]tate . . . chiefly because it is one of great public necessity for the protection and welfare of the [s]tate itself"). Two of our landmark decisions in the area of education provide remarkably persuasive support for identifying an implicit qualitative standard in our education clause.[3] See *Sheff* v. *O'Neill*, supra, 238 Conn. 1; *Horton I*, supra, 172 Conn. 615.

---

[3] I disagree with the plurality that either *Savage* v. *Aronson*, 214 Conn. 256, 286, 571 A.2d 696 (1990), or *Broadley* v. *Board of Education*, supra,

Education finance litigation in Connecticut has followed the national trend of progressing in two "waves," beginning with what are known as "equity" claims, equal protection actions based on claimed disparities in education financing. The present action represents the second wave of cases, known as "adequacy" claims, which are premised not on any alleged unconstitutional disparities but, rather, on the assertion that the state constitution guarantees some minimum standard of education that the state is not delivering to the plaintiffs.[4] *Horton I* was a classic equity case, presenting the issue of whether financial disparities between property rich and property poor towns rendered the system of public education financing at that time, which depended heavily on local property taxes, invalid under the equal protection clause of the state constitution. *Horton I, supra,* 172 Conn. 618, 628. The case did not rely on a claim that students were guaranteed a minimally adequate level of education. The court, in fact, took great pains to clarify that "minimal sufficiency" was not at issue in the action. Id., 645–46 ("[t]he [e]qual [p]rotection [c]lause is not addressed to the minimal sufficiency but rather to the unjustifiable inequalities of state

229 Conn. 6, merit consideration as bearing on the issue, as neither case sheds light on the question of whether the education clause implicitly includes a qualitative element. The mere fact that those cases consider claims based on the fundamental right to education recognized in *Horton I* does not make them worthy of discussion. A *Geisler* analysis must consider only sources that actually are relevant.

[4] Scholars actually refer to adequacy litigation as the "third wave." See, e.g., W. Koski, "Achieving 'Adequacy' in the Classroom," 27 B.C. Third World L.J. 13, 19–21 (2007); D. Verstegen, "Towards a Theory of Adequacy: The Continuing Saga of Equal Educational Opportunity in the Context of State Constitutional Challenges to School Finance Systems," 23 St. Louis U. Pub. L. Rev. 499, 506–507 (2004). According to these scholars, the first wave was education finance litigation that sought relief under the federal constitution. See *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 4–6, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). For the sake of convenience, because Connecticut's education finance litigation began with *Horton I, supra,* 172 Conn. 615, which brought an equity claim under our state constitution, I refer to only two waves of litigation.

action"). Although the question of whether the state constitution guaranteed a minimally adequate education was not before the court, it is telling that, in concluding that the plaintiffs had established a violation of their right to equal protection, the court relied heavily on the relation between education financing and education quality. Id., 648 ("[t]he present-day problem arises from the circumstance that over the years there has arisen a great disparity in the ability of local communities to finance local education, which has given rise to a consequent significant disparity in the quality of education available to the youth of the state"); id., 635 ("because many of the elements of a quality education require higher per pupil operating expenditures, there is a direct relationship between per pupil school expenditures and the breadth and quality of educational programs"). To be sure, the court concluded in *Horton I* only that the plaintiffs were entitled to receive an education that was substantially equal in quality to the education that was provided to other children, not that they were guaranteed an education meeting a minimum qualitative standard. Id., 648–49. It is not possible to infer generally from a requirement of equality a requirement of adequacy. On the other hand, the idea that it is the *quality of education* to which Connecticut children have an equal right, rather than merely equality in education financing, supports the general proposition that the interest that children have in the fundamental right to education guaranteed by our education clause is inextricably linked to the quality of the education provided. Put another way, our conclusion in *Horton I* that the plaintiffs had a right to substantially equal educational funding is based on the right to an education of substantially equal *quality*. The notion that children have a right to an education of substantially equal quality presupposes that "quality" is an essential component of the education clause. We cannot fairly separate the

right to education from the right to a *quality* education. This is the very idea that I discussed previously in this concurrence in examining the text of the education clause. "School" and "education" are concepts that embody the idea of some minimal level of quality. The majority opinion in *Horton I* aptly illustrates this connection.[5]

Another landmark case, *Sheff* v. *O'Neill*, supra, 238 Conn. 1, provides further guidance. I first note that *Sheff*, like *Horton I*, does not address directly the question of whether the state constitution guarantees a minimally adequate education. In fact, the *Sheff* court expressly declined to resolve the merits of that issue, even though the plaintiffs had alleged that the defendants had failed to provide them with a minimally adequate education.[6] Id., 36–37. Just as in *Horton I*, however, in which an equal protection claim based on financial disparities ultimately was grounded on an interest in quality education, *Sheff*, a case based on racial and ethnic segregation in public schools, ulti-

---

[5] As the plurality explains, the idea that the education clause implicitly includes a qualitative element was acknowledged not only by the majority in *Horton I*, but also by the concurring and dissenting opinions. See, e.g., *Horton I*, supra, 172 Conn. 655 (*Bogdanski, J.*, concurring) (equality issues presented in *Horton I* "are directed toward the right of the children of this state to a basic education, and the determination of whether certain statutes of this state unconstitutionally impinge upon that right"); id., 658–59 (*Loiselle, J.*, dissenting). It is not necessary in this concurring opinion to discuss the concurring and dissenting opinions in *Horton I* further, as the plurality opinion in the present case aptly sets forth the language in each of those opinions that supports the conclusion that our education clause guarantees an adequate education.

[6] The court in *Sheff* declined to address the plaintiffs' claim that the defendants failed to provide them with a minimally adequate education because the plaintiffs did not allege any nexus between that failure and the racial and ethnic isolation that formed the basis of the action, and because the plaintiffs conceded at oral argument that they had not claimed that the right to be free of such racial and ethnic isolation was a constitutionally required component of a minimally adequate education. *Sheff* v. *O'Neill*, supra, 238 Conn. 36.

mately was grounded in the interest that the plaintiffs had in obtaining a quality education. In the course of explaining why article eighth, § 1, and article first, § 20,[7] of the state constitution required the legislature to remedy the racial segregation in Hartford's public schools, the court looked to the general purpose and importance of education in our society, noting that "[s]chools bear central responsibility for inculcating [the] fundamental values necessary to the maintenance of a democratic political system . . . . When children attend racially and ethnically isolated schools, these shared values are jeopardized: If children of different races and economic and social groups have no opportunity to know each other and to live together in school, they cannot be expected to gain the understanding and mutual respect necessary for the cohesion of our society." (Citation omitted; internal quotation marks omitted.) Id., 34. The court explained the importance of providing children access to an unsegregated education, stating: "As the United States Supreme Court has eloquently observed, a sound education is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms. . . . The American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance. . . . We

---

[7] The constitution of Connecticut, article first, § 20, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

have recognized the public schools as a most vital civic institution for the preservation of a democratic system of government . . . and as the primary vehicle for transmitting the values on which our society rests. . . . And these historic perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists. . . . [E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society." (Citation omitted; internal quotation marks omitted.) Id., 43–44. Although we did not directly conclude that the state constitution guarantees a minimally adequate education, our equal protection analysis was guided by the underlying assumption that the education clause does not merely guarantee to each child in the state "an education" without qualification. Implicit in our analysis is the idea that the fundamental right to education guaranteed by the education clause is one that includes a qualitative component that is inseparable from the fundamental right. In other words, the right vindicated by *Sheff* logically and implicitly, if not expressly, was not merely a right of equal access to *any* education, but equal access to a "sound" or "adequate" education.

Justice Berdon's concurring opinion in *Sheff* goes even further, reasoning that, from the elevation of education to a fundamental right through the passage of the education clause, "it logically follows that the education guaranteed in the state constitution must be, at the very least, within the context of its *contemporary meaning*, an adequate education." (Emphasis added.) *Sheff* v. *O'Neill*, supra, 238 Conn. 50. This understanding of the fundamental right to education was, according to Justice Berdon, simply a matter of interpreting the education clause in a "reasonable manner." Id. I agree with

Justice Berdon that the contemporary meaning of the language of the education clause must inform our interpretation of the scope of the fundamental right to education and that interpreting the education clause in a reasonable manner requires the conclusion that the state constitution guarantees Connecticut children the right to an adequate education.

The first four *Geisler* factors—that is, the text and our case precedent, which I have discussed, plus the historical background of article eighth and the economic and sociological considerations, both of which are effectively set forth by the plurality opinion—taken together, appear to me to be highly persuasive on the issue. They convince me that the only reasonable interpretation of our education clause is that it implicitly includes a qualitative standard. The remaining two factors, sibling state decisions and federal precedent, although of significantly less relevance and persuasive value, provide further support for that conclusion. I turn first to the decisions of our sibling states.

There is some persuasive force in the fact that most state courts that have addressed the substantive issue have concluded that their state constitution guarantees a minimally adequate level of education.[8] Because the

[8] The courts in twenty states, Alabama, Arkansas, Colorado, Idaho, Kentucky, Maryland, Massachusetts, Montana, New Hampshire, New Jersey, New York, North Carolina, Ohio, South Carolina, Tennessee, Texas, Washington, West Virginia, Wisconsin and Wyoming, have interpreted their education clauses to include a guarantee that the education so provided must satisfy some minimally sufficient standard. See *Opinion of the Justices No. 338*, 624 So. 2d 107, 146 (Ala. 1993); *Lake View School District No. 25 v. Huckabee*, 351 Ark. 31, 57, 91 S.W.3d 472 (2002), cert. denied sub nom. *Wilson v. Huckabee*, 538 U.S. 1035, 123 S. Ct. 2097, 155 L. Ed. 2d 1066 (2003); *Lobato v. State*, 218 P.3d 358, 372 (Colo. 2009); *Idaho Schools for Equal Educational Opportunity v. Evans*, 123 Idaho 573, 583, 850 P.2d 724 (1993); *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 205–206 (Ky. 1989); *Hornbeck v. Board of Education*, 295 Md. 597, 632, 458 A.2d 758 (1983); *McDuffy v. Secretary of the Executive Office of Education*, 415 Mass. 545, 606, 615 N.E.2d 516 (1993); *Columbia Falls Elementary School District No. 6 v. State*, 326 Mont. 304, 310–11, 109 P.3d 257 (2005); *Claremont School*

education clauses in most state constitutions differ materially from our own, an analysis of sibling state decisions must focus on those states that have clauses most closely resembling our own, that is, clauses that do not contain qualitative language in setting forth the right to education.[9] There are few of these, and even

*District* v. *Governor*, 138 N.H. 183, 184, 635 A.2d 1375 (1993); *Abbott* v. *Burke*, 149 N.J. 145, 166–67, 693 A.2d 417 (1997); *Board of Education* v. *Nyquist*, 57 N.Y.2d 27, 48, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982), appeal dismissed, 459 U.S. 1138, 103 S. Ct. 775, 74 L. Ed. 2d 986 (1983); *Leandro* v. *State*, 346 N.C. 336, 345, 488 S.E.2d 249 (1997); *DeRolph* v. *State*, 78 Ohio St. 3d 193, 197, 203, 677 N.E.2d 733 (1997); *Abbeville County School District* v. *State*, 335 S.C. 58, 68, 515 S.E.2d 535 (1999); *Tennessee Small School Systems* v. *McWherter*, 851 S.W.2d 139, 150–51 (Tenn. 1993); *Neeley* v. *West Orange-Cove Consolidated Independent School District*, 176 S.W.3d 746, 753 (Tex. 2005); *Seattle School District No. 1* v. *State*, 90 Wash. 2d 476, 517–18, 585 P.2d 71 (1978); *Pauley* v. *Kelly*, 162 W. Va. 672, 705, 255 S.E.2d 859 (1979); *Kukor* v. *Grover*, 148 Wis. 2d 469, 486, 436 N.W.2d 568 (1989); *Vincent* v. *Voight*, 236 Wis. 2d 588, 624–25, 614 N.W.2d 388 (2000); *Campbell County School District* v. *State*, 181 P.3d 42, 48, 50 (Wyo. 2008).

The courts in eight states, Florida, Georgia, Illinois, Indiana, Nebraska, Oklahoma, Pennsylvania and Rhode Island, have determined either that the issue is nonjusticiable, or, without making a specific determination regarding justiciability, nevertheless determined that the issue properly should be directed to the legislature. See *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles*, 680 So. 2d 400, 408 (Fla. 1996); *McDaniel* v. *Thomas*, 248 Ga. 632, 644, 285 S.E.2d 156 (1981); *Lewis E.* v. *Spagnolo*, 186 Ill. 2d 198, 201, 710 N.E.2d 798 (1999); *Bonner* v. *Daniels*, 907 N.E.2d 516, 522 (Ind. 2009); *Nebraska Coalition for Educational Equity & Adequacy* v. *Heineman*, 273 Neb. 531, 534, 731 N.W.2d 164 (2007); *Oklahoma Education Assn.* v. *State*, 158 P.3d 1058, 1061 (Okla. 2007); *Marrero* v. *Commonwealth*, 559 Pa. 14, 20, 739 A.2d 110 (1999); *Pawtucket* v. *Sundlun*, 662 A.2d 40, 57–59 (R.I. 1995).

The courts in the remaining twenty-two states have yet to address the issue.

[9] For this reason, I disagree with the plurality that the decisions of the courts of New Hampshire, Tennessee and Washington interpreting the education clauses of their respective state constitutions provide helpful guidance in interpreting our education clause. The New Hampshire education clause contains qualitative language upon which the court relied heavily in its interpretation of the state constitutional right to education: "*Encouragement of* [l]iterature . . . [*k*]*nowledge and learning*, generally diffused through a community, being essential to the preservation of a free government; and *spreading the opportunities and advantages* of education through the various parts of the country, being highly conducive to promote this end; it

fewer that have been interpreted by the state courts resolving whether the clause implicitly includes a qualitative element, specifically, New York, North Carolina and South Carolina. Of those three states, I briefly discuss the decisions of New York and North Carolina because they are the most pertinent.[10] The education

shall be the duty of the legislators and magistrates, in all future periods of this government, to *cherish* the interest of literature and the sciences, and all seminaries and public schools, to encourage private and public institutions, rewards, and immunities for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and natural history of the country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and economy, honesty and punctuality, sincerity, sobriety, and all social affections, and generous sentiments, among the people . . . ." (Emphasis added.) N.H. Const., Pt. II, art. LXXXIII; see *Claremont School District* v. *Governor*, 138 N.H. 183, 187–88, 635 A.2d 1375 (1993).

Similarly, the case law of Tennessee is of limited persuasive value. The education clause in the Tennessee state constitution provides that "[t]he State of Tennessee recognizes the *inherent value* of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools." (Emphasis added.) Tenn. Const., art. XI, § 12. In interpreting that constitutional language, the Tennessee Supreme Court not only looked to the definition of "education," but also relied on the recognition of the "inherent value" of education in the provision. *Tennessee Small School Systems* v. *McWherter*, 851 S.W.2d 139, 150 (Tenn. 1993). Much of the court's analysis, leading to the conclusion that the education clause implies some qualitative component, centers on the "value of education." Id., 151.

The education clause of the Washington state constitution, also relied upon by the plurality, is also linguistically dissimilar to our own. That clause provides: "It is the *paramount* duty of the state to make *ample* provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." (Emphasis added.) Wash. Const., art. IX, § 1. In interpreting the constitutional text, the Washington Supreme Court noted specifically that its state constitutional language was "unique . . . ." *Seattle School District No. 1* v. *State*, 90 Wash. 2d 476, 498, 585 P.2d 71 (1978). In interpreting the education clause to include a qualitative guarantee, the court specifically relied on the meaning of the words "paramount"; id., 510; and "ample"; id., 515–16; adjectives conspicuously absent from our own education clause.

[10] South Carolina's precedent provides little guidance on this issue. In *Abbeville County School District* v. *State*, 335 S.C. 58, 66, 515 S.E.2d 535 (1999), the South Carolina Supreme Court considered the meaning of its education clause, which provides: "The General Assembly shall provide for

clause in New York's state constitution provides simply: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. Const., art. XI, § 1. In *Campaign for Fiscal Equity, Inc.* v. *State*, 86 N.Y.2d 307, 314, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995) (*Campaign I*), the court considered the plaintiffs' claim that the state system of public education financing violated the state constitution because it denied them a sound basic education, and noted that it already had, in dicta, construed the meaning of education to connote a "sound basic education." Id., 316, citing *Board of Education* v. *Nyquist*, 57 N.Y.2d 27, 48, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982), appeal dismissed, 459 U.S. 1138, 103 S. Ct. 775, 74 L. Ed. 2d 986 (1983). In *Nyquist*, the court relied on two sources to interpret the education clause, the text itself and the historical background of the clause. As to the historical background of the education clause, which was adopted in 1894, the court stated that "[w]hat appears to have been contemplated when the education article was adopted at the 1894 Constitutional Convention was a [s]tate-wide system assuring minimal acceptable facilities and services . . . ." *Board of Education* v. *Nyquist*, supra, 47. The court's consideration of the text is somewhat more oblique, yet still helpful. The opinion simply refers to "[i]nterpreting the term *education*, as we do, to connote a sound basic education . . . ." (Emphasis added.) Id., 48. Without directly saying so, the court was relying on the definition of the term

the maintenance and support of a system of free public schools open to all children in the State and shall establish, organize and support such other public institutions of learning, as may be desirable." S.C. Const., art. XI, § 3. The court, however, arrived at its conclusion without any analysis. The court simply concluded that "the South Carolina [c]onstitution's education clause requires the General Assembly to provide the opportunity for each child to receive a minimally adequate education." *Abbeville County School District* v. *State*, supra, 68.

*education* in concluding that the word must include some qualitative element. This is precisely what I have done in reading the term "schools" in our education clause. The two terms cannot be understood without finding the concept of a minimum qualitative standard in the definition.

The Supreme Court of North Carolina, in *Leandro* v. *State*, 346 N.C. 336, 345, 488 S.E.2d 249 (1997), interpreted the state constitution's two education clauses, which provide: "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right"; N.C. Const., art. I, § 15; and "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools . . . ." N.C. Const., art. IX, § 2 (1). The court concluded that the constitutional guarantee of the right to public education contains a qualitative element, and based its analysis primarily on the court's prior precedent and the education statutes. *Leandro* v. *State*, supra, 346–47. The court also based its conclusion, however, on the general principle that "[a]n education that does not serve the purpose of preparing students to participate and compete in the society in which they live and work is *devoid of substance* . . . ." (Emphasis added.) Id., 345. This is another way of stating the principle with which I began, in my textual analysis: the guarantee of quality is in the meaning of "school" and "education" themselves. Without some guarantee of a qualitative standard, the fundamental right to education guaranteed by our state constitution would be meaningless.

As I noted previously in this concurring opinion, I consider the factor of federal precedent last because it has the least relevance in this particular context, in which the language of our state constitution differs from the federal constitutional language. I observe merely that, although education is not a fundamental

right under the federal constitution, federal precedent repeatedly has recognized the importance of education to our democratic society. Indeed, even in *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 29, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973), the United States Supreme Court recognized the unique significance of the right to education in our society, citing to *Brown* v. *Board of Education*, 347 U.S. 483, 493, 74 S. Ct. 686, 98 L. Ed. 873 (1954), for the proposition that "education is perhaps the most important function of state and local governments." (Internal quotation marks omitted.) Moreover, at the same time that *San Antonio Independent School District* established that education is not a fundamental right under the federal constitution, the court left further resolution of the issue to the states, cautioning that its decision was "not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity." *San Antonio Independent School District* v. *Rodriguez*, supra, 58.

Finally, the General Assembly already has acknowledged statutorily the very same standard that we today hold is mandated constitutionally. Specifically, in General Statutes § 10-4a (1), the legislature identifies the educational interests of the state to include "the concern of the state that . . . each child shall have for the period prescribed in the general statutes equal opportunity to receive a *suitable* program of educational experiences . . . ." (Emphasis added.) Accordingly, the duty that we now hold to be *constitutionally* required is one that the legislature already has recognized and undertaken of its own volition.

These tools of constitutional analysis lead me to the firm conclusion that the fundamental right to free education guaranteed by the education clause, article eighth, § 1, of the state constitution, would be stripped of its meaning and content if we were to interpret that guarantee as not embodying some minimum qualitative standard. A guarantee of education cannot stand without assurance that the guaranteed "schools," and the education provided therein will meet a minimum qualitative standard.

II

Having concluded that our education clause implicitly includes a qualitative element, I next turn to the question of how we should define the contours of the right sufficiently to guide the trial court in determining the issues in the present action without intruding on the authority of the other branches of government, that is, within the scope of the justiciable issue in this case. The plurality opinion settles on the formula proposed by the plaintiffs, concluding that the education clause "guarantees Connecticut's public school students educational standards and resources suitable to participate in democratic institutions, and to prepare them to attain productive employment and otherwise to contribute to the state's economy, or to progress on to higher education." I suggest that it is important to explain more thoroughly the reasons for so defining the constitutional right. Otherwise, we run the risk of sacrificing the primary benefits of a *Geisler* analysis—enabling a principled development of our constitutional law and, by so doing, establishing and supporting the constitutional right with the authority of the court. Our sound reasoning comprises a crucial step in making a constitutional pronouncement with such far-reaching consequences. Regardless of the outcome of this litigation, this constitutional determination will continue to guide the legislative branch in carrying out its constitutional duty in

future years. Well reasoned explanation also may serve to establish common ground for the parties to reach consensus, now or in the future, on various aspects of the issues. Without sound reasoning to support and explain the decision, the court relinquishes its principal claim to authority. See *State* v. *Morales*, supra, 232 Conn. 716 n.10.

We must, accordingly, do more than merely conclude that our state constitution guarantees the right to an adequate education. That conclusion alone does not provide sufficient guidance to enable the trial court to determine whether the constitutional guarantee is being fulfilled or violated. It is essential to explain *how* we arrive at the stated goals that fully define the contours of the educational guarantee. Linguistic considerations alone support the conclusion that our task is not completed by stating that the education clause guarantees the right to an adequate education. That determination merely gives rise to the inevitable question as to adequacy "for what purposes?" Two general principles guide my inquiry as to the contours of the right. First, the question "for what purposes" suggests that the direction of the inquiry should be goal directed; that is, the inquiry seeks to determine the goals to be served by the adequate education. Second, in answering the question, it is necessary to examine why education has been elevated to the status of a fundamental right protected by our state constitution. In other words, only by understanding what we as a society so value in education, may we discern "for what purposes" such an education should be adequate. Accordingly, I examine in turn each of the purposes proposed by the plurality—in short, to prepare students to participate in democratic institutions and to become productive members of our society—to determine whether there is a sufficient basis in our law to conclude that each is an essential component of an adequate education.

"I know no safe depositary of the ultimate powers of the society but the people themselves; and if we think them not enlightened enough to exercise their control with a wholesome discretion, the remedy is not to take it from them, but to inform their discretion by education. This is the true corrective of abuses of constitutional power." Letter from Thomas Jefferson to William C. Jarvis (1820), 12 The Works of Thomas Jefferson (P. Ford ed., 1905), p. 163. Education is not simply a duty owed to the individual student. Rather, the duty to provide an education to the young in our society also is viewed in very utilitarian terms. That is, we educate our young not only for their personal benefit, but also to benefit our democracy. See *Bissell* v. *Davison*, supra, 65 Conn. 191 (duty to provide education "has always been assumed by the [s]tate; not only because the education of youth is a matter of great public utility, but also and chiefly because it is one of great public necessity for the protection and welfare of the [s]tate itself"). Certainly, an education that adequately prepares our children to participate effectively in our democracy is of critical importance to our society. Adequate education must prepare students fully for meaningful participation in the democratic process. I can envision that effective participation will involve, not only nominal performance of typical civic actions, such as voting and jury service, but well-informed and thoughtful contributions to the wide variety of activity and decision making that enables our democratic society to flourish. There is ample support for the conclusion that an adequate education should prepare students to become engaged in the democratic process. Evidence of this connection dates back to the Code of Laws for the Colony of Connecticut, commonly known as the Ludlow Code, which required that children receive "so much [l]earning as may inable them perfectly to read the [English] toungue, and *knowledge of*

*the Capitall Lawes.*" (Emphasis added.) Code of Laws, Children (1650), reprinted in 1 Col. Rec. 509, 521 (J. Hammond Trumbull ed., 1850). Simon J. Bernstein, a delegate to the 1965 constitutional convention and proponent of amending the constitution to add the education clause, expressly relied on the Ludlow Code in describing the purpose of the proposed constitutional amendment during the 1965 constitutional convention. Additionally, he specifically acknowledged the importance of education in fostering and maintaining our democratic government: "It goes without saying that if we are going to have representative [g]overnment elected by a public . . . the education of the public is the first and best way of promoting the best representatives to be elected . . . ." Proceedings of the Connecticut Constitutional Convention (1965), Pt. 1, p. 312, remarks of Delegate Bernstein.

More recent legislation also supports the conclusion that a principal purpose of education is to prepare children to participate effectively in our democracy. For example, General Statutes § 10-18 (a) (1) requires schools to provide courses in history, government and citizenship: "All . . . schools . . . shall provide a program of United States history, including instruction in United States government at the local, state and national levels, and in the duties, responsibilities, and rights of United States citizenship. No student shall be graduated from any such school who has not been found to be familiar with said subjects." In 2007 and 2008, that statute was amended by the enactment of No. 07-138 of the 2007 Public Acts and No. 08-153 of the 2008 Public Acts, to add a new subdivision requiring that "elementary schools shall include in their third, fourth or fifth grade curriculum a program on democracy in which students engage in a participatory manner in learning about all branches of government." General Statutes § 10-18 (a) (2). In 2000, the legislature enacted

No. 00-156 of the 2000 Public Acts, amending General Statutes § 10-221a to add civics as a requirement for high school graduation.[11] The Associate Commissioner of the State Department of Education at the time explained the impetus behind this amendment: "The civics requirement grows out of a concern that young citizens are disengaged from the democratic process. . . . Relevance to life is imperative for students to reconnect with democratic behaviors and institutions as citizens of the United States. It is this connection which must be explicitly made for students as a part of civics education." Connecticut Department of Education Letter to School Superintendents, High School Principals and Social Studies Department Heads, September 27, 2000, p. 1, available at http://www.sde.ct.gov/sde/lib/sde/Word Docs/Curriculum/soccivic.doc (last visited March 9, 2010). All of these recent changes to the curriculum and graduation requirements reflect the General Assembly's understanding of the critical role that education plays in preparing our children to become citizens in our democracy.

This court also has acknowledged, repeatedly, that a principal purpose of education is to prepare students to participate as citizens in our democracy. In his concurring opinion in *Horton I*, Justice Bogdanski eloquently described the function of education in our society: "[T]he right of our children to an education is a matter of right not only because our state constitution

---

[11] General Statutes § 10-221a (b) provides: "Commencing with classes graduating in 2004, and for each graduating class thereafter, no local or regional board of education shall permit any student to graduate from high school or grant a diploma to any student who has not satisfactorily completed a minimum of twenty credits, not fewer than four of which shall be in English, not fewer than three in mathematics, not fewer than three in social studies, *including at least a one-half credit course on civics and American government,* not fewer than two in science, not fewer than one in the arts or vocational education and not fewer than one in physical education." (Emphasis added.)

declares it as such, but because education is the very essence and foundation of a civilized culture: it is the cohesive element that binds the fabric of society together. In a real sense, it is as necessary to a civilized society as food and shelter are to an individual. It is our fundamental legacy to the youth of our state to enable them to acquire knowledge and possess the ability to reason: for it is the ability to reason that separates [men and women] from all other forms of life." *Horton I*, supra, 172 Conn. 654–55. Indeed, Justice Loiselle, in his dissenting opinion, stated: "We cannot lose sight of the fact that the issue is not that our children are not getting a sound education, measured by reasonable standards, which will enable them to exercise fully their rights as citizens of their country." Id., 661. These two statements also illustrate the principle that education simultaneously is intended to benefit individual members of society, by enabling them to exercise their rights as citizens, and society as a whole, by providing individuals with the means to exercise those rights intelligently.

We explained further in *Sheff*, in which the function of education in preparing students to participate as citizens in our society was central to our holding, that "[i]t is crucial for a democratic society to provide all of its schoolchildren with fair access to an unsegregated education. As the United States Supreme Court has eloquently observed, *a sound education 'is the very foundation of good citizenship*. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.' *Brown* v. *Board*

*of Education,* supra, 347 U.S. 493. 'The American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance. . . . We have recognized the public schools as a most vital civic institution for the preservation of a democratic system of government . . . and as the primary vehicle for transmitting the values on which our society rests. . . . And these historic perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists.' " (Emphasis added.) *Sheff* v. *O'Neill,* supra, 238 Conn. 43–44. One would have to look hard for a more compelling statement of the importance of a "sound" or "adequate" education to the preparation for good citizenship.

Marian Wright Edelman, the president and founder of the Children's Defense Fund, and a leading scholar in the area of educational theory, has stated that "education is for improving the lives of others and for leaving your community and world better than you found it"[12] and "education is a precondition to survival in America today."[13] Surely, enabling our children to become productive members of society, either directly following secondary school, or after completing a course of higher education, serves the general utilitarian purpose of benefiting the state as a whole. See *Bissell* v. *Davison,* supra, 65 Conn. 190–91. A statement made by President Barack Obama during an address to the Hispanic Chamber of Commerce on March 10, 2009, illustrates dramatically the importance of this purpose of education: "The source of America's prosperity has never been merely how ably we accumulate wealth, but how well we edu-

---

[12] M. W. Edelman, The Measure of Our Success: A Letter to My Children and Yours (1992) Pt. I, pp. 9–10.

[13] M. W. Edelman, "We must convey to children that we believe in them . . . ." Ebony, August, 1988, p. 130.

cate our people. This has never been more true than it is today. In a [twenty-first] century world where jobs can be shipped wherever there's an Internet connection, where a child born in Dallas is now competing with a child in New Delhi, where your best job qualification is not what you do, but what you know—education is no longer just a pathway to opportunity and success, it's a prerequisite for success." Our law has long supported the conclusion that one of the primary purposes of education is to prepare children in this state to compete in the economic marketplace. The Ludlow Code understood this to be an essential goal of education, requiring that schoolmasters "bring [up] theire [c]hildren and [a]pprentices in some honest lawfull [calling] labour or [e]mployment . . . proffitable for themselves and the Common wealth . . . ." Code of Laws, Children (1650), reprinted in 1 Col. Rec., supra, 521.

This court also has acknowledged the vital role that education plays in enabling citizens of this state to compete in the economic marketplace: "[E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our [n]ation when select groups are denied the means to absorb the values and skills upon which our social order rests." (Internal quotation marks omitted.) *Sheff* v. *O'Neil*, supra, 238 Conn. 44. Indeed, the words of the *Sheff* majority, describing the racial and ethnic isolation claims asserted by the plaintiffs in that case, characterize the claims of the plaintiffs in the present case precisely: "Although the constitutional basis for the plaintiffs' claims is the deprivation that they themselves are suffering, that deprivation potentially has an impact on the entire state and its economy—not only on its social and cultural fabric, but on its material well-being, on its jobs, industry, and

business. Economists and business leaders say that our state's economic well-being is dependent on more skilled workers, technically proficient workers, literate and well-educated citizens. And they point to the urban poor as an integral part of our future economic strength. . . . So it is not just that their future depends on the [s]tate, the state's future depends on them." (Internal quotation marks omitted.) Id. The purpose of preparing children to become productive members of society, then, like the purpose of preparing them to be good citizens in our democratic society, benefits both the individual and the state as a whole. Not only do democratically engaged and productive citizens, adequately prepared by their public educations, contribute to the well-being and progress of our society, but education also provides the means by which individuals improve their own social and economic circumstances, thereby enabling them and their successors to benefit from that education.

I conclude that these authorities sufficiently support the plaintiffs' contention that the education guaranteed by the education clause, article eighth, § 1, of the state constitution, must be adequate to prepare students to participate and engage in the processes of our democracy and to become productive members of our society.

## III

I write also to express prudential concerns regarding the next stage of this litigation and to offer suggestions in the form of a *preliminary template* based on what I anticipate may arise at trial. During the next stage, which is likely to consist of pleading, discovery, trial and decision making in the Superior Court, I can envision several issues, among many, that are likely to prove especially challenging. These issues will have to be addressed by the trial court and the parties as they litigate, in a sense as *proxies* for the people of the state,

who surely have a compelling interest in the outcome, the troubling allegations of inadequacy, as well as inequity, for which the plaintiffs seek relief. The first issue is the challenge that the court will face in determining the appropriate method of measuring educational adequacy for the public school students of the state. The second is the challenge that the court will face in determining whether the plaintiffs ultimately have proved that some or all of the students are being deprived of an adequate education. Finally, in the event that the trial court determines that the state has failed to meet its constitutional duty of providing an adequate education, the trial court, and ultimately this court, in all likelihood, will face the challenge of determining the extent to which the court can design a specific remedy without intruding on the constitutional authority of the legislative branch, or whether the crafting of the remedy must be left in the first instance to the legislature. I discuss each of these issues in turn.

The New York Court of Appeals, in a decision that was rendered at a stage of litigation similar to the posture of the present case, succinctly articulated the task of the trial court in determining the appropriate measure of adequacy and whether it is being met. The court first determined, with somewhat more specificity than we do today, that the education article of the New York constitution "requires the [s]tate to offer all children the opportunity of a sound basic education. . . . Such an education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury." (Citation omitted.) *Campaign I*, supra, 86 N.Y.2d 316. The court explained both the need to set forth a template to guide the trial court and the necessary limits of such a template, because of the early stage of the litigation process. "We do not attempt to definitively specify what the

constitutional concept and mandate of a sound basic education entails. Given the procedural posture of this case, an exhaustive discussion and consideration of the meaning of a 'sound basic education' is premature. Only after discovery and the development of a factual record can this issue be fully evaluated and resolved. Rather, we articulate a template reflecting our judgment of what the trier of fact must consider in determining whether [the] defendants have met their constitutional obligation." Id., 317–18. Given the preliminary contours that the court drew of a "sound basic education," it described the task of the trial court, which would "have to evaluate whether the children . . . are in fact being provided the opportunity to acquire the basic literacy, calculating and verbal skills necessary to enable them" to achieve the goals of education; id., 318; which we have identified in this opinion as participating fully in the democratic process and becoming productive members of society. As I have noted, we have identified the goals of education in less specific terms than the New York Court of Appeals did in *Campaign I*. Accordingly, the trial court in the present case will have to evaluate whether the schools in the plaintiffs' towns or districts are providing children with the skills necessary to enable the children to participate effectively in our democracy and to become productive members of our society. In other words, the court will have to determine whether the education provided is adequate to meet the goals that we have defined today.[14] As it carries out

---

[14] It is worth noting that the New York Court of Appeals also stated that a relevant issue might be whether the plaintiffs could establish a correlation between funding and educational opportunity. *Campaign I*, supra, 86 N.Y.2d 318. The court indicated that, given the procedural posture of the case, addressing that issue was also premature. Id. That issue will likely be germane to the present litigation, not only as to the total amount of funding provided and the strategies, equations, and formulae on which funding is based, but also as to the allocation of funding based on educational priorities, in the context of constitutional requirements. Given the economic context in which the present litigation takes place, that issue is a compelling reason that favors placing the initial responsibility for designing appropriate reme-

that task, the trial court will have to *flesh out* the goals with appropriate specificity, based on the factual record.

In order to make that evaluation, the court first will have to determine the appropriate method for measuring adequacy. Measuring educational adequacy traditionally is accomplished by identifying input and/or output standards that serve as a measure of adequacy, then calculating the actual cost of attaining those inputs and/or outputs, a process referred to as "costing out." S. Smith, "Education Adequacy Litigation: History, Trends, and Research," 27 U. Ark. Little Rock L. Rev. 107, 114 (2004). "There are four methodologies to identify adequate education funding: (1) the professional judgment model; (2) the evidence based or 'best practices' model; (3) the successful schools model; and (4) the advanced statistical model." Id., 115. "[T]he professional judgment and evidence based/best practices models can be viewed as input models in which expert educators and researchers identify inputs that are required to produce an adequate education system. These inputs are then costed out to arrive at an adequate funding level. The successful schools and advanced statistical models can be viewed as outcome models in which an analysis compares schools and/or school districts with varying demographics and student performance to their corresponding funding levels in order to identify adequate funding levels." Id. Basically these methods combine to allow the trier of fact to consider the state's general and per pupil expenditures along with the level of performance of children of the state on standardized tests, matriculation rates, and other measures of performance. An alternative means of measuring adequacy is to rely on statistical modeling stud-

dial action in the hands of the legislature rather than the judiciary, provided, of course, that the final outcome of the case calls for appropriate remedial action.

ies. These statistical methods are used "either to estimate (a) the quantities and qualities of educational resources associated with higher or improved educational outcomes or (b) the costs associated with achieving a specific set of outcomes, in different school districts, serving different student populations. The first of these methods is known as the education production function and the second of these methods is known as the education cost function." R. Wood & B. Baker, "An Examination and Analysis of the Equity and Adequacy Concepts of Constitutional Challenges to State Education Finance Distribution Formulas," 27 U. Ark. Little Rock L. Rev. 125, 147 (2004). The advantage of these two methods is that they both "require policymakers to establish explicit, measurable outcome goals." Id. Moreover, both of these statistical methods may prove helpful in estimating the effect of the different particular needs of the various districts on values such as resources and costs. Id.

The North Carolina Supreme Court endorsed this general approach in *Leandro* v. *State,* supra, 346 N.C. 355. That court directed that the trial court on remand could consider "[e]ducational goals and standards adopted by the legislature," "the level of performance of the children of the state [of North Carolina] and its various districts on standard achievement tests," and the "level of the state's general educational expenditures and per-pupil expenditures." Id. In *Campaign I,* the New York Court of Appeals listed the following relevant inputs, including: "minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn . . . minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks . . . [and] minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by

sufficient personnel adequately trained to teach those subject areas." *Campaign I*, supra, 86 N.Y.2d 317. The court in *Campaign I* also mentioned performance on standardized tests as a relevant output. Id.

In my view, it is not sufficient for the state merely to offer an opportunity for education without regard to the circumstances of the children to whom it is offered. In other words, because an opportunity exists only when it takes into account the conditions—social, economic, and other—that realistically limit the opportunity, the educational offering must be tailored to meet the adequacy standard in the context of the social and economic conditions of the children to whom it is offered. Although no one could reasonably argue that the state is constitutionally bound to be a *guarantor* of educational, civic, or economic success, the state is bound to provide an education that is adequate given the circumstances of the children to whom it must be provided. Depending on the circumstances, an offering that would suffice in one district of the state may not suffice in another.

By way of illustration, some commentators argue that the most serious social disadvantage preventing a child from being able to learn is, of course, poverty. Relying on data obtained from the United States Census Bureau, the General Assembly's Commission on Children reported in 2009 that one in ten Connecticut children under the age of eighteen in 2007 lived in a family with income below the federal poverty line—nearly 86,000 children. State of Connecticut General Assembly, Commission on Children, Fact Sheet on Child Poverty in Connecticut, 2009, available at http://www.cga.ct.gov/coc/PDFs/poverty/child poverty report 0109.pdf (last visited March 9, 2010). Not surprisingly, those children were not evenly distributed throughout the state's 169 towns. The 2000 census revealed that, in thirty-eight towns, the child poverty rate was less than 2 percent,

yet in seven towns that rate was 23 percent, led by Hartford, which had an extremely high child poverty rate of 47 percent. Id. Waterbury, Bridgeport and New Haven also had the high child poverty rates of 31.4 percent, 28.4 percent, and 28.7 percent, respectively. Id. The impact that poverty has on a child's ability to learn is difficult to quantify, but it is unquestionably considerable. Poverty brings with it a host of other impediments to learning: limited or no access to health and dental care, poor or no prenatal care for the child's mother, failure to identify conditions such as learning disabilities and autism that would require special education services, poor diet and inadequate housing in unsafe neighborhoods. See M. Rebell, "Poverty, 'Meaningful' Educational Opportunity, and the Necessary Role of the Courts," 85 N.C. L. Rev. 1467, 1472–73 (2007).[15]

As challenging as these issues are, the trial court and, likely, this court, may have to face the issue of remedies, depending on the outcome of the adequacy phase of the trial. In that event, it may well be that the appropriate option available to the courts, to avoid a conflict concerning the separation of powers, would be the

---

[15] As it evaluates the evidence concerning the adequacy of the education provided to public school students, the trial court will have to grapple with numerous difficult questions, including the following. Should the court, in determining whether a school is providing its students with an adequate education, use the same standards to evaluate the outputs of children in a town school system with relatively little poverty and the outputs of children in a town school system with high poverty rates? What should be used as the measure for a *representative* child or *representative* children in public school for purposes of determining whether the school system is failing in its duties? What is an appropriate measure for the correlation between a child's failure to achieve as measured by academic outputs and the school system's alleged inadequacies, given the difficulties in quantifying social, economic, and environmental factors that enable or impede a child from being able to learn and, ultimately, to succeed in obtaining higher education and employment? All of these concerns and others will challenge the trial court to fashion judicially manageable standards to resolve the present case.

route taken in *Sheff* and *Horton I,* that is, an order that would assign, at least initially, the responsibility of providing a specific remedy to the legislature and, as appropriate, to the parties to the litigation. *Sheff* v. *O'Neill,* supra, 238 Conn. 4 ("the constitutional imperative of separation of powers persuades us to afford the legislature, with the assistance of the executive branch, the opportunity, in the first instance, to fashion the remedy that will most appropriately respond to the constitutional violations that we have identified"); see also *Horton I,* supra, 172 Conn. 650–51.[16] The North Carolina Supreme Court explained the prudential concerns that support this approach. "[T]he legislative process provides a better forum than the courts for discussing and determining what educational programs and resources are most likely to ensure that each child of the state receives a sound basic education. The members of the General Assembly are popularly elected to represent the public for the purpose of making just such decisions. The legislature, unlike the courts, is not limited to addressing only cases and controversies brought before it by litigants. The legislature can properly conduct public hearings and committee meetings at which it can hear and consider the views of the general public as well as educational experts and permit the full expression of all points of view as to what curricula will best ensure that every child of the state has the opportunity to receive a sound basic education." *Leandro* v. *State,* supra, 346 N.C. 354–55. Moreover, "[e]ducational goals and standards adopted by the legislature are factors which may be considered on remand

---

[16] In this regard, it should be noted that even if funding resources were unlimited—which they are not under any circumstances, especially, current circumstances—expenditures alone are not likely to remedy whatever deficiencies exist. It can be anticipated that sound expenditures, allocations and reallocations of resources, even to the point of structural change, along with wise choices with respect to all educational resources, including teachers, equipment, and proper standards, among others, will be essential.

to the trial court for its determination as to whether any of the state's children are being denied their right to a sound basic education." Id., 355.

The standard of educational adequacy that is required by our constitution must be met with respect to all children in our state, including those who face serious obstacles to benefiting from it as well as those who are readily equipped to benefit. The public educational system does not operate in abstraction but, rather, in the full social and economic context of our diverse society. The children who have the greatest need for an adequate education are those who face the greatest obstacles to obtaining that education. For many of our children, public education is, perhaps ironically, the principal means by which they can surmount the obstacles that must be overcome, in the first place, in order to benefit from the education. While the state is not bound under the constitution to be a guarantor of educational, social or economic success in the long run, the state is bound to provide a public education that is well suited to enable all children to achieve that success.

VERTEFEUILLE, J., dissenting. I agree with the plurality's conclusion that the claim by the plaintiffs, the Connecticut Coalition for Justice in Education Funding, Inc., and numerous parents and their public school children, that the defendants, Governor M. Jodi Rell and various state officials and members of the state board of education,[1] have violated article eighth, § 1, of the Connecticut constitution by failing to provide the schoolchildren with suitable educational opportunities is justiciable. I also agree that this court's decision in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), sets forth the factors to be considered in

---

[1] See footnotes 3 and 5 of the plurality opinion, respectively, for the listing of the individual plaintiffs and defendants in this case.

determining the scope of the right guaranteed by the constitutional provision. I disagree, however, with the plurality's conclusion that the *Geisler* factors support the view that "article eighth, § 1, entitles Connecticut public school students to an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting," and that, to be constitutionally adequate, that education must "leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy." Instead, I would conclude that the constitutional requirement that "[t]here shall always be free public elementary and secondary schools in the state"; Conn. Const., art. VIII, § 2; was intended to ensure the perpetuation of Connecticut's statewide system of free public schools, and was not intended to guarantee a "suitable" education as interpreted by the majority. I therefore would conclude that the trial court properly granted the defendants' motion to strike counts one, two and four of the plaintiffs' complaint.

The plurality stated that, "[i]n considering whether a particular subject matter presents a nonjusticiable political question, we have articulated [six] relevant factors, including: a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one ques-

tion. Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. . . . Furthermore, simply because the case has a connection to the political sphere [is not] an independent basis for characterizing an issue as a political question . . . . *Office of the Governor* v. *Select Committee of Inquiry*, [271 Conn. 540, 573, 858 A.2d 709 (2004)]. Indeed, the principle that a case should not be dismissed for nonjusticiability as a political question unless an unusual need for unquestioned adherence to that decision is inextricable from the case, means that courts should view such cases with a heavy thumb on the side of justiciability, and with the recognition that, simply because the case is connected to the political sphere, it does not necessarily follow that it is a political question. *Seymour* v. *Region One Board of Education*, [261 Conn. 475, 488, 803 A.2d 318 (2002)]." (Internal quotation marks omitted.)

In *Sheff* v. *O'Neill*, 238 Conn. 1, 14, 678 A.2d 1267 (1996), this court considered whether the plaintiffs' claim that they were entitled to "a substantially equal educational opportunity arising under article eighth, § 1, and article first, §§ 1 and 20," of the state constitution was justiciable. The defendants in *Sheff* had claimed that the case presented a nonjusticiable question because the constitution conferred exclusive power on the legislature to "implement [the principle that there shall always be free public schools in the state] by appropriate legislation." Conn. Const., art. VIII, § 1; see *Sheff* v. *O'Neill*, supra, 13. This court responded to this claim by observing that in *Horton* v. *Meskill*, 172 Conn. 615, 625, 649–50, 376 A.2d 359 (1977) (*Horton I*), and *Horton* v. *Meskill*, 195 Conn. 24, 35, 486 A.2d 1099 (1985) (*Horton III*),[2] we had "reviewed, in plenary fash-

---

[2] "In *Horton* v. *Meskill*, 187 Conn. 187, 445 A.2d 579 (1982) (*Horton II*), we addressed the ability of municipalities to intervene in the litigation arising out of our decision in *Horton I*." *Sheff* v. *O'Neill*, supra, 238 Conn. 14 n.15.

ion, the actions taken by the legislature to fulfill its constitutional obligation to public elementary and secondary schoolchildren."[3] *Sheff* v. *O'Neill*, supra, 14. The court then observed that "[t]he plaintiff schoolchildren in the present case invoke the same constitutional provisions to challenge the constitutionality of state action that the plaintiff schoolchildren invoked in *Horton I* and *Horton III*. The text of article eighth, § 1, has not changed. Furthermore, although prudential cautions may shed light on the proper definition of constitutional rights and remedies; see *Fonfara* v. *Reapportionment Commission*, 222 Conn. 166, 184–85, 610 A.2d 153 (1992); such cautions do not deprive a court of jurisdiction." *Sheff* v. *O'Neill*, supra, 14–15. In light of these precedents, we concluded that the plaintiffs' claims in *Sheff* were justiciable. Id., 15–16.

The court then rejected the *Sheff* defendants' claim that this court's decision in *Simmons* v. *Budds*, 165 Conn. 507, 338 A.2d 479 (1973), cert. denied, 416 U.S. 940, 94 S. Ct. 1943, 40 L. Ed. 2d 291 (1974), supported their claim that the case was nonjusticiable. See *Sheff* v. *O'Neill*, supra, 238 Conn. 15 n.17. In *Simmons*, the plaintiffs had claimed that the defendants, various University of Connecticut officials, had violated the constitutional mandate of article eighth, § 2, of the Connecticut constitution that the University of Connecticut " 'shall be dedicated to excellence in higher education.' " *Simmons* v. *Budds*, supra, 513. The court in *Simmons* concluded that, when article eighth, § 2, was adopted, "[i]t was intended that the board of trustees and the administrators were to be free to decide what is wise in educational policy. . . . Corrective action, if warranted, lies within the provinces of the board of trustees from whom the university senate's authority is derived, the governor who appoints the

---

[3] In *Horton I* and *Horton II*, this court did not directly address claims that the issues raised by the plaintiffs were nonjusticiable.

trustees under § 10-118 of the General Statutes, and, ultimately, with the General Assembly to which the constitution of Connecticut, article eighth, § 2, entrusts the responsibility of governing the University of Connecticut." (Citations omitted.) Id., 514. The court concluded that "the constitutional [s]tandard of 'excellence' was not meant to be a wedge for penetration of the educational establishment by judicial intervention in policy decisions." Id. In *Sheff*, this court characterized its holding in *Simmons* as a decision on the merits of the plaintiffs' constitutional claim, and stated that "[w]e did not hold that the claim was nonjusticiable." *Sheff* v. *O'Neill*, supra, 15 n.17. Accordingly, we concluded that *Simmons* did not support the defendants' argument in *Sheff* that the plaintiffs' claim was nonjusticiable. Id., 15 and n.17.

It is clear, therefore, that this court has recognized that there is considerable overlap between the "prudential cautions [that] may shed light on the proper definition of constitutional rights and remedies"; *Sheff* v. *O'Neill*, supra, 238 Conn. 15; and the factors that inform our determination as to whether an issue constitutes a nonjusticiable political question.[4] See *Moore* v. *Ganim*, 233 Conn. 557, 614–15, 660 A.2d 742 (1995) ("[t]he difficulty of defining the scope of [a state constitutional right to minimal subsistence for poor citizens], or of deciding what is the appropriate government response [to indigence]" supports conclusion that no such right exists); *Fonfara* v. *Reapportionment Commission*, supra, 222 Conn. 185 ("[p]rudential and functional considerations [as set forth in *Baker* v. *Carr*, 369 U.S. 186,

---

[4] This court has on occasion treated the textual commitment of an issue to the legislature, respect for the other branches of government, the need to make policy decisions and the difficulty of crafting appropriate equitable relief as prudential factors relevant to the scope and contours of a constitutional right rather than factors depriving this court of jurisdiction. See *Sheff* v. *O'Neill*, supra, 238 Conn. 15; *Fonfara* v. *Reapportionment Commission*, supra, 222 Conn. 184–85; *Simmons* v. *Budds*, supra, 165 Conn. 514.

217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)] are relevant to the classical enterprise of constitutional interpretation, especially where, as here, the constitutional provisions at issue are so remarkably open-textured"); see also *United States Dept. of Commerce* v. *Montana,* 503 U.S. 442, 459, 112 S. Ct. 1415, 118 L. Ed. 2d 87 (1992) ("[r]espect for a coordinate branch of [g]overnment raises special concerns . . . but those concerns relate to the merits of the controversy, rather than to our power to resolve it"). Thus, this court has been willing to treat factors such as respect for a coordinate branch of government and the difficulty of crafting appropriate equitable relief as prudential considerations relevant to the scope of a constitutional right, rather than as limits on the scope of the courts' power to resolve constitutional questions. This approach is consistent with "the principle that every presumption is to be indulged in favor of subject matter jurisdiction." *Sheff* v. *O'Neill,* supra, 15.

Accordingly, although I recognize, as Justice Zarella argues in his dissenting opinion, that the claim that the plaintiffs have raised in the present case is not precisely the same as the claim raised by the plaintiffs in *Sheff,*[5] the principles underlying this court's holding in *Sheff* that the plaintiffs' claim in that case was justiciable apply equally here. Accordingly, I would conclude that deference to the legislature and the difficulty of formulating appropriate equitable relief do not deprive this court of jurisdiction to determine the scope of the right but, instead, are factors to be considered in determining the scope of the right created by article eighth, § 1, as the trial court concluded.[6]

---

[5] Specifically, the plaintiffs in *Sheff* claimed that the defendants had violated their state constitutional "right to a substantially equal educational opportunity"; *Sheff* v. *O'Neill,* supra, 238 Conn. 14; while the plaintiffs in the present case claim that the defendants have violated their state constitutional right to "suitable and substantially equal educational opportunities . . . ."

[6] The plaintiffs contend that the trial court's consideration of these prudential factors was premature and that they "would have been more properly

I turn, therefore, to the merits of the plaintiffs' claim that, under article eighth, § 1, they have a right to receive suitable and substantially equal educational opportunities. To support this claim, the plaintiffs allege in counts one, two and four of their complaint, that various plaintiffs: (1) are in classes too large to learn effectively; (2) have had no opportunity to attend preschool; (3) lack access to remedial instruction or summer school; (4) attend schools with limited or poor quality technological resources; (5) are taught by teachers lacking subject matter expertise;[7] and (6) attend schools with high concentrations of special education students, bilingual or non-English speaking students and students who are "at risk," and schools that lack access to resources commensurate with their needs. In addition, the plaintiffs claim that these inadequacies are caused by a flawed educational funding system.

I agree with the plurality that this question may be resolved by application of the factors set forth in *State* v. *Geisler*, supra, 222 Conn. 684–86.[8] Although *Geisler* ordinarily supplies "[t]he analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our

considered after [the] plaintiffs had the opportunity to present appropriate and intelligible standards after discovery and at trial." This argument is circular. The court's alleged inability to determine "appropriate and intelligible standards" in this context *is* the prudential concern.

[7] In their complaint, for example, the plaintiffs allege that 68 percent of the teachers at Lincoln Elementary School in New Britain have a master's degree, while the state average is 80 percent.

[8] As set forth in part II of the plurality opinion, the *Geisler* factors are: "(1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 510, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

citizens than the federal constitutional minimum"; (internal quotation marks omitted) *State* v. *McKenzie-Adams*, 281 Conn. 486, 509, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007); I perceive no reason why this framework should not be equally useful in analyzing the scope of a right guaranteed by the state constitution that has no federal analog. See *Moore* v. *Ganim*, supra, 233 Conn. 581–82 (applying *Geisler* analysis to claim that state has constitutional obligation to provide minimal assistance to its poor citizens). Accordingly, I address each factor in turn.

With respect to federal precedent, I recognize that this factor has limited relevance in the present case because the federal constitution contains no analog to article eighth, § 1, of the state constitution. I disagree, however, with the plurality's conclusion that the federal precedent is entirely irrelevant to our analysis. Rather, I believe the United States Supreme Court's decision in *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 42, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973), supports the trial court's conclusion that there are important prudential considerations that must be considered in determining the scope of the state constitutional right. In that case, the United States Supreme Court stated that "[e]ducation, perhaps even more than welfare assistance, presents a myriad of intractable economic, social, and even philosophical problems. . . . *The very complexity of the problems of financing and managing a statewide public school system suggests that there will be more than one constitutionally permissible method of solving them, and that, within the limits of rationality, the legislature's efforts to tack the problems should be entitled to respect*. . . . On even the most basic questions in this area the scholars and educational experts are divided. . . . The ultimate wisdom as to [the] . . . problems of education is not likely to

be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the [s]tates inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions." (Citations omitted; internal quotation marks omitted.) Id., 42–43. The court in *San Antonio Independent School District* concluded that "[t]he consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the *legislative processes* of the various [s]tates . . . ." (Emphasis added.) Id., 58. I would conclude that this reasoning strongly counsels against interpreting article eighth, § 1, to endow the plaintiffs with the right to a "suitable" education that is enforceable in our courts.

With respect to the text of article eighth, § 1, I disagree with the plurality's conclusion that it is ambiguous as applied to the claims in this case.[9] Article eighth, § 1, of the Connecticut constitution provides in relevant part: "There shall always be free public elementary and secondary schools in the state. . . ." As the plurality points out in footnote 29 of its opinion, the common understanding of the word " 'school' " is " 'an organization that provides instruction . . . .' " As the plurality also recognizes, article eighth, § 1, "does not contain any qualitative language, in contrast to § 2 of article eighth . . . which requires the state to 'maintain a system of higher education, including The University of Connecticut, which *shall be dedicated to excellence* in

---

[9] I would also point out that, even if article eighth, § 1, were ambiguous, in accordance with the presumption that the state has acted constitutionally, "a well established jurisprudential doctrine counsels us to construe ambiguous constitutional principles narrowly." *Moore* v. *Ganim*, supra, 233 Conn. 629 (*Peters, J.*, concurring).

higher education'"; (emphasis in original); and in contrast to the education provisions of the constitutions of many of our sister states. In light of the language of article eighth, § 2, and inasmuch as this state was the last state to adopt a constitutional education provision; see *Sheff* v. *O'Neill*, supra, 238 Conn. 30; it is clear to me that the framers were well aware of their option to include a qualitative standard in article eighth, § 1, and deliberately chose not to include one. This deliberate choice weighs very heavily with me, and I therefore would conclude that the text of article eighth, § 1, reasonably cannot be read as mandating that the instruction in our public schools be "suitable" or effective for some specific end.[10]

With respect to the precedents of this court, I would conclude that our previous cases construing article eighth, § 1, provide no guidance in the present case because, as the plurality recognizes, they have involved claims of inequality, while this case presents for the first time a claim that that constitutional provision establishes a qualitative standard. There is ample precedent in our decisions, however, for the general proposition that prudential considerations such as an absence of judicially discoverable and manageable standards for resolving the case and the difficulty in crafting equitable relief are relevant to our determination of the scope of a state constitutional right. See *Sheff* v. *O'Neill*, supra, 238 Conn. 15; *Moore* v. *Ganim*, supra, 233 Conn. 614–15; *Fonfara* v. *Reapportionment Commission*, supra, 222 Conn. 185; *Simmons* v. *Budds*, supra, 165 Conn. 514.

---

[10] In support of its interpretation of article eighth, § 1, the plurality relies on Justice Loiselle's statement in his dissenting opinion in *Horton I* that this provision "must be interpreted in a reasonable way. A town [constitutionally] may not herd children in an open field to hear lectures by illiterates." *Horton I*, supra, 172 Conn. 659. The allegations in the present case differ dramatically from the conditions described by Justice Loiselle, and the issue before us is whether the rights asserted by the plaintiffs in this case are cognizable under article eighth, § 1.

As Justice Zarella has demonstrated in part III B of his dissenting opinion in the present case, courts simply are not well suited to make the difficult policy determinations as to what constitutes a "suitable" education and how to achieve that end. In my view, these prudential considerations weigh heavily against an interpretation that article eighth, § 1, includes an implicit qualitative standard.

With respect to the history of article eighth, § 1, I disagree with the plurality that this factor supports its conclusion that the provision contains an implicit qualitative requirement. Rather, I would conclude that the statements of the delegates to the constitutional convention support a conclusion that the framers merely intended to guarantee that the legislature would continue to provide the free public school system that it traditionally had provided. Simon J. Bernstein, a delegate to the 1965 constitutional convention and the principal supporter of the provision that became article eighth, § 1, stated during convention proceedings that "we do have the tradition which goes back to our earliest days of free good public education and we have [had] good public schools so that this again is not anything revolutionary, it is something which we have . . . which is [in] practically all [c]onstitutions in the [s]tates of our nation and Connecticut with its great tradition certainly ought to honor this principle." Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, p. 1039; see also Proceedings of the Connecticut Constitutional Convention (1965), Pt. 1, p. 312, remarks of Delegate Bernstein ("[w]e have a great history and tradition requiring that the public body supply our children with free public education"). Thus, Delegate Bernstein's statements emphasize that the provision was intended merely to honor and perpetuate Connecticut's tradition of providing free public schools for all of its school aged children. See *Moore* v. *Ganim*, supra, 233

Conn. 596 ("the framers of the education provisions looked to the historical statutory tradition of free public education in this state to support its explicit inclusion in the state constitution"); J. Dinan, "The Meaning of State Constitutional Education Clauses: Evidence from the Constitutional Convention Debates," 70 Alb. L. Rev. 927, 941 (2007) (including article eighth, § 1, among class of state constitutional education clauses that had "purpose of recognizing or confirming actions already taken by legislatures" and were intended to be merely hortatory); id., 943 (noting that Delegate Bernstein "was clear . . . that he did not mean for adoption of this clause to signal any change in the current school system"). There is no evidence that article eighth, § 1, was intended to create a new, judicially enforceable right to a suitable education.

With respect to the decisions of our sister states, I disagree with the plurality that they are "of paramount importance" in determining the scope of article eighth, § 1. The plurality relies on cases from New York, New Hampshire, South Carolina, Tennessee and Washington in support of its interpretation.[11] See part II E of the plurality opinion. As the plurality acknowledges, however, courts in seven other states, several of which have constitutions containing education clauses with qualitative standards,[12] have concluded that claims

[11] I would note that the New York cases on which the plurality heavily relies were split decisions. In *Campaign for Fiscal Equity, Inc.* v. *New York*, 100 N.Y.2d 893, 801 N.E.2d 326, 769 N.Y.S.2d 106 (2003), the dissenting justice argued that the constitutional standard articulated by the majority was "illusory"; id., 948 (Read, J., dissenting); because the court was "without any way to measure whether [the standard] has been (or may be) met." Id., 952; see also *Campaign for Fiscal Equity, Inc.* v. *New York*, 86 N.Y.2d 307, 342, 655 N.E.2d 661, 631 N.Y.S.2d 565 (1995) (Simons, J., dissenting) ("[t]he courts have the power to see that the legislative and executive branches of government address their responsibility to provide the structure for a [s]tate-wide school system and support it but we have no authority, except in the most egregious circumstances, to tell them that they have not done enough").

[12] See *Lobato* v. *State*, 216 P.3d 29, 38–40 (Colo. App. 2008) (construing article IX, § 2, of Colorado constitution providing that "[t]he general assem-

seeking to enforce those provisions are nonjusticiable. See footnotes 24 and 54 of the plurality opinion. In addition, a number of states have concluded that the education clauses of their respective constitutions do not contain judicially enforceable qualitative standards or funding requirements.[13] Indeed, recent scholarship

bly shall . . . provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state" [internal quotation marks omitted]), rev'd, 218 P.3d 358 (Colo. 2009); *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles*, 680 So. 2d 400, 405 (Fla. 1996) (construing article IX, § 1 [a], of Florida constitution providing that "[a]dequate provision shall be made by law for a uniform, efficient, safe, secure and high quality system of free public schools" [internal quotation marks omitted]); *Committee for Education Rights* v. *Edgar*, 174 Ill. 2d 1, 10, 672 N.E.2d 1178 (1996) (construing article X, § 1, of Illinois constitution providing that "[a] fundamental goal of the [p]eople of the [s]tate is the educational development of all persons to the limits of their capacities" and "[t]he [s]tate shall provide for an efficient system of high quality public educational institutions and services" [internal quotation marks omitted]); *Nebraska Coalition for Educational Equity & Adequacy* v. *Heineman*, 273 Neb. 531, 535, 731 N.W.2d 164 (2007) (construing article I, § CI-4, and article VII, § CVII-1, of Nebraska constitution, respectively, providing that "[r]eligion, morality, and knowledge . . . being essential to good government, it shall be the duty of the [l]egislature to pass suitable laws . . . to encourage schools and the means of instruction" and "[t]he [l]egislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years" [internal quotation marks omitted]); *Oklahoma Education Assn.* v. *State ex rel. Oklahoma Legislature*, 158 P.3d 1058, 1062 n.6 (Okla. 2007) (construing article I, § 5, of Oklahoma constitution provision providing that "[p]rovisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state" [internal quotation marks omitted]); *Marrero* v. *Commonwealth*, 559 Pa. 14, 15, 739 A.2d 110 (1999) (construing article III, § 14, of Pennsylvania constitution providing that General Assembly is to "provide for the maintenance and support of a thorough and efficient system of public education" [internal quotation marks omitted]); *Pawtucket* v. *Sundlun*, 662 A.2d 40, 49–50 (R.I. 1995) (construing article XII, § 1, of Rhode Island constitution providing that "[t]he diffusion of knowledge, as well as of virtue among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools and public libraries, and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education and public library services" [internal quotation marks omitted]).

[13] See *Charlet* v. *Louisiana*, 713 So. 2d 1199, 1207 (La. App.) (construing preamble to article VIII and article VIII, § 13 [B], of Louisiana constitution,

demonstrates that the trend in education adequacy litigation since 2005 has been "towards deference [to the legislature] and away from judicial intervention." J. Simon-Kerr & R. Sturm, "Justiciability and the Role of Courts in Adequacy Litigation: Preserving the Constitutional Right to Education," 6 Stan. J. C.R. & C.L. 83, 85 (2010). The primary reasons for this trend are the fact that the courts that have waded into these waters have found themselves drowning in endless litigation and they have increasingly realized that they are institutionally unable to craft appropriate relief. See id., p. 88; id., p. 99 (proposed remedies are " 'rife with policy choices that are properly the [l]egislature's domain' " and are "fundamentally political"), citing *Hancock* v. *Driscoll*, 443 Mass. 428, 460, 822 N.E.2d 1134 (2005); J. Simon-Kerr & R. Sturm, supra, p. 117 ("'The landscape is littered with courts that have been bogged down in the legal quicksand of continuous litigation and challenges to their states' school funding systems. Unlike those courts, we refuse to wade into that Stygian swamp.' "),

respectively, providing that " '[t]he goal of the public educational system is to provide learning environments and experiences, at all stages of human development, that are humane, just, and designed to promote excellence" and requiring state to " 'develop and adopt a formula which shall be used to determine the cost of a minimum foundation program of education in all public elementary and secondary schools,' " and concluding that constitution "does not require that educational funding provided by the state be 'adequate' or 'sufficient,' or that it achieve some measurable result for each pupil or each school district"), cert. denied, 730 So. 2d 934 (La. 1998); *School Administrative District No. 1* v. *Commissioner of Education*, 659 A.2d 854, 857 (Me. 1995) (construing article VIII, pt. 1, § 1, of Maine constitution providing that " '[a] general diffusion of the advantages of education being essential to the preservation of the rights and liberties of the people; to promote this important object, the [l]egislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools,' " and concluding that "[t]here is no provision in the Maine [c]onstitution guaranteeing a certain level of state funding of education or equitable funding").

citing *Nebraska Coalition for Educational Equity & Adequacy* v. *Heinman*, 273 Neb. 531, 557, 731 N.W.2d 164 (2007); see also part III B of Justice Zarella's dissenting opinion. The plurality attempts to distinguish these cases on various grounds; see footnote 24 of plurality opinion; but I find persuasive the statement of the court in *Lobato* v. *State*, 216 P.3d 29, 36 (Colo. App 2008), rev'd, 218 P.3d 358 (Colo. 2009), that these disparate results are not based on any clearly discernible legal principles, but "revolve around policy choices and value determinations"; (internal quotation marks omitted); that courts are ill suited to make in the first instance. Finally, even if the plurality were correct that this factor tends to favor the plaintiffs, I would conclude that the text of article eighth, § 1, of our state constitution, the history of the provision, and our state and federal precedents establishing that prudential concerns, such as the lack of manageable judicial standards and the difficulty of crafting equitable relief, are relevant to the scope of a state constitutional provision, are of greater importance and substantially outweigh this factor.

With respect to economic and sociological concerns, the plurality concludes that the plaintiffs and the state itself have a vital interest in a school system that provides a sound basic education to every child in the state. I agree with this assessment. The majority also concludes that this interest trumps any prudential concerns, such as the absence of judicially discoverable and manageable standards and the inability of this court to craft appropriate relief, which "are in our view better addressed in consideration of potential remedies for any constitutional violations that may be found at a subsequent trial on the merits, which might well require staying further judicial action pending legislative action." I disagree with this conclusion. Although this court has, on occasion, left the enforcement of a state

constitutional right to the legislature in the first instance; see *Sheff* v. *O'Neill,* supra, 238 Conn. 45–46; *Horton I,* supra, 172 Conn. 650; I believe that, in the present case, the absence of any qualitative standard in the text of our constitution, together with the dismaying experiences of other courts that have attempted to enforce such a standard, weigh heavily against interpreting article eighth, § 1, to contain an implicit qualitative standard, and in favor of leaving the crafting of a remedy to the legislature. In my view, the absence of a judicially enforceable remedy strongly implies the absence of a judicially enforceable right. See *Dimmock* v. *New London,* 157 Conn. 9, 16, 245 A.2d 569 (1968) ("for the vindication of every right there is a remedy" [internal quotation marks omitted]). The course taken by the plurality can only create unrealistic expectations and divert scarce public resources from supporting schools to defending endless litigation.

In summary, I would conclude that none of the *Geisler* factors supports the plurality's conclusions that: (1) "article eighth, § 1, entitles Connecticut public school students to an education suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting"; and (2) the constitutionally adequate education provided by the public schools will "leave Connecticut's students prepared to progress to institutions of higher education, or to attain productive employment and otherwise contribute to the state's economy." Accordingly, I would conclude that the trial court properly determined that the plaintiffs have failed to state a claim that the state has violated its constitutional obligation to provide "free public elementary and secondary schools in the state"; Conn. Const., art. VIII, § 1; and that it properly granted the defendants' motion to strike counts one, two and four of the plaintiffs' complaint.

Accordingly, I respectfully dissent.

ZARELLA, J., with whom McLACHLAN, J., joins, dissenting. This case presents this court with a rare opportunity to consider the experience of our sister states in deciding whether to become involved in the resolution of an issue that raises important philosophical and practical questions regarding the legitimate exercise of judicial power. Rather than examining and learning from this experience, however, a majority of this court has elected to ignore it, thus setting the court on a path that will lead to decades of confusion and produce a trail of wasteful litigation. James Madison warned in the Federalist Papers that judges must refrain from lawmaking: "Were the power of judging joined with the legislative . . . the judge would then be the legislator." The Federalist No. 47 (James Madison). Yet that is what will come to pass as a result of the court's conclusion that the plaintiffs'[1] stricken claims are justiciable under *Baker* v. *Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Judges will become legislators because courts will now be allowed, and very likely required, to define minimum educational "inputs" and "outputs" in order to determine whether the state has satisfied its purported constitutional mandate to provide Connecticut schoolchildren with a "suitable" education, a task that involves educational policy making and demands specialized skills that courts do not possess. In concluding that the plaintiffs' claims do not involve a political question, this court misinterprets our case law and dismisses the clear distinctions between the plaintiffs' claims and the claims adjudicated by this court in *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996), and *Seymour* v. *Region One Board of Educa-*

---

[1] The plaintiffs are the Connecticut Coalition for Justice in Education Funding, Inc., and certain parents and grandparents of students enrolled in various public schools throughout the state. See footnote 3 of the plurality opinion and accompanying text.

*tion,* 261 Conn. 475, 803 A.2d 318 (2002). More importantly, this court disregards the plain language of article eighth, § 1, which directs the General Assembly, not the judiciary, to implement the principle of "free public elementary and secondary" education by enacting "appropriate legislation." The most immediate practical effect of the court's decision is that it will take control of educational matters from local boards of education and vest it with the courts, a result that the framers of article eighth, § 1, could not have possibly envisioned. Moreover, it will require the legislature to appropriate *at least* $2 billion per year in additional funding to ensure that Connecticut schoolchildren will be provided with the resources allegedly required for a suitable education. See part III D of this opinion. Thus, by extending judicial authority into areas expressly reserved to the legislature, this court's ruling in the present case sets a dangerous precedent that will create a quagmire of uncertainty with respect to future controversies regarding the boundaries of judicial and legislative power in matters concerning education. Because I cannot agree with this clear violation of the separation of powers, I respectfully dissent.[2]

---

[2] I note that, although the trial court deemed the plaintiffs' claims justiciable on the basis of this court's reasoning in *Horton* v. *Meskill,* 172 Conn. 615, 376 A.2d 359 (1977), *Horton* v. *Meskill,* 195 Conn. 24, 486 A.2d 1099 (1985), and *Sheff* v. *O'Neill,* supra, 238 Conn. 1, among other cases, commentators from Yale University Law School have concluded that the trial court's *Geisler* analysis; see *State* v. *Geisler,* 222 Conn. 672, 684–85, 610 A.2d 1225 (1992); was for all practical purposes "a thinly veiled justiciability decision." J. Simon-Kerr & R. Sturm, "Justiciability and the Role of Courts in Adequacy Litigation: Preserving the Constitutional Right to Education," 6 Stan. J. C.R. & C.L. 83, 119 (2010). According to the analysis of these commentators, which I find persuasive, "[the trial court] claimed [that its] 'prudential cautions' concerns were part of the *Geisler* test traditionally employed by Connecticut courts to construe the contours of a state constitutional right. A close reading of [the trial court's memorandum of decision] shows, however, that [its] 'prudential cautions' map perfectly onto the justiciability case [of] *Baker* v. *Carr* [supra, 369 U.S. 217]. Further, neither *Geisler*—nor any case before or after—introduces a justiciability analysis as a step in defining the contours of a constitutional right. [The trial court's application] of the *Geisler* test

I

## THE PLAINTIFFS' CLAIMS

It is first necessary to understand exactly what the plaintiffs claim in order to fully appreciate the effect of this court's decision on our state constitutional jurisprudence and the separation of powers. The plaintiffs do not claim that the current school funding system is in violation of the state constitution's equal protection provisions because different towns are not receiving reasonably similar funding. Rather, they claim that Connecticut students are not receiving a "suitable" educational opportunity as measured by certain "outputs . . . ." Thus, irrespective of the relative equality of funding, the plaintiffs claim that, if certain performance based results or outcomes are not *achieved*, students will be deprived of a suitable educational opportunity.

The plaintiffs specifically allege in their complaint that their constitutional rights have been violated because the state has failed "to maintain an educational

therefore suggests that, as in other states recently dismissing adequacy suits, justiciability concerns actually drove the [court's] decision." J. Simon-Kerr & R. Sturm, supra, pp. 119–20.

Moreover, even if the trial court's analysis had followed the *Geisler* test more closely, I agree with commentators who question its legitimacy on the ground that "it is no more than a checklist from which to select [various interpretive] tools" and that it provides no guidance as to the significance of selecting "any particular method in any particular case." M. Besso, "Commenting on the Connecticut Constitution," 27 Conn. L. Rev. 185, 207 (1994). See generally *State* v. *Geisler*, supra, 222 Conn. 684–85 (stating that court should consider text of constitutional provision, holdings and dicta of this court and Appellate Court, federal precedent, sister state decisions, history surrounding adoption of constitutional provision and economic and sociological factors in interpreting contours of state constitution). The test is more harmful than beneficial because, without such guidance, the mere accumulation of analyses or precedents from an array of different methods, some of which may be of questionable relevance, can be used as a means to reach a desired end. See M. Besso, supra, 216–17.

system that provides [them] with *suitable* and substantially equal educational opportunities . . . ." (Emphasis added.) The plaintiffs further allege that the state has failed "to maintain a public school system that provides [them] with *suitable* educational opportunities . . . ." (Emphasis added.) The plaintiffs describe generally the "inputs" and "outputs" that are essential to a "suitable" educational experience, with the "inputs," or "essential components of a suitable educational opportunity," consisting of (1) high quality preschool, (2) appropriate class sizes, (3) programs and services for at-risk students, (4) highly qualified administrators and teachers, (5) modern and adequate libraries, (6) modern technology and appropriate instruction, (7) an adequate number of hours of instruction, (8) a rigorous curriculum with a wide breadth of courses, (9) modern and appropriate textbooks, (10) a school environment that is healthy, safe, well maintained and conducive to learning, (11) adequate special needs services pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., (12) appropriate career and academic counseling, and (13) an adequate array of and suitably run extracurricular activities. The plaintiffs describe the even more crucial "outputs" as measures of, inter alia, performance on the student achievement tests required under the federal No Child Left Behind Act of 2001, 20 U.S.C. § 6301 et seq., school retention rates, and high school graduation rates. The plaintiffs thus do not seek to create programs and allocate resources on an equal funding basis but in a manner designed to ensure that all students graduate at a constitutionally guaranteed minimum level of competence. With this understanding in mind, I briefly recapitulate the governing law on justiciability.

## II

## LAW OF JUSTICIABILITY

"The principles that underlie justiciability are well established. Justiciability requires (1) that there be an

actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . The third requirement for justiciability, the political question doctrine, is based on the principle of separation of powers. . . . The characterization of [an issue] as political is a convenient shorthand for declaring that some other branch of government has constitutional authority over the subject matter superior to that of the courts. . . . The fundamental characteristic of a political question, therefore, is that its adjudication would place the court in conflict with a coequal branch of government in violation of the primary authority of that coordinate branch. . . .

"Whether a controversy so directly implicates the primary authority of the legislative or executive branch, such that a court is not the proper forum for its resolution, is a determination that must be made on a case-by-case [basis]. . . . Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unques-tion[ed] adherence to a political decision already made; or [6] the potentiality of embarrassment from multifari-ous pronouncements by various departments on one question. Unless one of these formulations is inextrica-ble from the case at bar, there should be no dismissal for

nonjusticiability on the ground of a political question's presence." (Citations omitted; internal quotation marks omitted.) *Nielsen* v. *State,* 236 Conn. 1, 6–8, 670 A.2d 1288 (1996), quoting *Baker* v. *Carr,* supra, 369 U.S. 217. In the present case, all six *Baker* factors are implicated by the plaintiffs' stricken claims, and, accordingly, the controversy is nonjusticiable.

## III

### APPLICATION OF THE *BAKER* FACTORS

#### A

#### Textually Demonstrable Commitment to the Legislature

I begin by noting that article eighth, § 1, does not refer to a "suitable" education or to an "adequate" education, nor does any other constitutional provision suggest that the state is obligated to provide Connecticut schoolchildren with a suitable or minimum standard of education. Even the plurality ultimately concedes in its discussion of the first *Geisler* factor that the defendants'[3] interpretation of the constitutional text to mean that it does not confer a right to suitable educational opportunities is reasonable in the absence of an affirmative provision regarding a minimum educational standard. Consequently, I would initially conclude that the plaintiffs' claims are nonjusticiable because there is no explicit basis in the constitution for the right to a suitable education.

The lack of such a provision is consistent with the purpose of article eighth, § 1. As this court noted in *Sheff,* "[t]he primary motivation for the addition of arti-

---

[3] The defendants in this case are M. Jodi Rell, the governor of Connecticut, Denise Lynn Nappier, the state treasurer, Nancy S. Wyman, the state comptroller, Mark K. McQuillan, successor to Betty J. Sternberg, the former state commissioner of education, and various former and current members of the state board of education.

cle eighth, § 1, to the constitution in 1965 appears to have been the realization that Connecticut was the only state in the nation that did not provide an express right to public elementary and secondary education in its constitution. See [Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3] pp. 1039–40, remarks of [Simon Bernstein]." *Sheff* v. *O'Neill*, supra, 238 Conn. 30–31. Bernstein, a delegate to the constitutional convention and the proponent of article eighth, § 1, explained during a debate on the matter that he had submitted a similar resolution earlier in the proceedings and that the purpose of the resolution was to ensure "that our system of free public education have a tradition [of] acceptance on a par with our bill of rights and it should have the same [c]onstitutional sanctity.[4] It was because our [c]onstitution had no reference to our school system that I submitted my resolution and of course others were aware of the same [omission] in our [c]onstitution and other similar resolutions were submitted. . . . Connecticut with its great tradition certainly ought to honor this principle. . . . I can't possibly see any dispute over the principle involved, [as] it is such a basic principle that it should be in the [c]onstitution." Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, pp. 1039–40. The only other delegate to speak on the proposed provision explained that he supported it because Connecticut was the only state in the nation in which the constitution made no reference to elementary and secondary education, and, therefore, adopting the amendment seemed like the "natural and proper thing to do." Id., p. 1040,

---

[4] Resolution No. 109 of the constitutional convention, which originally received an unfavorable report from the resolution committee, contained the following statement of purpose: "Our system of free public education has traditional acceptance on a par with our Bill of Rights and it should have the same constitutional sanctity." Convention Resolution No. 109 (July 27, 1965), reprinted in 1965 Connecticut Constitutional Convention Bulletins, Calendars, Resolutions, Files, Appendix (1965).

remarks of Albert E. Waugh. Thus, the delegates gave no thought to the question of educational quality, their intent simply being to elevate the general principle of a free public elementary and secondary education to the status of a constitutional right, as every other jurisdiction in the nation had done.[5] Indeed, if it had been the intent and purpose of the delegates to adopt a constitutional provision that would guarantee students a minimum standard of education or level of educational achievement, one would have expected such a controversial concept to have been mentioned and fiercely debated. An examination of the proceedings, however, indicates that the very brief discussion that occurred when Bernstein introduced the provision that became article eighth, § 1, was entirely about constitutionalizing the right to a free public education, not the right to a minimum standard of education or level of educational achievement. See Proceedings of the Connecticut Constitutional Convention (1965), Pt. 1, pp. 310–13; Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, pp. 1038–41. To that end, Bernstein repeatedly emphasized that the purpose of the proposed provi-

---

[5] Bernstein also referred in passing to a " 'good education' " when he stated: "[I]n the decade of the [1950s] . . . I served on a board of education and was surprised to find that Connecticut with its traditional good education had no reference to it in the [c]onstitution[.] [W]hen I use the word[s] 'good education' I am quoting, because if I may I would like to quote from the Connecticut [C]ode of 1650 which others I believe call the Ludlow Code. Quote '[a good] education of children is of singular . . . benefit to any [c]ommonwealth' so we do have the tradition which goes back to our earliest days of free good public education and we have [had] good public schools so that this again is not anything revolutionary . . . ." Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, p. 1039. It is clear from the context in which these remarks were made, however, that, in using the word "good," Bernstein did not intend to give any substantive meaning to the proposed provision but intended to recognize that a free public education is a deeply rooted tradition in this state that should be elevated to a constitutional right. See, e.g., *Moore* v. *Ganim*, 233 Conn. 557, 596, 660 A.2d 742 (1995) (purpose of article eighth, § 1, was to give right to public education constitutional status).

sion was to secure nothing more than the right to a "free public education," adding that the principle ought to be honored because it was "not anything revolutionary . . . ." Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, p. 1039; see also *Sheff* v. *O'Neill*, supra, 120 (*Borden, J.*, dissenting) ("[Bernstein] made clear that [article eighth, § 1] was intended *only* to constitutionalize the then existing system of free public education" [emphasis added]). Accordingly, in the absence of an affirmative statement of a governmental obligation to provide Connecticut schoolchildren with a minimum standard of education, there is no textual basis or historical support for the judicial enforcement of such a right. See, e.g., *Moore* v. *Ganim*, 233 Conn. 557, 595, 660 A.2d 742 (1995) ("We are especially hesitant to read into the constitution unenumerated affirmative governmental obligations. In general, the declaration of rights in our state constitution was implemented not to impose affirmative obligations on the government . . . but rather to secure individual liberties against direct infringement through state action.").

I also conclude that the plaintiffs' claims are nonjusticiable because article eighth, § 1, unequivocally delegates to the legislature the task of enacting "appropriate legislation" to ensure that Connecticut schoolchildren will be provided with a free public education. By implication, "appropriate legislation" includes whatever qualitative standards, if any, the legislature deems necessary to achieve its mandate.[6]

---

[6] Some scholars have divided the education clauses of the state constitutions into four categories that are based on the level of obligation each state constitution imposes on the respective state legislature, with the first category imposing the slightest obligation and the fourth category imposing the greatest obligation. W. Thro, "The Third Wave: The Impact of the Montana, Kentucky, and Texas Decisions on the Future of Public School Finance Reform Litigation," 19 J.L. & Educ. 219, 243–45 nn.130–39 (1990); see also E. Grubb, "Breaking the Language Barrier: The Right to Bilingual Education," 9 Harv. C.R.-C.L. L. Rev. 52, 66–70 (1974); G. Ratner, "A New Legal Duty

The directive in article eighth, § 1, that the General Assembly "shall implement" the principle of a free education by enacting "appropriate legislation" is no different from the language used in other constitutional provisions that impose affirmative obligations on the legislature and that have been deemed nonjusticiable. See *Nielsen* v. *State*, supra, 236 Conn. 9–10 (article third, § 18); *Pellegrino* v. *O'Neill*, 193 Conn. 670, 681–82, 480 A.2d 476 (article fifth, § 2), cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984); *Simmons* v. *Budds*, 165 Conn. 507, 514, 338 A.2d 479 (1973) (article eighth, § 2), cert. denied, 416 U.S. 940, 94 S. Ct. 1943, 40 L. Ed. 2d 291 (1974). For example, article fifth, § 2, which concerns the number and appointment of judges, provides in relevant part that "[t]*he judges of the . . . superior court shall,* upon nomination by the governor, *be appointed by the general assembly* in such manner as shall by law be prescribed. . . ." (Emphasis added.) Similarly, article third, § 18 (b),[7] which imposes a cap on general budget expenditures, provides in relevant part that "[t]*he general assembly shall by law define* 'increase in personal income', 'increase in inflation' and 'general budget expenditures' for the purposes of this section . . . ." (Emphasis added.) Finally, article eighth, § 2, which requires the state to "maintain a system of higher education, including The University of

for Urban Public Schools: Effective Education in Basic Skills," 63 Tex. L. Rev. 777, 815–16 and nn. 143–46 (1985). Connecticut and fourteen other states are included in the first category, presumably because the education clauses of the constitutions of those states do not refer to any standard concerning educational quality but merely require the establishment of a system of free public schools. See W. Thro, supra, 243–44 and nn.130–31. Thus, "[a]ccording to the very terms of [any constitutional] provision [providing merely for free public schools], the legislature has met its obligation simply by setting up a free public school system. To force the legislature to do more, while obviously desirable, would be to engage in judicial activism." Id., 246.

[7] Article third, § 18, was added to the state constitution in 1992 by article twenty-eight of the amendments.

Connecticut, which shall be dedicated to excellence in higher education," provides in relevant part that "[*t*]*he general assembly shall determine* the size, number, terms and method of appointment of the governing boards of The University of Connecticut and of such constituent units or coordinating bodies in the system as from time to time may be established." (Emphasis added.)

We concluded in *Nielsen, Pellegrino* and *Simmons* that claims brought under each of the foregoing provisions were nonjusticiable because they could not be resolved without interfering with a clearly articulated duty of the legislature. See *Nielsen* v. *State*, supra, 236 Conn. 10; *Pellegrino* v. *O'Neill*, supra, 193 Conn. 682; *Simmons* v. *Budds*, supra, 165 Conn. 514. We specifically observed in *Pellegrino* that "[w]e must resist the temptation which this case affords to enhance our own constitutional authority by trespassing [on] an area clearly reserved as the prerogative of a coordinate branch of government." *Pellegrino* v. *O'Neill*, supra, 681. We likewise noted in *Nielsen* that article third, § 18, "by its plain and unambiguous terms, commits exclusively to the General Assembly the power to define the spending cap terms and nowhere intimates any role in this process for the judiciary. . . . Nothing elsewhere in our constitution contradicts this textual commitment to the General Assembly." (Citation omitted.) *Nielsen* v. *State*, supra, 9. In *Simmons*, we also explained that the plaintiff's claim in that case was nonjusticiable because the language in article eighth, § 2, referring to the General Assembly's affirmative duty to appoint the university's governing boards and constituent bodies, indicated a clear intention that "the board of trustees and the administrators were to be free to decide what is wise in educational policy. . . . Corrective action, if warranted, lies within the provinces of the board of trustees from [which] the university senate's

authority is derived, the governor who appoints the trustees under [General Statutes] § 10-118 . . . and, ultimately, with the General Assembly to which the constitution of Connecticut, article eighth, § 2, entrusts the responsibility of governing the University of Connecticut. We find no error in the conclusion of the trial court that the constitutional [s]tandard of 'excellence' was not meant to be a wedge for penetration of the educational establishment by judicial intervention in policy decisions." (Citations omitted.) *Simmons* v. *Budds*, supra, 514.

The language of article eighth, § 1, is similar to the language in the preceding provisions—all of which impose an affirmative duty on the legislature—because it plainly and unambiguously provides that the "general assembly *shall* implement [the] principle [of a free public elementary and secondary school education by enacting] *appropriate legislation.*" (Emphasis added.) There is no suggestion in this or in any other constitutional provision that the judicial branch has a role in the process, nor has the court referred to any Connecticut case permitting judicial intervention when the claim involves a constitutional provision that imposes an affirmative duty on the legislature. Moreover, it is counterintuitive to conclude, in light of *Simmons*, that, when a level of quality is mandated by the constitution, there is *no* justiciable issue because matters concerning educational quality fall within the legislative domain but that when no level of quality is mandated, there *is*. Thus, even if a "free" education could be construed to mean a suitable education, *Simmons* dictates that questions concerning educational quality are nonjusticiable.

Our decisions in *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977) (*Horton I*), and *Horton* v. *Meskill*, 195 Conn. 24, 486 A.2d 1099 (1985) (*Horton III*), are distinguishable because the constitutional challenge in

those cases was brought under *both* article eighth, § 1, *and* the equal protection provisions of the state constitution, namely, article first, §§ 1 and 20. See, e.g., *Horton* v. *Meskill*, supra, 172 Conn. 621. The right to equal protection, as with most other rights guaranteed by the state constitution, differs from the right to education because it is a "negative" right, that is, a right granted to the individual on which the government may not infringe. *State ex rel. Morrison* v. *Sebelius*, 285 Kan. 875, 894, 179 P.3d 366 (2008). The judiciary almost always can protect a negative constitutional right by ordering the government to cease the infringement, either by striking the offending statute or by prohibiting the offending act. Id. In contrast, a person alleging that the legislature has failed to perform an affirmative duty must seek a judicial remedy that mandates the performance of that duty. Id. Our precedent, however, particularly in *Simmons*, in which this court declined to intervene even though the constitution specifically declared that the University of Connecticut shall be dedicated to excellence; see *Simmons* v. *Budds*, supra, 165 Conn. 514; compels this court to refrain from interfering in the present dispute because the duty to implement the principle of a free public education is clearly committed to the legislature.

The plurality's conclusion that *Nielsen* did not consider the "appropriate legislation" language of article eighth, § 1, to be a textual commitment to the General Assembly like the "plain and unambiguous" spending cap language in article third, § 18; *Nielsen* v. *State*, supra, 236 Conn. 9; reflects an improper understanding of that case. What the court indicated in *Nielsen* was that the "appropriate legislation" language at issue in *Horton I* was broader than the spending cap language only in the context of the equal protection claim in *Horton I*. See id., 10 ("In construing [article eighth, § 1], we expressly held [in *Horton I*] that the then-existing

financing scheme for the state's public schools [was] not appropriate legislation . . . *to implement the requirement that the state provide a substantially equal educational opportunity* to its youth in its free public elementary and secondary schools. . . . It was in light of the textual distinction between these different constitutional provisions that, in *Pellegrino* v. *O'Neill,* supra, [193 Conn.] 683, we described *Horton I* as clearly [a case in which] a judicial remedy could have been applied . . . ." [Citations omitted; emphasis added; internal quotation marks omitted.]). Consequently, in *Nielsen,* we did not view the "appropriate legislation" language of article eighth, § 1, as opening the door to judicial intervention in all matters pertaining to education but, rather, as a tool that the court in *Horton I* had used *in conjunction with* the equal protection provisions of the state constitution to evaluate whether the then existing system of funding public education was providing children with substantially equal educational opportunities. See *Nielsen* v. *State,* supra, 10.

The plaintiffs in the present case appear to be asking this court to do something that the court in *Nielsen* could not have imagined, that is, to use the equal protection provisions of the state constitution as a vehicle to establish a substantive floor for educational achievement as a constitutional right. See, e.g., B. Neuborne, "State Constitutions and the Evolution of Positive Rights," 20 Rutgers L.J. 881, 887 (1989) (in absence of independent textual basis for substantive federal constitutional rights in education, health and housing, lawyers have sought to use federal constitution to protect poor by invoking equal protection and due process clauses "to bootstrap judges into a position [of] trump[ing] government refusals to spend money on critical services [that are] desperately needed by the poor"). This court, however, should do everything in its power to avoid using the equal protection provisions in this manner

because the concept of substantive equal protection has not been recognized in this state, and there is no textual support in the constitution for judicial intervention in substantive educational matters. See *Harris* v. *McRae*, 448 U.S. 297, 322, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980) ("[t]he guarantee of equal protection . . . is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity").

In addition to the fact that the text of article eighth, § 1, specifically commits the function of providing a free public education to the legislature, this court has recognized on numerous occasions that providing Connecticut schoolchildren with an education is a function of the state that is properly exercised by the legislature. See, e.g., *New Haven* v. *State Board of Education*, 228 Conn. 699, 703, 638 A.2d 589 (1994) (article eighth, § 1, "places the ultimate responsibility for the education of the children of Connecticut on the state," which distributes responsibility through statutory framework granting state board of education "the broad and general power to supervise and control the educational interests of the state" [internal quotation marks omitted]); *Stolberg* v. *Caldwell*, 175 Conn. 586, 598, 603, 402 A.2d 763 (1978) (state function and duty of providing education is manifest from extensive legislation relating to furnishing of education for general public under article eighth, §§ 1 and 2, the legislative branch having responsibility for determining general education policy). Indeed, the legislature has committed significant financial resources and developed an extensive statutory framework to carry out this duty. For example, the General Assembly's office of fiscal analysis has estimated that the annual appropriation for elementary and secondary education for the budget years 2009 through 2011 will be approximately $3.3 billion, or 17 percent

of the state budget, the second highest expenditure after human services. Office of Fiscal Analysis, Connecticut General Assembly, Connecticut State Budget 2009–2011, p. 12.

The funds appropriated for education are administered pursuant to an extensive and detailed statutory scheme incorporated in title 10 of the General Statutes, which vests ultimate power and authority for general supervision and control of the state's educational interests in the state board of education. See General Statutes § 10-4.[8] The legislature has further delegated responsibility for *implementing* the principle of a free

---

[8] General Statutes § 10-4 (a) provides that the state board of education "shall have general supervision and control of the educational interests of the state, which interests shall include preschool, elementary and secondary education, special education, vocational education and adult education; shall provide leadership and otherwise promote the improvement of education in the state, including research, planning and evaluation and services relating to the provision and use of educational technology, including telecommunications, by school districts; shall prepare such courses of study and publish such curriculum guides including recommendations for textbooks, materials, instructional technological resources and other teaching aids as it determines are *necessary to assist school districts to carry out the duties* prescribed by law; shall conduct workshops and related activities, including programs of intergroup relations training, to assist teachers in making effective use of such curriculum materials and in improving their proficiency in meeting the diverse needs and interests of pupils; shall keep informed as *to the condition, progress and needs of the schools* in the state; and shall develop or cause to be developed evaluation and assessment programs designed to measure objectively the *adequacy and efficacy* of the educational programs offered by public schools and shall selectively conduct such assessment programs annually and report, pursuant to subsection (b) of this section, to the joint standing committee of the General Assembly having cognizance of matters relating to education, on an annual basis." (Emphasis added.) General Statutes § 10-4a adds that it shall be an educational interest of the state to ensure that "(1) each child shall have . . . equal opportunity to receive a *suitable* program of educational experiences; [and] (2) each school district shall finance at a reasonable level . . . an educational program designed to achieve this end . . . ." (Emphasis added.) In furtherance of these goals, General Statutes § 10-4 (b) requires that the state board of education "shall submit to the Governor and to the joint standing committee of the General Assembly having cognizance of matters relating to education an account of the condition of the public schools and of the amount and

public education to local boards of education. E.g., *Cheshire* v. *McKenney*, 182 Conn. 253, 257–58, 438 A.2d 88 (1980); *West Hartford Education Assn., Inc.* v. *DeCourcy*, 162 Conn. 566, 573, 295 A.2d 526 (1972); see also *State ex rel. Board of Education* v. *D'Aulisa*, 133 Conn. 414, 418–19, 52 A.2d 636 (1947) ("Under the statutes, provision is made for the education of the inhabitants of each town through its town board of education. Accordingly . . . [a] town board of education is an agency of the state in charge of education in the town; to that end it is granted broad powers by the legislature . . . ." [Internal quotation marks omitted.]). This court has expressly acknowledged the link between the constitutional mandate and the duty of local boards by describing the boards as agencies of the state that "carry out the constitutional guarantee of free public education contained in article eighth, § 1 . . . ." *Local 1186, AFSCME* v. *Board of Education*, 182 Conn. 93, 100, 438 A.2d 12 (1980); see also *Murphy* v. *Board of Education*, 167 Conn. 368, 372–73, 355 A.2d 265 (1974) ("[T]he furnishing of education for the general public, required by article eighth, § 1, of the Connecticut constitution, is by its very nature a state function and duty. . . . The local boards have of necessity been delegated this responsibility. . . . Clearly, then, town boards of education . . . act as agents of the state under the authority of our state constitution and the enactments of our legislature." [Citations omitted.]).

To guide and assist the local boards in carrying out this duty, General Statutes § 10-220 (a) provides that "[e]ach local or regional board of education shall maintain *good* public elementary and secondary schools, implement the educational interests of the state as defined in section 10-4a and provide such other educational activities as *in its judgment* will best serve the

quality of instruction therein and such other information as will assess the true condition, progress and needs of public education."

interests of the school district . . . ." (Emphasis added.) This includes providing an "appropriate learning environment" through "(1) adequate instructional books, supplies, materials, equipment, staffing, facilities and technology, (2) equitable allocation of resources among its schools, (3) proper maintenance of facilities, and (4) a safe school setting . . . ." General Statutes § 10-220 (a). Local boards of education also "shall prescribe rules for the management, studies, classification and discipline of the public schools and, subject to the control of the State Board of Education, the textbooks to be used; shall make rules for the control, within their respective jurisdictions, of school library media centers and approve the selection of books and other educational media therefor, and shall approve plans for public school buildings and superintend any high or graded school in the manner specified in this title." General Statutes § 10-221 (a). General Statutes § 10-222 (a) further requires each local board to "prepare an itemized estimate of the cost of maintenance of public schools for the ensuing year . . . ." Thus, it is the local boards of education that decide, in their discretion, how education funds shall be budgeted and expended. *Local 1186, AFSCME* v. *Board of Education,* supra, 182 Conn. 100.

The effect of the court's decision to permit—indeed, require—judicial involvement in educational matters will be to wrest control of education from the local boards and place it in the hands of the court. It is clear that this will happen because the plaintiffs' complaint alleges that the state's failure to provide "suitable" educational opportunities is caused by inadequate and unequal educational "inputs," which the complaint defines as "the resources and conditions, such as staff, programs, and environment, that constitute an educational system." Such "resources and conditions," however, are exactly what the legislature has directed local

boards to provide under §§ 10-4a and 10-220 to ensure that each child will have a "suitable program of educational experiences"; General Statutes § 10-4a (1); and "an appropriate learning environment . . . ." General Statutes § 10-220 (a). Court intervention to establish a minimum standard of education or level of educational achievement thus will conflict with legislative directives to local boards, whose discretion to determine what constitutes a "suitable program" and "an appropriate learning environment" for children in their respective districts will not only be severely curtailed, but very likely eliminated, because the court will become the ultimate arbiter of whether Connecticut schoolchildren are receiving the proper educational resources to satisfy the newly defined constitutional mandate of a suitable education.

The plurality asserts that its ruling is "not intended to supplant local control over education," explaining that the purpose of court intervention is merely "to articulate the broad parameters of [the] constitutional right, and to leave their implementation to the expertise of those who work in the political branches of state and local government, informed by the wishes of their constituents. [As] long as those authorities prescribe and implement a program of instruction rationally calculated to enforce the constitutional right to a minimally adequate education . . . then the judiciary should stay its hand." Footnote 59 of the plurality opinion. As New Jersey, Kansas and other jurisdictions have discovered, however, such a view is unrealistic. See part III B of this opinion. The court will not be able to limit its involvement in educational matters to vague declarations of principle but will be required to adjudicate constitutional challenges to the adequacy of *specific* state and local programs of instruction, which will place the court in a position to override decisions made by state and local authorities regarding the level and distri-

bution of limited financial resources for education in their respective jurisdictions.

This could not be what the proponents of article eighth, § 1, intended. If it were, they surely would not have described the provision as "not anything revolutionary." Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, p. 1039, remarks of Bernstein. That the framers never would have contemplated this change of course also is evident from other parts of the convention records, in which delegates described the proposed provision on education as embodying nothing more than Connecticut's long history and tradition of providing children with a free public education. See, e.g., Convention Resolution No. 109 (July 27, 1965), reprinted in 1965 Connecticut Constitutional Convention Bulletins, Calendars, Resolutions, Files, Appendix (1965). Proponents of article eighth, § 1, demonstrated no interest in supplanting legislative or local control of education but, rather, stated that their intent was to correct an *omission* in the constitution and thus achieve consistency with the constitutions of other states. See Proceedings of the Connecticut Constitutional Convention (1965), Pt. 3, pp. 1039–40, remarks of Bernstein. In fact, there is nothing in the recorded history of the 1965 convention to suggest that the framers wanted to end the tradition of local control of education by granting the courts authority to determine how the principle of a free public education should be implemented. If that had been the framers' intent, they would not have used specific language delegating such authority to the legislature. Indeed, cases interpreting the power of the state and local boards of education following adoption of article eighth, § 1, never have questioned the constitutionality of the statutory scheme or the authority of the legislature or the boards to determine the content of a suitable educational opportunity or an appropriate learning environment. I thus fail to compre-

hend how a majority of this court can peruse our case law, the statutory framework and the history of the constitutional convention without concluding that the legislature and local boards have been delegated exclusive authority to implement the constitutional mandate of providing children with a free public education.

Nevertheless, the plurality, after failing to find any textual support in the constitution, claims that the principle articulated in *Sheff* that courts may enforce the constitutional right to substantially equal education opportunities also governs in the present case because our holding in *Sheff* "does not refer specifically to the [state] constitution's equal protection provisions, and relies expressly on the 'appropriate legislation' clause from article eighth, § 1, to justify judicial examination of [education] statutes." Footnote 18 of the plurality opinion. The plurality, however, adopts an extraordinarily broad interpretation of *Sheff* and ignores the fact that the court's holding in *Sheff* was intended to resolve the claim, raised in the state's affirmative defense, that "the text of article eighth, § 1, deprives the trial court of jurisdiction to consider whether the plaintiffs are entitled to relief by way of an order to the legislature to provide a remedy for their impaired educational opportunities"; *Sheff* v. *O'Neill*, supra, 238 Conn. 12; the impairment being that the state did not satisfy the constitutional mandate of providing "substantially *equal* educational opportunit[ies] . . . ." (Emphasis added.) Id., 14. Thus, the plurality ignores the court's observation in *Sheff* that the claim of nonjusticiability had been raised "[i]n the context of judicial enforcement of the right to a substantially equal educational opportunity arising under article eighth, § 1, and article first, §§ 1[9] and 20[10] . . . ." Id. The court explained that

[9] Article first, § 1, of the Connecticut constitution provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[10] Article first, § 20, of the Connecticut constitution provides: "No person shall be denied the equal protection of the law nor be subjected to segrega-

it had reviewed similar claims involving inequities in educational opportunities in *Horton I* and *Horton III*, and that the defendants in *Sheff* had not challenged the continued vitality of those two cases but had argued that their claim of nonjusticiability was distinguishable. Id. The court disagreed with the defendants, however, stating that the plaintiffs had "invoke[d] the *same* constitutional provisions [concerning equality and education] to challenge the constitutionality of state action that the plaintiff schoolchildren [had] invoked in *Horton I* and *Horton III*";[11] (emphasis added) id., 14–15; and that our decisions in *Horton I* and *Horton III* had been reaffirmed in *Nielsen* v. *State*, supra, 236 Conn. 9–10, and *Pellegrino* v. *O'Neill*, supra, 193 Conn. 683. *Sheff* v. *O'Neill*, supra, 14. Only then did the court state that the phrase "appropriate legislation" in article eighth, § 1, did not preclude it from determining what was "appropriate" in that case, plainly referring to the court's constitutional duty to review whether the legislature had fulfilled its obligation to provide children who attend the state's public schools with substantially equal educational opportunities. Id., 15. The court concluded with the observation that "our *precedents* compel the conclusion that the balance must be struck in favor of the justiciability of the plaintiffs' complaint."[12] (Emphasis added.) Id., 16.

---

tion or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

Article first, § 20, has been amended by articles five and twenty-one of the amendments, which added sex and disability, respectively, to the list of protected classes.

[11] In *Sheff*, the plaintiffs claimed, inter alia, that the Hartford public school district, in comparison to surrounding suburban school districts, had failed to provide equal educational opportunities for Hartford schoolchildren. *Sheff* v. *O'Neill*, supra, 238 Conn. 5–6.

[12] In *Sheff*, we explicitly acknowledged that the constitutional underpinnings of *Horton I* and *Horton III* were the same when we stated: "The defendants do not challenge the continued validity of *Horton I* and *Horton III* . . . but argue that their claim of nonjusticiability differs. That argument is unavailing. The plaintiff schoolchildren in the present case invoke the *same constitutional provisions* to challenge the constitutionality of state

The language in *Sheff* thus demonstrates, without question, that the court did not reject the defendants' affirmative defense on the ground that article eighth, § 1, permits the judicial branch to consider whether the General Assembly has enacted "appropriate legislation" in *all* cases arising under that provision, as the plurality declares. *Sheff* merely determined that the "appropriate legislation" language in article eighth, § 1, does not prevent the courts from adjudicating claims involving inequities in educational opportunities similar to the claims that the court addressed in *Horton I* and *Horton III*. Indeed, the only logical explanation for the court's repeated references to the *Horton* decisions is that it wished to reaffirm their continued precedential value in similar cases involving claims alleging unequal educational opportunities.

The plurality asserts that, because *Sheff* did not refer specifically to the constitution's equal protection provisions in its holding on article eighth, § 1, it intended to endorse judicial review of issues relating to public education generally that do not implicate equal protection concerns. The *Sheff* holding, however, merely repeated language used in the defendants' affirmative defense, in which they argued that the "text of article eighth, § 1," deprived the court of jurisdiction to consider the relief that the plaintiffs requested under both the equal protection and education provisions of our state constitution. Id., 12. Moreover, the court interpreted the provision only after specifying that it was doing so "[i]n light of these precedents" involving inequalities in educational opportunities. Id., 15. In relying on *Sheff* to permit judicial review of education adequacy claims, the plurality expands the principles articulated in *Sheff* far beyond their stated meaning.

action that the plaintiff schoolchildren invoked in *Horton I* and *Horton III*." (Emphasis added.) *Sheff* v. *O'Neill*, supra, 238 Conn. 14–15.

The arguments made by the parties in *Sheff* further illustrate this point. In their brief to this court, the defendants contended that the plaintiffs' claims were nonjusticiable under article eighth, § 1, because the "appropriate legislation" language committed the issues that the plaintiffs raised to the legislature. *Sheff* v. *O'Neill*, Conn. Supreme Court Records & Briefs, September Term, 1995, Pt. 4B, Defendants' Brief p. 75. The plaintiffs countered that the defendants' characterization of their claims as resting on "article eighth, § 1, in isolation" was incorrect because the complaint had "*conjoin[ed]* the guarantee of free public elementary and secondary schools with article first, §§ 1 and 20, which promise 'equal rights' to public benefits and privileges and which condemn 'segregation and discrimination.'" (Emphasis added.) *Sheff* v. *O'Neill*, Conn. Supreme Court Records & Briefs, September Term, 1995, Pt. 4C, Plaintiffs' Reply Brief p. 18. The plaintiffs further explained that article eighth, § 1, must be read "in pari materia" with article first, §§ 1 and 20, to establish "a 'basic and fundamental right' . . . to a 'substantially equal educational opportunity.'" (Citation omitted.) Id. The plaintiffs in *Sheff* thus took great pains to clarify that they viewed the "appropriate legislation" language of article eighth, § 1, in the context of their right to equal protection enumerated in article first, §§ 1 and 20, as this court did in the opinion that followed. Consequently, the plurality's construction of *Sheff* to mean that all claims arising under article eighth, § 1, are justiciable represents a significant and unwarranted departure from *Sheff* that the court in that case could not have contemplated.

The plurality attempts to bolster its strained reading of *Sheff* to mean that educational issues arising under article eighth, § 1, are not textually committed to the legislature by resorting to a footnote in that opinion in which the court states that other jurisdictions "over-

whelmingly" have determined that "the judiciary has a constitutional duty to review whether the legislature has fulfilled its obligation." *Sheff* v. *O'Neill*, supra, 238 Conn. 15 and n.18. The court, however, could not have intended to establish a principle of general reviewability of all education claims arising under article eighth, § 1, when it cited cases from our sister states because the claim before our court was the far narrower one of whether the plaintiffs had been deprived of "substantially equal educational opportunit[ies] . . . ." Id., 6. The plurality thus takes that footnote out of context[13] and applies its reasoning to an entirely different factual and legal scenario. In other words, rather than interpret the statement in the footnote in the context of the claims made in *Sheff*, the plurality elects to untether the comment and make it a statement of general applicability. Moreover, it is absurd to attribute such a major change in our interpretation of article eighth, § 1, to a comment in a footnote referring to cases from other jurisdictions, especially when the footnote does not make it absolutely clear that that was the court's intent. Accordingly, although the plurality relies on footnote 18 in *Sheff*, which, in any event, is nothing more than dictum, I submit that the footnote sheds no light on the meaning of article eighth, § 1. The only conclusion that can be

---

[13] Significantly, one of the cases involved a claim brought *solely* under the equal protection provision of that state's constitution; see *Washakie County School District Number One* v. *Herschler*, 606 P.2d 310, 315–16, 332 (Wyo.) (reviewing claim that school funding system failed to provide equal educational opportunity and thus was in violation of equal protection clause of Wyoming constitution), cert. denied sub nom. *Hot Springs County School District Number One* v. *Washakie County School District Number One*, 449 U.S. 824, 101 S. Ct. 86, 66 L. Ed. 2d 28 (1980); and another case involved a de facto equal protection claim brought under the "thorough and efficient" education clause of that state's constitution only to avoid the possibility of an appeal to the United States Supreme Court. J. Lichtenstein, note, "*Abbott v. Burke*: Reaffirming New Jersey's Constitutional Commitment to Equal Educational Opportunity," 20 Hofstra L. Rev. 429, 439–40 n.42 (1991); see *Robinson* v. *Cahill*, 69 N.J. 133, 140, 147, 351 A.2d 713, cert. denied sub nom. *Klein* v. *Robinson*, 423 U.S. 913, 96 S. Ct. 217, 46 L. Ed. 2d 141 (1975).

drawn from the footnote is that the court in *Sheff* simply was recognizing that other courts also have determined that constitutional claims involving education are justiciable when the provision or provisions implicated, like the "conjoin[ed]" equal protection and education provisions in *Sheff*; *Sheff* v. *O'Neill,* Conn. Supreme Court Records & Briefs, September Term, 1995, Pt. 4C, Plaintiffs' Reply Brief p. 18; or the equal protection provision in the Wyoming constitution, permit judicial review.

The plurality subsequently concludes that certain cases that the defendants cite, in which other jurisdictions have deemed education adequacy claims nonjusticiable, are inapplicable in the present case because they do not involve constitutional language similar to the "appropriate legislation" language contained in article eighth, § 1. See *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles,* 680 So. 2d 400, 405 (Fla. 1996) ("[a]*dequate provision* shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require" [emphasis in original; internal quotation marks omitted]), quoting Fla. Const., art. IX, § 1; *Nebraska Coalition for Educational Equity & Adequacy* v. *Heineman,* 273 Neb. 531, 535, 731 N.W.2d 164 (2007) ("[r]eligion, morality, and knowledge . . . being essential to good government, it shall be the duty of the Legislature to pass *suitable* laws . . . to encourage schools and the means of instruction," and "[t]he Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years" [emphasis added; internal quotation marks omitted]), quoting Neb. Const., art. I, § 4, and art. VII, § 1; and *Oklahoma Education Assn.* v. *State ex rel. Oklahoma Legislature,* 158 P.3d 1058, 1062 nn.6 and 8 (Okla. 2007) ("[p]rovisions shall be made for the

establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control; and said schools shall always be conducted in English: Provided, that nothing herein shall preclude the teaching of other languages in said public schools," and "[t]he Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated" [internal quotation marks omitted]), quoting Okla. Const., art. I, § 5, and art. XIII, § 1. A review of the constitutional provisions of such states nevertheless suggests that the Connecticut constitutional provision, which contains no qualitative language, is textually closer to those of states that do not permit judicial review of such matters than to those of states that do.

In sum, the plaintiffs' claims are nonjusticiable under the first *Baker* factor because there is no enumerated constitutional right to a suitable or a minimum standard of education, and there is a textually demonstrable commitment of issues concerning education to the General Assembly as part of its express obligation under the constitution to enact legislation to provide Connecticut schoolchildren with a free public education. This court has stated that, "[i]n dealing with constitutional provisions we must assume that infinite care was employed to couch in scrupulously fitting language a proposal aimed at establishing or changing the organic law of the state. . . . Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution." (Citations omitted.) *Stolberg* v. *Caldwell*, supra, 175 Conn. 597–98. The delegates to the 1965 constitutional convention established the right to a free public education and, in unambiguous language, assigned its implementation to the legislature, not the courts.

## B

### Lack of Judicially Discoverable and Manageable Standards

I also disagree with the plurality that the second *Baker* factor poses no obstacle to judicial review because "[t]here are easily discoverable and manageable judicial standards for determining the merits of the plaintiffs' claim[s]." (Internal quotation marks omitted.) As I previously discussed, the constitution provides no qualitative or substantive standards regarding the type of public education to be provided to Connecticut schoolchildren, and there is nothing in the historical record indicating that the delegates to the 1965 constitutional convention considered such standards. The majority nonetheless concludes that *Seymour* v. *Region One Board of Education*, supra, 261 Conn. 475, and *Horton I* govern our resolution of this question because the plaintiffs merely request a declaration of a constitutional violation,[14] "with the precise remedy being left to the defendants in the first instance." Part I of the plurality opinion; see *Seymour* v. *Region One Board of Education*, supra, 484; *Horton* v. *Meskill*, supra, 172 Conn. 650–51. Consequently, the plurality asserts that the requested remedies will not "turn a trial judge into a de facto education superintendent . . . ." The complaints in *Seymour* and *Horton I*, however, are distinguishable.

The principal issue before the court in *Seymour* and *Horton I* was the constitutionality of school financing legislation under one or more of the due process and equal protection provisions of the state and federal constitutions. See *Seymour* v. *Region One Board of*

---

[14] The plaintiffs' complaint requests, inter alia, that "[t]he [trial] [c]ourt order [the] defendants to create and maintain a public education system that will provide suitable and substantially equal educational opportunities to [the] plaintiffs."

*Education*, supra, 261 Conn. 479–80 (involving claim that statutory formula set forth in General Statutes § 10-51 [b] for financing public education in regional school districts deprived plaintiff taxpayers of state and federal constitutional rights to due process and equal protection because tax burden per student fell more heavily on taxpayers in some communities than similarly situated taxpayers in surrounding communities); *Horton* v. *Meskill*, supra, 172 Conn. 618, 649 (involving claim that state system of public education financing violated equal protection provisions of state constitution and was not constitutionally mandated "appropriate legislation," under article eighth, § 1, to implement requirement that state provide substantially equal educational opportunity to students in free public elementary and secondary schools). In contrast, the principal issue in the present case is whether Connecticut schoolchildren have a right to a suitable education, which does not implicate the state constitution's equal protection provisions.[15] This distinction is significant because the nature of a claim determines the difficulty of developing the judicial standards required to resolve it.

Courts are uniquely qualified to determine issues of equality and particularly unqualified to determine minimum educational standards. In *Baker*, the United States Supreme Court emphasized that "[j]udicial standards under the [e]qual [p]rotection [c]lause are well developed and familiar, and it has been open to courts since the enactment of the [f]ourteenth [a]mendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action."[16] *Baker* v. *Carr*, supra, 369 U.S. 226.

---

[15] Although two of the plaintiffs' three stricken claims are also brought under the equal protection provisions of the state constitution, the disputed issue in all three claims is the alleged right of the plaintiffs to a suitable education.

[16] The court in *Baker* nonetheless did not presume that *all* equal protection claims would be justiciable, noting that "it must be clear that the [f]ourteenth [a]mendment claim is not so enmeshed with those political question ele-

Thus, equity claims in school funding cases are often decided under the rational basis test. See, e.g., *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 44, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973); *Pawtucket* v. *Sundlun*, 662 A.2d 40, 60 (R.I. 1995); see also R. Levy, "Gunfight at the K-12 Corral: Legislative vs. Judicial Power in the Kansas School Finance Litigation," 54 U. Kan. L. Rev. 1021, 1052 (2006); cf. *Lobato* v. *State*, 218 P.3d 358, 362–63 (Colo. 2009) (combining elements of traditional equal protection and adequacy analysis, and concluding that challenge to "the adequacy of [the state's] public school funding system" is justiciable and that courts are responsible for reviewing funding scheme to determine if it is rationally related to legislature's constitutional mandate to provide " 'a thorough and uniform' " system of public education in accordance with legislature's own pronouncements).

In Connecticut, educational financing legislation is strictly scrutinized under the equal protection clause pursuant to a three part test designed to evaluate whether the financing plan, as a whole, supports the policy of "providing significant equalizing state support to local education."[17] *Horton* v. *Meskill,* supra, 195 Conn. 38. The claim that Connecticut schoolchildren have a right to a "suitable" education, however, does not implicate the equal protection provisions of our state constitution and will require the court to articulate

---

ments which render [related] claims nonjusticiable as actually to present a political question itself." *Baker* v. *Carr,* supra, 369 U.S. 227.

[17] We articulated the test in *Horton III* as follows: "First, the plaintiffs must make a prima facie showing that disparities in educational expenditures are more than de minimis in that the disparities continue to jeopardize the plaintiffs' fundamental right to education. If they make that showing, the burden then shifts to the state to justify these disparities as incident to the advancement of a legitimate state policy. If the state's justification is acceptable, the state must further demonstrate that the continuing disparities are nevertheless not so great as to be unconstitutional." *Horton* v. *Meskill,* supra, 195 Conn. 38.

qualitative standards defining a minimum quality of education. This is a complicated task heavily laden with policy implications that courts are ill equipped to handle, a conclusion shared by many other jurisdictions. See, e.g., *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles*, supra, 680 So. 2d 406–408 ("While the courts are competent to decide whether or not the [l]egislature's distribution of state funds to complement local education expenditures results in the required uniform system, the courts cannot decide whether the [l]egislature's appropriation of funds is adequate in the abstract, divorced from the required uniformity. To decide such an abstract question of adequate funding, the courts would necessarily be required to subjectively evaluate the [l]egislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them. . . . The judiciary must defer to the wisdom of those who have carefully evaluated and studied the social, economic, and political ramifications of this complex issue—the legislature. . . . [T]here are no judicially manageable standards available to determine adequacy. . . . [T]he phrase uniform has manageable standards because by definition this word means a lack of substantial variation. By contrast . . . [the term] adequacy simply does not have such straightforward content." [Citations omitted; internal quotation marks omitted.]); *Lewis E.* v. *Spagnolo*, 186 Ill. 2d 198, 209, 710 N.E.2d 798 (1999) ("No matter how the question is framed, recognition of the plaintiffs' cause of action under the education article would require the judiciary to ascertain from the constitution alone the content of an 'adequate' education. The courts would be called [on] to define what minimal standards of education are required by the constitution, under what conditions a classroom, school, or district falls below these minimums so as to constitute a 'virtual absence of educa-

tion,' and what remedy should be imposed. . . . [T]hese determinations are for the legislature, not the courts, to decide."); *Nebraska Coalition for Educational Equity & Adequacy* v. *Heineman,* supra, 273 Neb. 553 ("It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise . . . . Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion. To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals . . . . In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the [s]tate and their elected representatives." [Internal quotation marks omitted.]); see also J. Elson, "Suing to Make Schools Effective, or How to Make a Bad Situation Worse: A Response to Ratner," 63 Tex. L. Rev. 889, 904–905 (1985) ("Ordering schools to become more effective poses unique problems because no one knows how to force educators to make students learn. . . . The methods for making ineffective schools effective . . . are neither direct nor objective, because they must affect students' minds through the medium of educator behavior. Before a successful remedy can be constructed, certain now-mysterious causal relations must be understood: how teacher behavior affects learning, how school administration affects teacher behavior, and how the implementation of school reforms affects school administration and teacher behavior.").

Moreover, some jurisdictions that have assumed the challenge have become bogged down for years in endless litigation because there are no easily identifiable judicial standards by which to measure whether children are receiving a suitable education. Among the most compelling examples of what may happen in the absence of judicial standards is the state of New Jersey. After the New Jersey Supreme Court struck down the state's education funding system in *Robinson* v. *Cahill*, 62 N.J. 473, 515–20, 303 A.2d 273 (1973) (*Robinson I*), because it failed to comply with the constitutional mandate of providing students with a "thorough and efficient"[18] education; id., 520; the court found itself embroiled in the controversy for years thereafter as it tried to avoid imposing judicial standards and as the legislature struggled to develop a means of eliminating disparities in education expenditures among districts with vastly different resources.[19] In *Robinson I*, the court first interpreted the "thorough and efficient" clause; see footnote 18 of this opinion; to mean the

---

[18] The New Jersey constitution provides in relevant part: "The Legislature shall provide for the maintenance and support of a *thorough and efficient* system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." (Emphasis added.) N.J. Const., art. VIII, § IV, para. 1.

[19] The court did not rule that the system violated the equal protection clause of either the state or the federal constitution because the United States Supreme Court had rejected an equal protection challenge to the Texas public school funding scheme in *San Antonio Independent School District* v. *Rodriguez*, supra, 411 U.S. 28, 37, 55 (ruling that Texas public school funding scheme was constitutional because, inter alia, claim did not involve fundamental right or suspect class). As one commentator observed: "[T]he New Jersey Supreme Court [in *Robinson I*] modified the constitutional basis of the lower court's ruling in order to shield its decision from any possible hostile review by the United States Supreme Court. . . . [T]he New Jersey Supreme Court [thus] became the first in the nation to base its opinion that the state's system of funding public schools was unconstitutional *solely* upon the [education provision of the] state constitution." (Citations omitted; emphasis in original.) J. Lichtenstein, note, "*Abbott v. Burke*: Reaffirming New Jersey's Constitutional Commitment to Equal Educational Opportunity," 20 Hofstra L. Rev. 429, 439–40 n.42 (1991).

"educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market." *Robinson v. Cahill*, supra, 62 N.J. 515. The court then decided that the legislature had not provided all students with a "thorough and efficient" education solely on the basis of the gross disparities in expenditures between wealthier and poorer districts because it had "been shown no other viable criterion for measuring compliance with the constitutional mandate." Id., 515–16. Lacking any standards to shape a proper judicial remedy, the court ordered the legislature to do so and then postponed issuance of the order for nearly eighteen months to give the legislature a reasonable opportunity to comply with the constitutional directive. *Robinson v. Cahill*, 63 N.J. 196, 198, 306 A.2d 65, cert. denied sub nom. *Dickey v. Robinson*, 414 U.S. 976, 94 S. Ct. 292, 38 L. Ed. 2d 219 (1973). When the legislature failed to act, the court extended the deadline. See *Robinson v. Cahill*, 67 N.J. 35, 36–37, 335 A.2d 6 (1975). In the continuing absence of legislative action, the court finally issued an order to redistribute $300 million in state funds to achieve greater conformity with the constitutional mandate, but, still hoping to avoid imposing a judicial solution, the court delayed the order's effective date approximately four months to give the legislature additional time to enact remedial legislation. See *Robinson v. Cahill*, 69 N.J. 133, 144 n.4, 146–50, 351 A.2d 713, cert. denied sub nom. *Klein v. Robinson*, 423 U.S. 913, 96 S. Ct. 217, 46 L. Ed. 2d 141 (1975). The legislature finally responded with the Public School Education Act of 1975 (act), c. 212, 1975 N.J. Laws 871, which was intended to reduce gross disparities in education expenditures among the districts and which the court found "constitutional on its face . . . assuming it [was] fully funded." *Robinson v. Cahill*, 69 N.J. 449, 467, 355 A.2d 129 (1976). When the act was not fully funded, the court enjoined state

and local officials from distributing *any* funds, with a few limited exceptions, beginning July 1, 1976, if the legislature did not provide full funding for the act by that date. See *Robinson* v. *Cahill*, 70 N.J. 155, 159–61, 358 A.2d 457, modified, 70 N.J. 464, 360 A.2d 400 (1976). The legislature finally passed legislation imposing the state's first income tax to provide the required funding, and the court dissolved the injunction. See *Robinson* v. *Cahill*, 70 N.J. 465, 360 A.2d 400 (1976).

After the *Robinson* cases, in which the court repeatedly gave the legislature additional time to act because it was reluctant to develop its own constitutionally based standards, there followed another line of cases in a still ongoing controversy challenging the constitutionality of the school funding formula and its ability to provide a "thorough and efficient education" for disadvantaged students living in "property-poor school districts" with special needs. *Abbott ex rel. Abbott* v. *Burke*, 100 N.J. 269, 279, 495 A.2d 376 (1985); see also *Abbott ex rel. Abbott* v. *Burke*, 117 N.J. 51, 563 A.2d 818 (1989); *Abbott ex rel. Abbott* v. *Burke*, 119 N.J. 287, 575 A.2d 359 (1990); *Abbott ex rel. Abbott* v. *Burke*, 136 N.J. 444, 643 A.2d 575 (1994); *Abbott ex rel. Abbott* v. *Burke*, 149 N.J. 145, 693 A.2d 417 (1997); *Abbott ex rel. Abbott* v. *Burke*, 153 N.J. 480, 710 A.2d 450 (1998); *Abbott ex rel. Abbott* v. *Burke*, 163 N.J. 95, 748 A.2d 82 (2000); *Abbott ex rel. Abbott* v. *Burke*, 164 N.J. 84, 751 A.2d 1032 (2000); *Abbott ex rel. Abbott* v. *Burke*, 170 N.J. 537, 790 A.2d 842 (2002); *Abbott ex rel. Abbott* v. *Burke*, 172 N.J. 294, 798 A.2d 602 (2002); *Abbott ex rel. Abbott* v. *Burke*, 177 N.J. 578, 832 A.2d 891 (2003), modified, 182 N.J. 153, 862 A.2d 538 (2004); *Abbott ex rel. Abbott* v. *Burke*, 177 N.J. 596, 832 A.2d 906 (2003); *Abbott ex rel. Abbott* v. *Burke* 185 N.J. 612, 889 A.2d 1063 (2005); *Abbott ex rel. Abbott* v. *Burke*, 187 N.J. 191, 901 A.2d 299 (2006); *Abbott ex rel. Abbott* v. *Burke*, 193 N.J. 34, 935 A.2d 1152 (2007); *Abbott ex rel. Abbott* v. *Burke*, 196 N.J. 451, 956 A.2d 923 (2008);

*Abbott ex rel. Abbott* v. *Burke*, 196 N.J. 544, 960 A.2d 360 (2008); *Abbott ex rel. Abbott* v. *Burke*, 199 N.J. 140, 971 A.2d 989 (2009). In these cases, the court considered various definitions of a "thorough and efficient" education as applied to students in the state's poorer districts, constantly revising and redefining the concept. See J. Lichtenstein, note, "*Abbott v. Burke*: Reaffirming New Jersey's Constitutional Commitment to Equal Educational Opportunity," 20 Hofstra L. Rev. 429, 473–75 (1991). The court ultimately moved away from its original definition in *Robinson I*, pursuant to which the goal had been to reduce significant disparities in state funding among the districts; *Robinson* v. *Cahill*, supra, 62 N.J. 515–16; and gravitated toward a broader definition that considered educational outputs and resulted in greater funding for poorer districts with large numbers of disadvantaged students who "must be given a chance to be able to compete with relatively advantaged students." *Abbott ex rel. Abbott* v. *Burke*, supra, 119 N.J. 313; see also J. Lichtenstein, supra, 474. The *Abbott* litigation is still in progress as a special master considers on remand whether the "special needs of disadvantaged students can be met sufficiently" through the application of the state's most recent funding formula. *Abbott ex rel. Abbott* v. *Burke*, supra, 199 N.J. 190.

Reacting with alarm to the proceedings in New Jersey, the Rhode Island Supreme Court noted in *Pawtucket* v. *Sundlun*, supra, 662 A.2d 40, that, in attempting to define what constitutes the "thorough and efficient" education specified in the New Jersey constitution, "the New Jersey Supreme Court has struggled in its self-appointed role as overseer of education for more than twenty-one years, consuming significant funds, fees, time, effort, and court attention. The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a [l]egislature." Id., 59. Hoping

to avoid a "morass comparable to the decades-long struggle [in New Jersey]"; id.; the Rhode Island Supreme Court declined to adopt the lower court's holding that the Rhode Island constitution required an "equal, adequate and meaningful education . . . ." (Internal quotation marks omitted.) Id., 55, 58.

When the Kansas Supreme Court chose to follow the path taken by New Jersey, it found itself facing similar problems for the exact same reason, namely, the lack of objective, quantifiable judicial standards. What later was described as a "constitutional confrontation"; R. Levy, supra, 54 U. Kan. L. Rev. 1021; began in earnest when the Kansas Supreme Court ruled in *Montoy* v. *State*, 278 Kan. 769, 771, 773, 102 P.3d 306 (2005), that the state's school financing system was unconstitutional because it violated the mandate in the Kansas constitution that "[t]he legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools"; Kan. Const., art. 6, § 1; and by making "suitable provision for finance of the educational interests of the state. . . ." Id., art. 6, § 6 (b). Rejecting the plaintiffs' claim that the then existing school funding scheme raised equal protection concerns, the court in *Montoy* concluded that an equitable and fair distribution of funding was required to provide an opportunity for every student to obtain the constitutionally mandated suitable education to which he or she was entitled. *Montoy* v. *State*, supra, 773. Just as the New Jersey court had done in the *Robinson* case, however, the Kansas court declined to develop its own standards and relied instead on the legislature, which commissioned an independent study "to define the level of performance for which funding must be provided." R. Levy, supra, 1052. As a consequence of that decision, the legislature enacted school finance legislation that appropriated approximately $142 million of additional

funding for education and changed the funding formula. Id., 1022. The Kansas Supreme Court ruled that the new legislation did not remedy the constitutional violation, however, and, relying on the independent study, the court ordered the legislature to implement a minimum increase of $285 million above the funding level for the 2004–2005 school year, which included the $142 million of additional funding already contemplated in the existing legislation. *Montoy* v. *State*, 279 Kan. 817, 840, 845, 112 P.3d 923 (2005). As a result of that order, the legislature was called back into a "very contentious special session"; R. Levy, supra, 1022; during which unsuccessful efforts were made to amend the constitution or to reject *Montoy* v. *State*, supra, 279 Kan. 817. R. Levy, supra, 1023. Ultimately, the legislature enacted a multiyear plan that increased school funding by approximately $466 million. Id., 1023–24. In *Montoy* v. *State*, 282 Kan. 9, 138 P.3d 755 (2006), the court subsequently held that the latest school finance legislation substantially complied with its prior orders, noting that the legislature will have provided annual increased funding by the 2008–2009 school year of $755.6 million over that provided in the 2004–2005 school year; id., 19, 22; and that the funds had been allocated in a manner that satisfied the court's concerns regarding at-risk students, special education students and medium and large school districts. Id., 21–22.

The difficulty of developing standards in the present case is brought into stark relief by the plaintiffs' complaint, which, as I previously noted, describes the "essential components of a suitable educational opportunity" in vague generalities, such as "appropriate" class sizes, "highly qualified" administrators and teachers, an "adequate" number of hours of instruction and a "rigorous" curriculum with a "wide breadth" of courses,[20] and proposes to measure whether a suitable

---

[20] Many have observed that student achievement is not merely a function of what takes place at school, but is also influenced by economic, social,

education has been attained by evaluating student achievement, a concept that is far removed from the plain meaning of article eighth, § 1, and is devoid of any substantive content. I would suggest that the court is not equipped to evaluate these "inputs" and "outputs" or to provide them with the content now lacking to determine whether Connecticut schoolchildren are being provided with an adequate education. The plurality nevertheless dismisses such concerns, stating that the plaintiffs' complaint is similar to the complaints in *Seymour* and *Horton I* because it seeks, among other remedies, declaratory relief, "with the precise remedy being left to the defendants in the first instance." The plurality also observes that "the plaintiffs' claims at this stage [of the proceedings] present nothing more than a basic question of constitutional interpretation"; part I of the plurality opinion; and that it "will not let premature, and perhaps unfounded, concerns about the crafting of a remedy deprive the plaintiffs of their day in

cultural and other factors, some unknown and perhaps unknowable, beyond the control of the educational system. See J. Simon-Kerr & R. Sturm, "Justiciability and the Role of Courts in Adequacy Litigation: Preserving the Constitutional Right to Education," 6 Stan. J. C.R. & C.L. 83, 110 and n.125 (2010) (courts increasingly skeptical that greater funding will produce constitutionally adequate school systems when children are exposed to negative home environment). Thus, in seeking to elevate to the status of a constitutional right a minimum level of achievement for every student, the plaintiffs ask our schools to perform an impossible task. As the current President of the United States, Barack Obama, recently explained in an address before a joint session of Congress: "[E]ducation policies will open the doors of opportunity for our children. But it is up to us to ensure they walk through them. In the end, there is no program or policy that can substitute for a mother or father who will attend those parent-teacher conferences, or help with homework after dinner, or turn off the TV, put away the video games, and read to their child. I speak to you not just as a President, but as a father, when I say that responsibility for our children's education must begin at home." President Barack Obama, Address to Joint Session of Congress (February 24, 2009), available at http://www.whitehouse.gov/the-press-office/remarks-president-barack-obama-address-joint-session-congress (last visited March 9, 2010).

court." Footnote 22 of the plurality opinion. The plurality further suggests that, even if this court ultimately must adjudicate the substantive content of an adequate education, similar adequacy claims have been considered by our sister states, some of which have articulated standards that could serve as guideposts for Connecticut courts in determining when public schools have satisfied the constitutional mandate of a suitable education.

I find the plurality's assertion that it will not allow concerns about the crafting of a remedy to "deprive the plaintiffs of their day in court" remarkable in light of the fact that it is the existence of judicial standards, or lack thereof, that determines the court's ability to adjudicate a matter, including the crafting of an effective remedy. This goes to the heart of the doctrine of justiciability. The plurality's rationale effectively concedes that this court will be required at some point in the proceedings to define what a "suitable" education actually means if the defendants are unable to do so "in the first instance." This court, however, will not be able to declare, even "in the first instance," that the present system does *not* provide the plaintiffs with "suitable educational opportunities" without first adding substantive content to this presently vague and open-ended concept. We thus are asking the trial court to do what the plurality refuses to do, which is to define the constitutional parameters. Furthermore, educational standards cannot necessarily be borrowed from other states with different public needs and perceptions as to what a minimum quality of education entails because policy judgments regarding educational goals and methods and how to resolve competing claims for limited state resources are typically based on unique local factors that may not be relevant in other jurisdictions. Accordingly, there are no easily discoverable judicial standards available to guide this court in

determining whether Connecticut schoolchildren have been provided with a suitable education that guarantees certain predetermined outputs.

## C

### Nonjudicial Policy Determination

For many of the same reasons that I conclude that there is a textually demonstrable commitment of the issue to the legislature and a lack of judicially discoverable and manageable standards, I also conclude that the third *Baker* factor is implicated by the plaintiffs' claims, namely, the impossibility of resolving them without an initial policy determination of a kind clearly intended for nonjudicial discretion. See *Baker* v. *Carr*, supra, 369 U.S. 217. The plurality declares that deciding the plaintiffs' claims would not require the court to become involved in policy determinations regarding issues such as maximum class sizes or minimal technical specifications for classroom computers but that the judicial role would be limited to deciding whether selected public education systems, as presently constituted and funded, satisfy an articulated constitutional standard. The plurality, however, fails to provide even the faintest clue as to what that constitutional standard might be, just as it fails to recognize that, in order to determine whether a particular system is properly constituted and funded, the courts will be required to develop baseline criteria to make such comparisons possible, a task that most certainly will involve policy making because it will require decisions regarding the distribution of limited state resources and the balancing of competing political interests.

## D

### Lack of Respect for a Coordinate Branch of Government

The prudential considerations embodied in the final three *Baker* factors, which limit the challenges that a

court may hear, also counsel against justiciability in this case. Judicial intervention to resolve an issue with potentially vast financial consequences demonstrates a lack of respect for a coordinate branch of government because the court is treading on a constitutional prerogative of the legislature regarding education *and* the legislature's exclusive authority to appropriate funds.[21] As I previously noted, jurisdictions that have considered constitutional claims alleging that the state has failed to provide a suitable education have required the legislature to enact drastic increases in education funding to satisfy the constitutional mandate. For example, the Kansas legislature adopted a multiyear plan that increased the annual appropriation for education by several hundred million dollars over a period of four years to ensure that adequate funding would be available. See *Montoy* v. *State*, supra, 282 Kan. 19, 22. Similarly, the New Jersey legislature was compelled to institute the state's first income tax to provide increased school funding before the court would lift an injunction precluding state and local officials from distributing any funds for education until sufficient funding had been provided. See *Robinson* v. *Cahill*, supra, 70 N.J. 159–61. Court decisions that affect basic legislative functions such as funding thus pose challenges that have serious practical as well as philosophical implications for the separation of powers. As the Florida Supreme Court wisely observed, "[w]hile the courts are competent to decide whether or not the [l]egislature's distribution of state funds to complement local education expenditures results in the required uniform sys-

---

[21] Although there is no constitutional provision that vests the legislature with the power to make appropriations, we have stated that "[s]uch legislative power is readily inferrable from article fourth, § 22, [of the Connecticut constitution] concerning the duties of the state treasurer, who shall receive all monies belonging to the state, and disburse the same only as he may be directed by law." (Internal quotation marks omitted.) *Eielson* v. *Parker*, 179 Conn. 552, 561, 427 A.2d 814 (1980).

tem, the courts cannot decide whether the [l]egislature's appropriation of funds is adequate in the abstract, divorced from the required uniformity. To decide such an abstract question of adequate funding, the courts would necessarily be required to subjectively evaluate the [l]egislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them. In short, the [c]ourt would have to usurp and oversee the appropriations power, either directly or indirectly, in order to grant the relief sought by [the] [p]laintiffs." (Internal quotation marks omitted.) *Coalition for Adequacy & Fairness in School Funding, Inc.* v. *Chiles*, supra, 680 So. 2d 406–407.

In the present case, the named plaintiff, the Connecticut Coalition for Justice in Education Funding, Inc., commissioned a report published in 2005 estimating that $2.02 billion in additional funding, an annual increase of nearly 92 percent over actual school funding,[22] would have been required in the 2003–2004 school year to ensure that all school districts across the state had a reasonable chance of meeting the standards that the report deemed necessary to provide Connecticut schoolchildren with a suitable public education.[23] See

---

[22] According to the General Assembly's office of fiscal analysis, the annual appropriation for education other than higher education (i.e., public colleges and universities) for fiscal year 2004, which would cover the 2003–2004 school year, was approximately $2.2 billion, or approximately 16 percent of the gross annual budget of $13.8 billion. Office of Fiscal Analysis, Connecticut General Assembly, Connecticut State Budget 2003–2005, p. 13. This means that the $2.02 billion increase in funding for a purportedly adequate education proposed in the report commissioned by the named plaintiff would constitute a staggering 91.8 percent increase in school funding for that year, thus increasing the appropriation for education from approximately 16 percent to nearly 26.7 percent of the total state budget for the 2004 fiscal year.

[23] The plurality asserts that consideration of this report is premature because its content, which the plurality describes as consisting of "adjudicative, rather than legislative, facts," cannot be "subject to judicial notice without an opportunity for a hearing . . . ." Footnote 20 of the plurality opinion. The plurality misses the point; the report is relevant not because

Augenblick, Palaich & Associates, Inc., Estimating the Cost of an Adequate Education in Connecticut (June, 2005) p. v (report), available at http://www.schoolfunding.info/states/ct/CT-adequacystudy.pdf (last visited March 9, 2010). Even this astounding estimate may have been low, however, because it focused exclusively on operating rather than capital expenses and did not include the cost of enforcing similar standards in public institutions such as magnet and vocational schools, which also educate students. Id., p. ii. Moreover, the report notes that its figures will require adjustment for inflation to calculate costs in future years. Id., p. iii. Thus, the inescapable fact that emerges from the report is that the plaintiffs are asking this court to order the legislature to rearrange its spending priorities by increasing the annual appropriation for public elementary and secondary education by nearly 92 percent over the present level of funding in order to satisfy the constitutional mandate of providing Connecticut schoolchildren with a suitable education. This represents a significant reallocation of limited state resources, a function that normally rests with the legislature rather than the courts.

The situation in the present case is further complicated by the fact that none of the defendants has the power or authority to increase state funding for education.[24] The complaint does not name any members of

the facts contained therein are necessary to a judicial determination of the case but because the facts demonstrate that the plaintiffs *themselves* recognize that the remedy they seek will require a significant reallocation of limited state resources.

[24] To the extent that the plaintiffs' intent is merely to seek a redistribution of funds already appropriated by the legislature to the state department of education and the towns, it is unclear whether this can be accomplished without knowing which statutes have been violated and without naming the towns as defendants. Although the plaintiffs' failure to join the legislature and the towns as parties does not implicate the subject matter jurisdiction of the trial court or this court; see *Hilton* v. *New Haven*, 233 Conn. 701, 721, 661 A.2d 973 (1995); their participation in the proceedings would appear to be required to aid the court in determining the appropriate relief in the

the legislature as defendants. Also omitted from the list of defendants are the individual towns that potentially would be affected if the court deems their discretionary funds necessary for redistribution to satisfy the purported constitutional mandate of providing children with a suitable education. Accordingly, it is not clear how the court could order a funding increase as the complaint is presently structured.

E

Risk of Multifarious Pronouncements and
Unquestioning Adherence to
a Political Decision

In addition, judicial intervention would raise the possibility of "embarrassment from multifarious pronouncements" on educational matters as the courts and the legislature struggle to define and carry out their respective responsibilities. *Baker* v. *Carr*, supra, 369 U.S. 217. There is also an "unusual need for unquestioning adherence to a political decision already made"; id.; namely, the constitutional delegation of authority to the legislature to implement the principle of a free public education, for the obvious reason that to do otherwise would constitute a violation of the separation of powers and might even have the unfortunate effect of creating an adversarial relationship between the judicial and legislative branches. When the Kansas Supreme Court accepted a similar challenge, what subsequently occurred was described as "[a] dramatic and suspenseful showdown between two governmental heavyweights . . . [that] kept many Kansans gripping the edges of their seats as each new episode unfolded . . . [and that] set in motion a series of actions and reactions [the] repercussions [of which] have not yet been fully

event that the current school funding system is deemed unconstitutional under article eighth, § 1. See *Horton* v. *Meskill*, 187 Conn. 187, 198, 445 A.2d 579 (1982).

realized." R. Levy, supra, 54 U. Kan. L. Rev. 1021. This court should learn from what has happened in other jurisdictions and decline to shoulder a burden that clearly does not fall within the judicial domain and that, upon delegation to the courts, will turn judges into legislators.

Accordingly, because I conclude that the plaintiffs' claims are nonjusticiable, I respectfully dissent.